UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
SEATTLE DIVISION

CINDY CODONI and MICHELLE GREER, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

PORT OF SEATTLE, ALASKA AIR GROUP, and DELTA AIR LINES, INC.,

Defendants.

Case No. 2:23-cv-00795

NOTICE OF REMOVAL

**TO: Clerk of the Court**

**AND TO: Counsel of Record**

**PLEASE TAKE NOTICE** that, pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1331, 1332, 1441, 1446, 1453, and 1711, and 42 U.S.C. § 2210, Defendants Delta Air Lines, Inc. ("Delta") and Alaska Air Group, Inc.[1] ("Alaska") (collectively, the "Airline Defendants"), remove this action from the Superior Court of the State of Washington for King County, where it is pending, to the United States District Court for the Western District of Washington. The Port of Seattle (the "Port") consents to removal. A true and correct copy of this notice will be filed contemporaneously with the Clerk of the Superior Court of the State of

[1] Alaska Air Group, Inc., a holding company that does not own or operate any aircraft and did not engage in any of the conduct at issue in this suit, joins this removal without prejudice to its arguments that the company's subsidiary, Alaska Airlines, Inc., is the proper defendant in this case.

Washington for King County, and notice of removal will be provided to counsel of record for Plaintiffs. This Notice of Removal is supported by the Declarations of Malaika M. Eaton ("Eaton Decl."), Nicholas Scott ("Scott Decl."); and Jeffrey Elder ("Elder Decl.").

**I. INTRODUCTION**

On April 19, 2023, plaintiffs Cindy Codoni and Michelle Greer ("Plaintiffs") commenced this action by filing a Class Action Complaint, Cause No. 23-2-07049-6 SEA, in King County Superior Court. On April 21, 2023, Plaintiffs filed an Amended Class Action Complaint (the "Amended Complaint" or "Am. Compl."), which is attached to this Notice of Removal. The Amended Complaint alleges, on behalf of a putative class, that defendants Alaska, Delta and the Port harmed residents, homeowners, and renters within a five-mile radius of Seattle-Tacoma International Airport ("Sea-Tac" or "the Airport") through permitted emissions of pollutants from the Airline Defendants' aircraft. Am. Compl. ¶¶ 4, 51, 77–78. Plaintiffs allege that such emissions (which are alleged to include pollutants expelled in aircraft exhaust and particulate matter that flakes off aircraft fuselages as aircraft takeoff and land at Sea-Tac) are the result of the Airline Defendants' negligence, constitute a public nuisance, and have led to continuing intentional trespass upon putative class members' property. *Id.* ¶¶ 10–11, 51, 54–55. Plaintiffs also allege that, by permitting the Airline Defendants to operate at Sea-Tac, the Port inversely condemned the property of the putative subclass of people who rent or own residential property in the five-mile zone without compensation in violation of the Washington Constitution. *Id.* ¶¶ 12, 136–39.

Among other relief, the Amended Complaint seeks injunctive relief and/or damages "reflecting the cost to remediate" the putative class members' properties "of contamination," money damages for the alleged "loss of the use and enjoyment" of the putative class members' properties, and injunctive relief against the Airline Defendants in the form of a court-supervised medical monitoring program "to facilitate the diagnosis … [of] illnesses associated with exposure to airport-related pollution." *Id.* at Part VII ("Request for Relief").

## II. GROUNDS FOR REMOVAL

### A. REMOVAL IS PROPER BECAUSE THIS COURT HAS SUBJECT-MATTER JURISDICTION PURSUANT TO THE CLASS ACTION FAIRNESS ACT.

By passing the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §§ 1332(d), 1453, 1711–1715, Congress conferred on federal courts original jurisdiction over class actions where: (1) there are at least 100 members of the putative class; (2) the aggregate amount in controversy exceeds $5 million; (3) at least one defendant is a citizen of a state different from at least one putative class member (*i.e.*, minimal diversity); and (4) the primary defendants are not "States, State officials, or other governmental entities against whom the district court may be foreclosed from ordering relief." *Id.* § 1332(d)(2)(A), d(5)(A)–(B), and d(6). The requirements for this Court's exercise of CAFA jurisdiction are met. Removal of Cause No. 23-2-07049-6 SEA from King County Superior Court to this Court is proper.

#### 1. There are At Least 100 Putative Class Members.

To be eligible for removal under CAFA, a putative class must contain at least 100 members. 28 U.S.C. § 1332(d)(5)(B). The Amended Complaint seeks to certify a class of "all residents of the Contamination Zone," defined as the area within "a five-mile radius of the Airport." Am. Compl. ¶¶ 4, 96. Plaintiffs assert claims against the Airline Defendants on behalf of the proposed resident class. *Id.* at ¶¶ 107–114. Plaintiffs also propose a "Homeowner and Renter Subclass" to consist of "[a]ll current renters and owners of residential real property located in the Contamination Zone," *id.* ¶ 96, and assert various claims against Defendants on behalf of this subclass. *Id*. at Counts Two, Three, Four, and Five. Plaintiffs allege that "[n]early 300,000 people live within the Contamination Zone." *Id.* ¶ 4. It goes without saying that out of the 300,000 residents more than 100 are renters or homeowners. Based on the size and scope of Plaintiffs' putative class, there can be no reasonable dispute that there are at least 100 members of the putative class of residents and/or the subclass of homeowners and renters.

**2. The Aggregate Amount in Controversy Exceeds $5 Million.**

CAFA permits removal of a putative class action when the amount in controversy exceeds $5 million, exclusive of interest and costs, aggregated across class members' claims. 28 U.S.C. § 1332(d)(2). To satisfy CAFA, a defendant does not need to prove this amount with any specificity. *See Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 84 (2014) (explaining that a notice of removal "need not contain evidentiary submissions"). Instead, when the complaint does not allege a specific amount in controversy, a defendant can satisfy CAFA simply "based on reasonable assumption" without going "so far as to prove Plaintiff's case for him by proving the actual rates of violation." *Dawsey v. Travelers Indem. Co.*, No. 15-cv-05188, 2015 WL 4394545, at *2 (W.D. Wash. July 16, 2015).

Here, although the Amended Complaint does not precisely state what amount Plaintiffs are seeking on behalf of the putative class and sub-class, it is obvious that the amount in controversy exceeds $5 million.[2] The Amended Complaint alleges that residents within a five-mile radius of SeaTac have suffered personal and property damages from the alleged pollution of particulate matter from the Airline Defendants and seeks:

- Injunctive relief and/or an award of damages against all Defendants "reflecting the cost to remediate Plaintiffs' and Subclass members' properties of the contamination;"
- An award of monetary damages against the Airline Defendants "sufficient to compensate Plaintiffs and Subclass members for the loss of the use and enjoyment of their properties;" and
- An injunction ordering the Airline Defendants, among other things, to fund a Court-supervised trust fund for a medical monitoring program.

[2] The analysis included in this Notice is offered solely to establish that CAFA's amount-in-controversy requirement is reasonably met if the Amended Complaint's allegations are accepted as true. It is not an admission of any allegation in the Amended Complaint, an admission that class certification is appropriate, an admission as to the proper method for calculating damages, or an admission that Plaintiffs are entitled to any relief.

*See* Am. Compl. Request for Relief.

Given Plaintiffs' allegation that some "300,000 people live within the Contamination Zone," Am. Compl. ¶ 4, if each resident of the so-called Contamination Zone seeks just $100 in remediation, compensation, and medical monitoring expenses, the amount in controversy would be at least $30 million. In fact, the value of the medical monitoring program alone exceeds $5 million for the putative resident class of 300,000 people. Likewise, Plaintiffs' request for an award of damages "sufficient to compensate Plaintiffs and Subclass members for the loss of use and enjoyment of their properties" and complaint that the Port failed to "pay just compensation or formally acquire rights to the property" through eminent domain calls for quantification of property values. *See* Am. Compl. ¶¶ 135–139 & Prayer for Relief. Here, Plaintiff Codoni alleges she owns a home located at 17014 40th Avenue South in SeaTac. Am. Compl. ¶ 16. The King County Assessor's Office's appraised value of this property was $485,000 in 2022.[3] *See* Eaton Decl., Ex. A. Plaintiff Geer alleges that she owns a home located at 16238 11th Avenue Southwest in Burien. Am. Compl. ¶ 32. The King County Assessor's Office's appraised value of this property was $350,000. *See* Eaton Decl., Ex. B. Assuming the named Plaintiffs are representative of the putative class and subclass, the average appraised value of their property is $417,000. Just 12 members of a putative class or subclass seeking recovery for the appraised value of their property at an average of $417,000 would exceed the amount-in-controversy threshold of $5 million.

In sum, as with the size of the putative class, there can be no doubt that the amount in controversy in this matter exceeds $5 million.

---

[3] The Airline Defendants request that this Court take judicial notice of Exs. A–B to the Eaton Decl. Judicial notice is appropriate under Fed. R. Evid. 201, and Washington courts have expressly found that county public records such as these are appropriate for judicial notice. *Estate of McCartney v. Pierce County*, 22 Wn. App. 2d 665, 700, 513 P.3d 119 (2022) (courts may take judicial notice of county public records of undisputed authenticity).

**3. Minimum Diversity is Satisfied.**

CAFA allows for removal if any defendant is a citizen of a different state than any one class member. 28 U.S.C. § 1332(d)(2)(A). Here, the named plaintiffs are both Washington residents. Am. Compl. ¶¶ 15, 31. Delta is not a citizen of Washington for purposes of jurisdiction. Delta is a Delaware corporation with its principal place of business in Georgia. *Id.*, Eaton Decl., Ex. C (Georgia Secretary of State filing). For diversity purposes, a corporation is "deemed to be a citizen of every State and foreign state by which it has been incorporated and of the State or foreign state where it has its principal place of business." 28 U.S.C. § 1332(c)(1). A corporation's "principal place of business" is the corporation's "nerve center"—the place "where a corporation's officers direct, control, and coordinate the corporation's activities." *Hertz Corp. v. Friend*, 559 U.S. 77, 92–93 (2010). Delta maintains its corporate headquarters in Atlanta, Georgia. Its principal officers, including its Chief Executive Officer, likewise report to work at Delta's Atlanta headquarters. *See* Eaton Decl., Ex. C (providing business addresses of selected Delta corporate officers). Because CAFA only requires minimal diversity, removal is proper based on the citizenship of Delta alone. Accordingly, CAFA's minimal diversity requirement is satisfied.

**4. The Primary Defendants Are Not Governmental Entities.**

Removal is appropriate under CAFA because "the primary defendants" in the action are not "States, State officials, or other governmental entities against whom the district court may be foreclosed from ordering relief." 28 U.S.C. § 1332(d)(5)(A); *Serano v. 180 Connect, Inc.*, 478 F.3d 1018, 1020 n.3 (9th Cir. 2007) ("[S]atisfaction of § 1332(d)(5) serves as a prerequisite … to jurisdiction under § 1332(d)(2)."). As clarified in CAFA's legislative history, "[t]he purpose" of this provision "is to prevent states, state officials, or other governmental entities from dodging legitimate claims by removing class actions to federal court and then arguing that the federal courts are constitutionally prohibited from granting the requested relief." Sen. Rep. No. 109-14, 42 (2005). Here, however, the Port is a special-purpose municipal corporation, not a state, state official or state agency constitutionally immune from federal jurisdiction. Moreover, courts have

recognized that 28 U.S.C. § 1332(d)(5)(A) only bars removal where *all* of the primary defendants are "States, State officials, or other governmental entities against whom the district court may be foreclosed from ordering relief." *Woods v. Standard Ins. Co.*, 771 F.3d 1257, 1263 (10th Cir. 2014) ("The use of the definite article, 'the,' before the plural noun, 'primary defendants,' and the use of the plural verb, 'are,' leaves no doubt Congress intended the state action provision to preclude CAFA jurisdiction only when *all* of the primary defendants are states, state officials, or state entities."); *Frazier v. Pioneer Americas LLC*, 455 F.3d 542, 546 (5th Cir. 2006) ("The plain text of § 1332(d)(5)(A), using the definite article before the plural nouns, requires that all primary defendants be states. Had Congress desired the opposite, it would have used 'a' and the singular, or no article."); *see also, e.g.*, *Monaco v. W. Va. Parkways Auth.*, 57 F.4th 185, 190 n.5 (4th Cir. 2023) (noting that, in cases with mixed private and governmental primary defendants, "the limitation in § 1332(d)(5)(A) applies only when *all* primary defendants are 'States, State officials, or other governmental entities.'" (emphasis in original)).[4] As a result, there is no bar to removal here.

---

[4] Plaintiffs may assert that removal is barred under CAFA's narrow "local controversy" exception. To meet their burden of proving that the exception applies, Plaintiffs must establish, *inter alia*, that the "principal injuries resulting from the alleged conduct or any related conduct of each defendant were incurred in the State in which the action was originally filed[.]" 28 U.S.C. § 1332(d)(4)(A); *see also Busker v. Wabtec Corp*., 750 F.App'x 522, 523 (9th Cir. 2018). Plaintiffs' own allegations demonstrate that this is not the case. Plaintiffs challenge the purported emission of "pollutants. . . over local communities" adjacent to airports generally, a phenomenon that is not unique to Sea-Tac but, as Plaintiffs acknowledge, occurs at airports around the world. Am. Compl. ¶ 3; *see also id*. ¶¶ 72, 74. Further, the flight paths Plaintiffs fault for these emissions, *id*. ¶¶ 60–66, are set nationally by the FAA and require nationwide compliance. *See* 49 U.S.C. § 40103(b)(2)(A)–(C); 49 U.S.C. § 40102(a)(32); 14 C.F.R. § 91.123; 14 C.F.R. § 91.181. This is precisely the type of putative class action that CAFA intended to make removable to federal court. *See Faulk v. JELD-WEN, Inc.*, 3:22-cv-00171-JMK, 2023 WL 166909, at *5 (D. Alaska Jan. 12, 2023) (rejecting local controversy exception because "Plaintiffs' action is 'local only in the trivial and almost tautological sense that the definition of the putative class and the legal bases of the asserted claims make it so'"); *Brook v. UnitedHealth Grp., Inc.*, No. 06-cv-12954, 2007 WL 2827808, at *4 (S.D.N.Y. Sept. 27, 2007) (finding that the local controversy exception "does not apply to cases in which the defendants engaged in conduct that 'could be alleged to have injured [persons] throughout the country or broadly throughout several states'") (internal quotation marks and citation omitted).

**B. REMOVAL IS PROPER BECAUSE THIS COURT HAS SUBJECT-MATTER JURISDICTION PURSUANT TO 28 U.S.C. § 1331.**

The Court also has federal question jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims directly implicate the regulations and rulemaking of the Federal Aviation Administration ("FAA") under the Federal Aviation Act, 49 U.S.C. § 40101, *et seq*.

The Supreme Court has recognized that federal question jurisdiction exists over claims asserted under state law if the state law claims implicate substantial federal questions. *Grable & Sons Metal Prods., Inc. v. Dante Eng'g & Mfg.*, 545 U.S. 308, 314–15 (2005). This doctrine "captures the commonsense notion that a federal court ought to be able to hear claims recognized under state law that nonetheless turn on substantial questions of federal law," in part to promote the "uniformity that a federal forum offers on federal issues." *Id*. at 312. According to the Supreme Court, the test for whether a federal court has federal question jurisdiction is not whether a federal statute provides a private right of action parallel to the state-law claim alleged by the plaintiff, but whether the "state-law claim necessarily raise[s] a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." *Id*. at 314. That is precisely the case here.

The federal government, specifically through the FAA, "has exclusive sovereignty of airspace of the United States." 49 U.S.C. § 40103(a). As Congress noted when enacting the Federal Aviation Act, "[a]viation is unique among transportation industries" in that "it is the only one whose operations are conducted almost wholly within Federal jurisdiction . . . [t]hus, the Federal Government bears virtually complete responsibility for the promotion and supervision of this industry." Sen. Rep. No. 1811, 85th Cong., 2d Sess. 5 (1958). In accordance with that exclusive authority, the FAA is tasked with "develop[ing] plans and policy for the use of the navigable airspace and assign[ing] by regulation or order the use of the airspace necessary to ensure the safety of aircraft and the efficient use of airspace." 49 U.S.C. § 40103(b)(1).

Significantly, FAA regulations tightly constrain two issues critical to whether the Airline Defendants' conduct was reasonable and permissible under state law: (1) the flight paths utilized by the Airline Defendants, including takeoff and landing routes and altitudes at Sea-Tac; and (2) the design of the airplanes used by the Airline Defendants, including the materials with which they were manufactured and the fuel venting and exhaust emission requirements.

***First***, Plaintiffs' claims depend on whether the Airline Defendants acted unreasonably or impermissibly in utilizing flight paths over Plaintiffs' residences at certain altitudes, which will require an evaluation of the FAA's decision making with respect to these subjects. Plaintiffs allege that pollutants are not able to "fully disperse" "when planes fly below 3,000 feet"—an effect which is purportedly "magnified" as a plane gets closer to landing—and assert that there is a "close association between airplane landing paths and fine particulate matter contamination." Am. Compl. ¶¶ 57, 63, *see also id.* ¶¶ 60–66 ("communities underneath and downwind of the flight path are exposed to aircraft-related particulate matter pollution"). Accordingly, Plaintiffs' entire theory of liability centers on the notion that "[a]s aircraft . . . take off from and land at Sea-Tac Airport, they rain down pollutants on Contamination Zone communities from altitudes lower than 3,000 feet." *Id.* ¶ 59. Each of Plaintiffs' claims rests on the allegation that the use of these flight paths at these altitudes were unreasonable or otherwise impermissible under the law. *See, e.g.*, *id.* ¶¶ 109–113, 117–120, 125–126, 134, 137.

The FAA, however, is specifically tasked with "prescrib[ing] air traffic regulations on the flight of aircraft (including regulations on safe altitudes)" for "navigating . . . aircraft," "protecting individuals and property on the ground," and "using the navigable airspace efficiently." 49 U.S.C. § 40103(b)(2)(A)–(C). Importantly, the "navigable airspace" that the FAA exercises authority over includes the "airspace needed to ensure safety in the *takeoff and landing of aircraft*." 49 U.S.C. § 40102(a)(32) (emphasis added). In implementing this statutory mandate, the FAA

requires detailed flight paths that carriers must follow precisely. *See* 14 C.F.R. § 91.123 (Air Traffic Control compliance); 14 C.F.R. § 91.181 (flight paths).[5]

Plaintiffs have not alleged that the Airline Defendants deviated from the flight paths and altitudes approved by the FAA when taking off and landing at Sea-Tac. Accordingly, a finding that the Airline Defendants acted unreasonably or otherwise impermissibly in flying over certain areas at certain altitudes would require an evaluation of the reasonableness of the FAA's regulations and decision-making related to the flight paths surrounding Sea-Tac, including the FAA's prior determination regarding the environmental impact of airport operations. *See McKay v. City & Cnty. of San Francisco*, No. 16-CV-03561 NC, 2016 WL 7425927, at *4 (N.D. Cal. Dec. 23, 2016) (agreeing that "the remedies plaintiffs seek" regarding defendant airlines' noise pollution caused by flight paths over plaintiffs' property "require nothing short of a reassessment, reevaluation and revamping of" FAA decisions on flight paths and, therefore, necessarily raise a federal issue). Indeed, such a lawsuit necessarily "challenge[s] the propriety [of the] FAA's rulemaking" even where a plaintiff is "demanding 'just compensation' for [a flight path's] usage" or "compensation for past harms." *Id.* at *5.

***Second***, Plaintiffs' claims require an evaluation of FAA regulations regarding the materials used to construct aircraft, as Plaintiffs allege that their injuries were caused both by "aircraft exhaust" and heavy metals which "flake off [an] aircraft's body" and "pollute the surrounding environment." Am. Compl. ¶¶ 54–55. "The [FAA] is responsible for evaluating and approving new versions of commercial airplanes before use by U.S.-based airlines." *United States*

[5] The FAA also is charged with approving any change to airport operations, including evaluation of impacts on air quality or the health and safety of the local community resulting from any proposed changes in operations. 42 U.S.C. § 4321 *et. seq*.; FAA Order 1050.1F (implementing federal statutory requirements mandating environmental review of certain agency actions). As one example of the extensive federal regulation implicated by Plaintiffs' claims, before a carrier, including the Airline Defendants, can operate a new type of aircraft at Sea-Tac, it must apply to the FAA for approval under the carrier's agency-issued operating license and specifically demonstrate that the proposed addition of a new aircraft type will not significantly impact air quality in the areas surrounding the airport. *See* FAA Order 1050.1F (requiring the FAA to evaluate any change in airport operations and make a finding that the proposed change does not have the potential to cause significant impacts to air quality.).

*v. Forkner*, 584 F. Supp. 3d 180, 184 (N.D. Tex. 2022). To receive approval for an aircraft design, an applicant must submit "the type design, test reports, and computations necessary to show that the product to be certificated meets the applicable airworthiness, aircraft noise, fuel venting, and exhaust emission requirements" under the relevant regulations. 14 C.F.R. § 21.21(b). The FAA then examines those results to determine whether "the product meet[s] the applicable noise, fuel venting, and emissions requirements." 14 C.F.R. § 21.21(b)(1). As a result, any finding that the Airline Defendants acted unreasonably by operating aircraft with fuselages that contain certain metals or exhaust systems that result in an inappropriate level of emissions would require a finding that the FAA's decision making in approving the aircraft's design was unreasonable.

Section 231 of the Clean Air Act likewise requires the U.S. Environmental Protection Agency ("EPA") to regulate aircraft emissions. *See* 42 U.S.C. § 7571(a)(2). Pursuant to this statutory mandate, EPA establishes aircraft emissions standards for particulate matter, carbon monoxide, and nitrogen dioxide (among other pollutants), all of which are at issue in Plaintiffs' Amended Complaint. *Compare* 40 C.F.R. Subpart 1031 (establishing emissions standards for aircraft engines), *with* Am. Compl. ¶ 3 (alleging harm from aircraft emissions of particulate matter, carbon monoxide, and nitrogen dioxide). Indeed, in its most recent final rule establishing particulate matter standards for aircraft emissions, EPA specifically considered the University of Washington monitoring study at Sea-Tac that the Amended Complaint cites extensively. *See Control of Air Pollution From Aircraft Engines: Emissions Standards and Test Procedures*, 87 Fed. Reg. 72,312, 72,321 (Nov. 23, 2022); *see also* Am Comp. ¶¶ 61–66. The delegation of authority in Section 231 "is both explicit and extraordinarily broad." *National Association of Clean Air Agencies v. EPA*, 489 F.3d 1221, 1229 (D.C Cir. 2007).[6] Thus, Plaintiffs' allegations

[6] The United States is a party to the Convention on International Civil Aviation, a treaty establishing the legal framework for the development of international civil aviation. *Control of Air Pollution From Aircraft Engines: Emissions Standards and Test Procedures*, 87 Fed. Reg. at 72,316–72,319 (describing the role of international law in regulating aircraft emissions). Pursuant to this obligation, EPA works with the United Nations' International Civil Aviation Organization (ICAO) in establishing international emission standards and related requirements, which the United States then adopts into domestic law and regulations under Clean Air Act Section 231. *Id*.

also raise substantial federal questions regarding the EPA's decision making, including decisions relating to appropriate emissions standards for aircraft. For this reason, too, the Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1331.

### C. REMOVAL IS PROPER BECAUSE THIS COURT HAS JURISDICTION UNDER THE FEDERAL OFFICER REMOVAL STATUTE.

Plaintiffs base their allegations on actions that Delta performed at Sea-Tac Airport under the direction of federal officials, including flying transport missions for the United States Department of Defense ("DOD") and carrying mail for the United States Postal Service ("USPS"). The federal officer removal statute provides for removal of an action against "any officer (or any person acting under that officer) of the United States or of any agency thereof . . . for or relating to any act under color of such office." 28 U.S.C. § 1442(a)(1). "A party seeking removal under section 1442 must demonstrate that (a) it is a 'person' within the meaning of the statute; (b) there is a causal nexus between its actions, taken pursuant to a federal officer's directions, and plaintiff's claims; and (c) it can assert a 'colorable federal defense.'" *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1251 (9th Cir. 2006) (citations omitted). The statute must be "liberally construed" in favor of removal. *Id.* at 1252 (*quoting Colorado v. Symes*, 286 U.S. 510, 517 (1932)). All three elements are satisfied here, and removal is proper under 28 U.S.C. § 1442(a)(1).

***First***, Delta is a "person" within the meaning of § 1442(a)(1). The Amended Complaint alleges that Delta is a corporation, Am. Compl. ¶ 47, which the Ninth Circuit has held qualifies as a "person" under § 1442. *See Goncalves By & Through Goncalves v. Rady Children's Hosp. San Diego*, 865 F.3d 1237, 1244 (9th Cir. 2017).

***Second***, a causal nexus exists between Delta's actions, taken pursuant to federal officers' directions, and Plaintiffs' claims. *Durham*, 445 F.3d at 1251. The causal nexus requirement is "quite low," and the defendant "need show only that the challenged acts occurred because of what they were asked to do by the Government." *Goncalves*, 865 F.3d at 1244–45.

Plaintiffs' broad claims in this case relate to Delta's conduct while performing transport missions for the DOD at Sea-Tac Airport. Delta has contracted with the DOD to provide military transport services within the United States, including flights that take off from and land at Sea-Tac Airport, subject to close supervision and control by DOD officials. *See* Scott Decl. For example, Delta's current contract governing military transport services specifies that "aircraft performing missions under this contract will ***not be considered public aircraft***," and it provides DOD officials control over "flight scheduling" and allows flights to "be scheduled at any time." Scott Dec. Ex. 4 at 2 (emphasis added). In addition, the DOD Contract specifies the type of aircraft Delta must use for the DOD missions, and Delta cannot change the aircraft type without DOD approval "prior to operation." *Id*. When performing its DOD Contract at Sea-Tac, Delta is also required to follow "all applicable rules, regulations, and standards of the Federal Aviation Administration," *id*., which include FAA-ordered flight paths, FAA operational requirements for take-off and landing, and even the type of fuel used (all of which impact the alleged emissions at issue in this case). And while Delta's airplanes are on the ground at any military installation, including for flights that ultimately land at Sea-Tac Airport, the contract gives DOD officials "full authority during all phases of ground servicing operations." *Id*. at 5.[7]

Under its military transport contract with the DOD, Delta has flown at least 11 military transport missions to or from Sea-Tac Airport since 2019. Scott Decl. ¶ 5. For each of these missions, the DOD specifically required Delta to fly to or from Sea-Tac and specified the date and type of aircraft to be used for the mission. *Id*. Exs. 5–11.

In addition to its military transport contract obligations at Sea-Tac, Delta also operates flights that take off from and land at Sea-Tac Airport under a contract with the USPS to transport mail and cargo. *See* Elder Decl. This contract subjects Delta to close supervision and control by

---

[7] In addition to the requirements governing its performance of DOD military transport flights, a separate mandatory requirement under the DOD Contract is that Delta must be a member of the Civil Reserve Air Fleet ("CRAF") program. Under this contract requirement, Delta must make a percentage of its fleet available for emergency use by the DOD "when the need for airlift exceeds the capability of military aircraft." Scott Decl. ¶ 6.

federal officials at the USPS. *See* Elder Decl. Ex. 2. Delta's contract requires that it "accept and deliver mail, 365 days a year, 24 hours a day," and that "Registered Mail must move as planned." *Id.* at 5, 6. With no prior notice to Delta, USPS officials have a contractual right to access all of Delta's "buildings, field areas, and ground equipment being used to sort, stage, or transport mail under this contract." *Id*. at 55. The contract further requires Delta to "comply with all lawful requirements of FAA." *Id.* at 51. Under the terms of the USPS Contract, Delta aircraft transport mail and other cargo for the USPS to and from Sea-Tac Airport daily. Elder Decl. ¶ 5.

Plaintiffs' theory of the case is that Delta's flights to or from Sea-Tac Airport—including flights under Delta's contracts with the DOD and the USPS—are tortious and have injured Plaintiffs. Am. Compl. ¶¶ 2, 4, 110, 112, 118, 119, 125, 130. Plaintiffs allege that "[a]s aircraft (including Defendants' commercial jets), take off from and land at Sea-Tac Airport, they rain down pollutants on the Contamination Zone communities," Am. Compl. ¶ 59, and that "[s]uch intrusions re-occur many times each day as Defendant Airlines' aircraft headed to or leaving from Sea-Tac Airport fly over or near Plaintiffs' and Subclass members' property." *Id*. ¶ 124.

As described above, federal officials at the DOD and USPS directed Delta flights to and from Sea-Tac Airport, thus requiring Delta to perform the very acts on which Plaintiffs base their claims. Moreover, Delta's actions transporting military personnel, equipment, and United States mail fulfill important governmental functions that "in the absence of a contract with a private firm, the Government itself would have had to perform." *Watson v. Philip Morris Companies, Inc.*, 551 U.S. 142, 154 (2007). In short, "the challenged acts occurred because of what [Delta was] asked to do by the Government," thereby satisfying the nexus requirement. *Goncalves*, 865 F.3d at 1244–45.

***Finally***, Delta can assert colorable federal defenses. Delta's defenses are summarized here for the threshold purpose of establishing removal; however, the Court need not reach the merits of any defense at this stage. *Leite v. Crane*, 749 F.3d 1117, 1124 (9th Cir. 2014) (*quoting Willingham*

*v. Morgan*, 395 U.S. 402, 407 (1969)) ("a defendant invoking § 1442(a)(1) 'need not win his case before he can have it removed.'").

Delta has a colorable defense that federal law preempts Plaintiffs' claims seeking to impose tort liability for Delta's compliance with FAA regulations, such as federally-approved flight paths, *see Montalvo v. Spirit Airlines*, 508 F.3d 464, 468 (9th Cir. 2007), and that Plaintiffs' claims constitute an impermissible collateral attack to a FAA order, *see McKay v. City & Cnty. of San Francisco*, No. 16-cv-03561, 2016 WL 7425927, at *1 (N.D. Cal. Dec. 23, 2016). Delta also has a colorable defense that federal law preempts Plaintiffs' attempts to impose tort liability based on its compliance with federally-approved aircraft design and emissions standards, which is regulated by the FAA and EPA (and, in the case of uranium, the Price-Anderson Act). *See supra* pp. 9-11 (FAA and EPA); *infra* pp. 15-16 (Price-Anderson Act). Accordingly, the three requirements for federal jurisdiction under the federal officer removal statute are met and removal is proper pursuant to 28 U.S.C. § 1442(a)(1).

**D. REMOVAL IS PROPER BECAUSE THIS COURT HAS SUBJECT-MATTER JURISDICTION UNDER THE PRICE-ANDERSON ACT.**

Plaintiffs allege that "pollutants" including "uranium" have "settle[d] over local communities, contaminating the air residents breathe and the soil where their children play." Am. Compl. ¶ 3. Because Plaintiffs allege personal injury and property damage resulting from uranium, removal under the Price-Anderson Act is also proper.

The Price-Anderson Act provides exclusive federal jurisdiction for "any public liability action arising out of or resulting from a nuclear incident" in the United States district court where the alleged incident takes place. 42 U.S.C. § 2210(n)(2). A "public liability action" includes "any legal liability arising out of or resulting from a nuclear incident." 42 U.S.C. §§ 2014(w), 2014(hh). A "nuclear incident" is broadly defined to include "any occurrence . . . within the United States causing . . . bodily injury, sickness, disease, or death, or loss or damage to property, or loss of use of property, arising out of or resulting from the radioactive, toxic, explosive, or other hazardous

properties of source, special nuclear, or byproduct material." *Id.* § 2014(q). The Act, in turn, defines "source" and "special nuclear" material to include "uranium." *Id.* § 2014(z), (aa); *see also El Paso Nat. Gas Co. v. Neztsosie*, No. CIV 96-049-PCT-RGS, 2000 WL 36751004, at *3 (D. Ariz. Mar. 7, 2000) (recognizing that claims "for personal injury resulting from the release of uranium . . . fall squarely within the plain wording of the [Price-Anderson Act]").

The law is clear that if a plaintiff has alleged liability for personal injury or property damage caused by uranium, federal courts have exclusive and original jurisdiction. *In re Hanford Nuclear Rsrv. Litig.*, 534 F.3d 986, 997 (9th Cir. 2008) ("[F]ederal courts have exclusive and original jurisdiction over claims stemming from nuclear incidents[.]"); *El Paso Nat. Gas Co. v. Neztsosie*, 526 U.S. 473, 484 (1999) ("The Act not only gives a district court original jurisdiction over such a claim, but provides for removal to a federal court as of right if a putative Price–Anderson action is brought in a state court."). This is true regardless of the "size of the occurrence or whether the incident involves atomic energy." *Lawson v. Gen. Elec. Co.*, 140 F. Supp. 3d 968, 972 (N.D. Cal. 2015) (holding that the plaintiff's exposure to radiation on the job constituted a nuclear incident); *Gassie v. SMH Swiss Corp.*, No. CIV. A. 97-3557, 1998 WL 71647, at *1 (E.D. La. Feb. 17, 1998) at *5–6 (noting that "courts have construed 'nuclear incidents' broadly" and holding that alleged personal injuries from tritium in wrist watches constituted a "nuclear incident").

Here, Plaintiffs allege bodily injury, sickness, and damage to property caused by the toxic and/or other hazardous properties of uranium, placing this case squarely within the exclusive federal court jurisdiction established by the Price-Anderson Act. Plaintiffs allege that uranium has "contaminat[ed] the air residents breathe and the soil where their children play," Am. Compl. ¶ 3, and that uranium's "Health Effects" include "skin irritation and rash, cough, shortness of breath . . . [l]ung cancer, bone cancer, kidney disease, reproductive damage," *id*. ¶ 51, Table 1. Based on these allegations, Plaintiffs assert that "[t]his contamination has caused property damage both at Ms. Geer's home and at the apartment complex she owns," *id*. ¶ 39, and that Ms. Geer's

"daughter's exposure as a young child to these same toxic heavy metals and other pollutants may have caused the cancer that ultimately ended her life," *id*. ¶ 36.

Assuming, without admitting, the truth of these allegations, the Amended Complaint on its face alleges claims within the Price-Anderson Act, 42 U.S.C. § 2210, which provides for exclusive federal jurisdiction and grounds for removal under section 2210(n)(2).[8]

**III. REMOVAL IS TIMELY**

Plaintiffs served their Amended Complaint on the Airline Defendants on April 27, 2023. This notice is filed within 30 days of service, as required by 28 U.S.C. § 1446(b)(1). *See Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 347–48 (1999) (30-day removal period begins on service of summons and complaint). Removal of this action is timely.

**IV. INTRADISTRICT ASSIGNMENT**

Removal to the Seattle Division of the Western District of Washington is appropriate because the Amended Complaint indicates that Plaintiffs' claims arose in King County, Am. Compl. ¶ 4, and because the Seattle Division encompasses the place where the action is pending. 28 U.S.C. §§ 128, 1441(a); W.D. Wash. LCR 3(e)(1).

---

[8] To the extent this Court has original jurisdiction over at least one claim in this action, the Court has supplemental jurisdiction over the remaining claims because they arise out of a common nucleus of operative facts. 28 U.S.C. § 1367 ("[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."); *Bahrampour v. Lampert*, 356 F.3d 969, 978 (9th Cir. 2004) ("A state law claim is part of the same case or controversy when it shares a 'common nucleus of operative fact' with the federal claims and the state and federal claims would normally be tried together.").

DATED: May 26, 2023

McNAUL EBEL NAWROT & HELGREN PLLC

By: */s/ Malaika M. Eaton*
Gregory J. Hollon, WSBA No. 26311
Malaika M. Eaton, WSBA No. 32837
Michael P. Hatley, WSBA No. 57500

600 University Street, Suite 2700
Seattle, Washington 98101
Telephone: (206) 467-1816
ghollon@mcnaul.com
meaton@mcnaul.com
mhatley@mcnaul.com

Attorneys for Defendant Delta Air Lines, Inc.

CORR CRONIN LLP

By: */s/ Steven W. Fogg*
Steven W. Fogg, WSBA No. 23528

1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
(206) 625-8600
sfogg@corrcronin.com

Attorneys for Defendant Alaska Air Group