**IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON**
**IN AND FOR THE COUNTY OF KING**

| | |
|---|---|
| CINDY CODONI and MICHELLE GEER, individually and on behalf of all others similarly situated, | No. 23-2-07049-6 SEA |
| Plaintiffs, | **AMENDED CLASS ACTION COMPLAINT** |
| v. | |
| PORT OF SEATTLE, ALASKA AIR GROUP, and DELTA AIR LINES, INC., | **JURY TRIAL DEMANDED** |
| Defendants. | |

AMENDED CLASS ACTION COMPLAINT
011150-11/2240798 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

**TABLE OF CONTENTS**

<u>Page</u>

I.      INTRODUCTION ..................................................................................1

II.     JURISDICTION AND VENUE .........................................................4

III.    PARTIES ...........................................................................................4

    A.    Plaintiffs ................................................................................4

        1.    Cindy Codoni ..............................................................4

        2.    Michelle Geer ...............................................................7

    B.    Defendants .............................................................................9

        1.    Port of Seattle ...............................................................9

        2.    Alaska Air Group ........................................................10

        3.    Delta Air Lines, Inc. ....................................................11

IV.     FACTUAL ALLEGATIONS .............................................................11

    A.    Pollutants, including particulate matter, dangerous gases,
        hazardous air pollutants, and toxic heavy metals, are harmful to
        human health. ........................................................................11

    B.    Aircraft emit dangerous pollutants as they fly, and these pollutants
        accumulate in places where planes routinely fly below 3,000 feet. ......................14

    C.    Defendant Airlines' operations, conducted with the consent and
        support of the Port of Seattle, have caused these pollutants to
        contaminate the Contamination Zone. .................................................15

        1.    Defendants' operations have contaminated the air in the
            Contamination Zone .......................................................15

        2.    Defendants' operations have contaminated the soil in the
            Contamination Zone .......................................................21

        3.    Nothing else can explain the pollutants in the
            Contamination Zone .......................................................22

    D.    Plaintiffs and other Class and Subclass members have been harmed
        by Defendants' actions. ...............................................................23

        1.    Defendants have increased the health risks faced by
            Plaintiffs and Class members. ..........................................23

2.   Defendants' actions have damaged Plaintiffs' and Subclass members' property by contaminating it with dangerous pollutants...................................................................................28

E.   Defendants knew or should have known that their activities were harming Plaintiffs and other Class members, and yet they continued to engage in these activities............................................28

F.   Plaintiffs and Class members will require professional assistance to redress the harm Defendants have caused. ............................32

1.   Appropriate diagnosis and treatment of airport-related illnesses among Plaintiffs and other Class members will require ongoing medical monitoring by healthcare professionals. ...................................................................32

2.   Decontaminating Plaintiffs' and Subclass members' property will require specialized equipment and skills.............................33

V.   CLASS ACTION ALLEGATIONS ................................................33

A.   All requirements of CR 23(a) are met.......................................34

B.   All requirements of CR 23(b)(3) are met....................................35

VI.   CLAIMS ................................................................................36

A.   Resident Class Claims..........................................................36

COUNT ONE NEGLIGENCE ......................................................36

B.   Homeowner and Renter Subclass Claims ..................................38

COUNT TWO NEGLIGENCE ......................................................38

COUNT THREE CONTINUING INTENTIONAL TRESPASS.................39

COUNT FOUR PUBLIC NUISANCE ..............................................40

COUNT FIVE INVERSE CONDEMNATION .....................................41

VII.   REQUEST FOR RELIEF .........................................................42

VIII.   JURY DEMAND .................................................................43

AMENDED CLASS ACTION COMPLAINT - ii
011150-11/2240798 V1



Plaintiffs Cindy Codoni and Michelle Geer, individually and on behalf of all others similarly situated, bring this class action against Defendants Port of Seattle, Alaska Air Group, and Delta Air Lines, Inc. (collectively, "Defendants") seeking injunctive relief and/or damages for harm caused by Defendants' emission of dangerously high levels of pollutants that have contaminated communities surrounding Seattle-Tacoma International Airport ("Sea-Tac Airport") in violation of community members' rights under Washington negligence, nuisance, trespass, and/or inverse condemnation laws.

## I.   INTRODUCTION

1.      Businesses and government agencies should not shower harmful pollutants on people's homes with impunity.

2.      When planes take off and land from Sea-Tac Airport, the jet fuel they burn spews pollutants into the atmosphere. Particulate matter can also flake off from the bodies of the airplanes themselves during flight, further contaminating the surrounding environment.

3.      Airplane activity generates a wide range of pollutants, including coarse, fine, and ultra-fine particulate matter; harmful gases including carbon monoxide, nitrogen dioxide, and sulfur oxide; hazardous air pollutants like formaldehyde, acrolein, 1,3-butadiene, naphthalene, benzene, acetaldehyde, and ethylbenzene; and toxic heavy metals including aluminum, barium, cadmium, copper, lead, magnesium, silver, uranium, and zinc. These pollutants settle over local communities, contaminating the air residents breathe and the soil where their children play. It is beyond dispute that these pollutants can cause respiratory problems (including asthma, chronic obstructive pulmonary disease, and pulmonary fibrosis) cardiovascular problems, central nervous system disorders, and Alzheimer's disease.

4.      Pollution from airport activity is particularly acute in a five-mile radius of the Airport (the "Contamination Zone"). Nearly 300,000 people live within the Contamination Zone, over 60,000 of whom are children. The Contamination Zone, depicted in the map below, encompasses the cities of Burien, Des Moines, SeaTac, and Tukwila, among others:

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

*Figure 1: Map of the Contamination Zone (5-mile radius from Sea-Tac Airport)*



5.      Predictably, residents within the Contamination Zone are now suffering the health consequences of breathing in Sea-Tac Airport-related pollution. Rates of cancer, heart disease, and chronic lower respiratory disease are significantly higher in the Contamination Zone than in other Seattle communities. Babies born in the Contamination Zone have a higher chance of being born prematurely or of being underweight. And residents of the Contamination Zone have lower life expectancies than those who live outside the Zone. In fact, researchers have concluded that exposure to airport-related pollution leads to hundreds of excess deaths in the Contamination Zone per year. And this pollution exposes class members to a heightened risk of disease.

6.      Sea-Tac Airport-related pollution disproportionately affects low-income and minority communities. Over 30% of Contamination Zone residents live in households with total incomes under 200% of the federal poverty level; nearly 50% of children in the Contamination

Zone live in such households. The majority of residents in the Contamination Zone are Black, Hispanic, Asian, Native American, or Native Hawaiian/Pacific Islander (52%), whereas these minority communities make up only one-third of all individuals living in King County as a whole. And residents of the Contamination Zone are also more likely to be immigrants. The disproportionate impact of airport pollution on low-income and racially diverse communities is an issue of environmental justice; it is unlikely that Defendants' behavior would continue for long if the affected community was wealthy or politically powerful (as, for example, Seattle's Madison Park neighborhood or Medina). This disproportionate impact has been known to the Port.

7.      Although knowledge by a defendant is not a requisite for any claim asserted in this action, at some point over the years of Sea-Tac Airport's operations, Defendants became aware that their actions were contaminating the Contamination Zone and making people sick and exposing them to a greater risk of disease than normal. But despite this knowledge, and despite pleas from local residents, Defendants have ignored the consequences of their actions and have not addressed the problem. Instead, they have carried on as usual, expanding operations at Sea-Tac and raking in profits at the expense of the health and the very lives of families living in the Contamination Zone.

8.      People have the right—well recognized by the laws of trespass, nuisance, and negligence, and protected by Article I, Section 16 of the Washington Constitution—not to have Defendants dump pollutants all over their property with the assistance, permission and encouragement of a government agency. They are entitled to breathe clean air and live on uncontaminated land. They should not have to resign themselves to becoming sick and/or being unreasonably exposed to the risk of disease, or to watching their children become sick and/or be exposed to an increased risk of disease, to enable Defendants' commercial profits. Defendants' interests in avoiding the costs of cleanup, or in the case of the Port of Seattle, of avoiding the expense of formally acquiring additional land to act as a buffer zone between the community and the Airport, does not outweigh community members' interests in living safe, healthy lives.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

9.      Defendants should be required to fix the harm they have caused. Because Defendants are unwilling to take on this responsibility voluntarily, Plaintiffs bring this case and seek injunctive relief and compensatory damages against Defendants under Washington law.

10.     Plaintiffs bring negligence claims against Alaska Air Group and Delta Air Lines, Inc. on behalf of themselves and a proposed class of all current Contamination Zone residents, seeking injunctive relief in the form of a medical monitoring program to help ensure early diagnosis and treatment of illnesses caused by exposure to airport pollution.

11.     Plaintiffs also bring negligence, trespass, and nuisance claims against Alaska Air Group and Delta Air Lines, Inc. on behalf of themselves and a proposed class of people who rent or own residential property in the Contamination Zone.

12.     Finally, Plaintiffs bring inverse condemnation claims against the Port of Seattle on behalf of themselves and a proposed class of people who rent or own residential property in the Contamination Zone.

## II.      JURISDICTION AND VENUE

13.     This Court has jurisdiction over the parties because all acts forming the basis of this Complaint occurred in King County, Washington. Furthermore, Defendants maintain offices in King County, Washington, and/or regularly transact business in King County, Washington.

14.     Venue is proper in this Court, pursuant to RCW 4.12.010(1) and RCW 4.92.010, because each Plaintiff owns property in King County that has been damaged by Defendants, and because each Plaintiff resides in King County, Washington.

## III.      PARTIES

**A.      Plaintiffs**

### 1.      Cindy Codoni

15.     Plaintiff Cindy Codoni is a resident of King County, Washington.

16.     Ms. Codoni owns a home located at 17014 40th Avenue South, in SeaTac, Washington, where she has lived for the past 54 years. Ms. Codoni's home is within a five-mile radius of Sea-Tac Airport, and thus is within the Contamination Zone.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

17.     As a direct and proximate result of Defendants' actions, Ms. Codoni's property has been contaminated with dangerous levels of airport-generated pollution. This contamination has caused property damage and has unreasonably interfered with Ms. Codoni's quiet enjoyment of her property and exposes her to an increased risk of disease.

18.     Ms. Codoni's property is almost permanently covered in a layer of black dust that she attributes to this pollution. This dust accumulates so quickly that Ms. Codoni regularly needs to wipe it off her car before driving.

*Image 1: Soot-like deposits wiped off of Ms. Codoni's vehicle.*



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

*Images 2 and 3: Soot-like deposits on Ms. Codoni's vehicle.*



19.     Ms. Codoni also notes that, as the quantity of this black dust has increased in recent years, the trees on her property have withered and died. For most of her adult life, Ms. Codoni had been an avid gardener. However, since learning about the presence of dangerous levels of pollution in the Contamination Zone in 2022, Ms. Codoni has been worried about spending too much time outdoors and has abandoned this pursuit.

20.     Ms. Codoni and her family have also suffered significant health issues that are tied, she believes, to airport pollution.

21.     Ms. Codoni's father moved to the Contamination Zone in 1968. In 2010, he began having breathing issues and underwent surgery to restore some of his lung function. Then, later that same year, he was diagnosed with multiple myeloma. At the time he received his cancer diagnosis, Ms. Codoni's father was working as a security guard at the SeaTac Municipal Court courthouse, but his ill-health forced him into early retirement. He passed away from the cancer five years later.

22.     Ms. Codoni's mother has lived in the Contamination Zone since 1968. Ten years after moving to the Contamination Zone, she was diagnosed with cervical cancer. Then, in the early 2000s, she was diagnosed with lymphoma. Ms. Codoni's mother survived both cancer diagnoses, but she has been in ill health ever since, suffering from strokes, heart failure, kidney failure, and dementia.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

23.     Ms. Codoni's oldest brother was born in the Contamination Zone and lived there most of his life. In April 2000, he was diagnosed with multiple myeloma. He died of this cancer less than a year later, on March 28, 2001, at the age of 51.

24.     Ms. Codoni's second brother was born in the Contamination Zone and lived there most of his life. He had a chronic cough that began in childhood. He passed away in 2003 due to an illness that doctors were unable to diagnose.

25.     Ms. Codoni's oldest sister was born in the Contamination Zone and has lived there for most of her life. She suffers from a chronic cough.

26.     Ms. Codoni's second sister was born in the Contamination Zone and has lived there for most of her life. In 1981, she was diagnosed with cervical cancer. She is currently in remission.

27.     Ms. Codoni's oldest son was born in the Contamination Zone and has lived there most of his life. He had regular asthma attacks as a child, and Ms. Codoni recalls that these attacks often required trips to the hospital emergency department.

28.     Ms. Codoni's second son was born in the Contamination Zone and lived there most of his life. He passed away from liver disease in 2009, at the age of 32.

29.     Ms. Codoni herself has also lived in the Contamination Zone most of her life. She was diagnosed with cervical cancer in 1979. She is currently in remission, but she suffers from a range of other illnesses including high blood pressure and chronic obstructive pulmonary disease (COPD).

30.     Ms. Codoni believes that her health and her family's health problems are due to their exposure to Sea-Tac Airport-related pollution, and that as a result of Defendants' pollution she is unreasonably exposed to an elevated risk of disease. She also believes that Defendants should take responsibility for their actions and help prevent similar devastation among other families.

**2.      Michelle Geer**

31.     Plaintiff Michelle Geer is a resident of King County, Washington.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE     (206) 623-0594 FAX

1    32.     Ms. Geer and her husband own a home located at 16238 11th Avenue Southwest,

2   in Burien, Washington, which they bought from Ms. Geer's mother-in-law in 2022. Ms. Geer's

3   home is within a five-mile radius of Sea-Tac Airport, and thus is within the Contamination Zone.

4    33.     Prior to purchasing the home located at 16238 11th Avenue Southwest, Ms. Geer

5   had owned and lived in a number of other homes within the Contamination Zone.

6    34.     The first house she purchased was located at 12236 23rd Avenue South, directly

7   under the Sea-Tac Airport flight path. Every time a plane passed overhead, Ms. Geer and her

8   husband could feel the entire house shake.

9    35.     While she was living in this house, Ms. Geer became pregnant with her first child,

10   a daughter, who was born with a hearing impairment but who seemed otherwise healthy. Then,

11   on Thanksgiving morning in 1994, Ms. Geer's daughter began walking at an odd angle. Within a

12   week, she had been diagnosed with medulloblastoma (a form of brain cancer). She passed away

13   six months later of treatment-related complications, just a few weeks after her fifth birthday.

14    36.     Ms. Geer now suspects that her own exposure to airport-generated pollution

15   during her pregnancy may have contributed to her daughter's hearing impairment. She also

16   suspects that her daughter's exposure as a young child to these same toxic heavy metals and

17   other pollutants may have caused the cancer that ultimately ended her life; Ms. Geer recalls

18   specifically that her daughter often played in the dirt in the front yard of the family's home.

19    37.     Ms. Geer also has two surviving children. Since learning about the presence of

20   dangerous levels of pollution in the Contamination Zone in 2022, she has become deeply

21   concerned about the potential future health consequences they may suffer, given that both spent

22   their entire childhoods in homes within the Contamination Zone.

23    38.     Aside from her current home at 16238 11th Avenue Southwest, Ms. Geer also

24   owns an apartment complex located at 800 South 216th St., in Des Moines, Washington. Ms.

25   Geer has owned the complex since 2004. The complex, which is comprised of seven units and

26   currently houses ten residents, is also within a five-mile radius of Sea-Tac Airport, and thus is

27   within the Contamination Zone.

28

AMENDED CLASS ACTION COMPLAINT - 8
011150-11/2240798 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

39.     As a direct and proximate result of Defendants' actions, Ms. Geer's property, including both her home and her apartment complex, have been contaminated with dangerously high levels of pollution. This contamination has caused property damage both at Ms. Geer's home and at the apartment complex she owns, and it has unreasonably interfered with her quiet enjoyment of her property. Ms. Greer is also unreasonably exposed to an increased risk of disease.

40.     Ms. Geer believes that Defendants should take responsibility for their actions and should clean up the pollution they have caused.

**B.    Defendants**

    **1.    Port of Seattle**

41.     The Port is an agency of the State of Washington. The agency owns Sea-Tac Airport, which serves commercial air passengers, air cargo, general aviation, and aircraft maintenance on a site of approximately 2,800 acres. In 2021, the Airport served over 36 million passengers, and in 2022 it accommodated 198,655 total landings. The airport averages 23 landings per hour. The airport operates 24 hours per day, 7 days per week.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1

*FIGURE 2: Number of flight arrivals per hour of day in 2018 at Sea-Tac Airport[1]*

2

3



4

5

6

7

8

9

10

11

12

42.    Over the last decade, the Port has expanded its airport facilities and has allowed

13   an increase in the number of total flights into and out of Sea-Tac Airport even as it has been

14   aware of the impact of its operations on the residents of the Contaminated Zone.

15      43.    The Port has the authority to grant airlines rights and privileges concerning the

16   occupancy and use of Sea-Tac Airport. These rights and privileges are set out in five-year

17   leases/operating agreements between the Port and the airlines.

18      **2.   Alaska Air Group**

19      44.    Defendant Alaska Air Group ("Alaska") is a multinational corporation organized

20   and existing under the laws of Delaware, with its principal place of business located in Seattle,

21   Washington. Alaska subsidiaries include Alaska Airlines, Inc. as well as Horizon Air Industries,

22   Inc. Alaska is currently the fifth largest airline in the United States, with operating revenue of

23   $9.6 billion in 2022.

24      45.    As of February 2023, Alaska's fleet consists of 289 commercial aircraft, including

25   primarily Boeing 737-series jets as well as a few Airbus and Embraer jets.

26

27   _____
     [1] Env'tl & Occupational Health Sciences, Mobile ObserVations of Ultrafine Particles: The MOV-UP Study
28   Report (Dec. 2019) at 26, https://deohs.washington.edu/sites/default/files/Mov-Up%20Report.pdf (hereafter the
     "MOV-UP Study").

**HAGENS BERMAN**

1    46.    Alaska has been operating out of Sea-Tac Airport since August of 1951. In 2020,

2    Alaska operated a combined total of 160,714 flights into and out of Sea-Tac Airport, accounting

3    for 56% of the total 287,114 flights the airport handled that year.

4    **3.    Delta Air Lines, Inc.**

5    47.    Defendant Delta Air Lines, Inc. ("Delta") is a multinational corporation organized

6    and existing under the laws of Delaware, with its principal place of business located in Atlanta,

7    Georgia. Delta is one of the largest publicly traded airlines by revenue; in 2022, Delta's total

8    operating revenue was over $50 billion.

9    48.    In 2019, Delta operated 915 commercial aircraft. Its fleet consists largely of

10    Airbus and Boeing jets, as well as a few Bombardier and Embraer jets. Delta has one of the

11    oldest fleets of any United States airline, with an average fleet age of 14.8 years as of December

12    2022.

13    49.    Delta has been operating out of Sea-Tac Airport since 1947. In 2020, Delta

14    operated a combined total of 68,451 flights into and out of Sea-Tac Airport, accounting for

15    approximately 24% of the total 287,114 flights the airport handled that year.

16    50.    Defendants Alaska and Delta are referred to collectively as "Defendant Airlines."

17    Together, Defendant Airlines operate nearly 80% of all flights into and out of Sea-Tac Airport.

18    **IV.    FACTUAL ALLEGATIONS**

19    **A.    Pollutants, including particulate matter, dangerous gases, hazardous air pollutants,**

20    **and toxic heavy metals, are harmful to human health.**

21    51.    This case is about people who live in communities that are contaminated with

22    dozens of pollutants that are the direct result of airport operations. The pollutants of most

23    concern fall into four categories: (1) particulate matter, (2) dangerous gases, (3) hazardous air

24    pollutants, and (4) toxic heavy metals. The negative health impacts of pollutants in each of these

25    categories are described in the chart below.

26

27

28



**TABLE 1. Health Effects of Various Pollutants**

| POLLUTANT | HEALTH EFFECTS |
|---|---|
| **Particulate Matter** | |
| *Coarse particulate matter (diameters of 2.5 to 10 μm)* | Short-term exposure: Respiratory problems (including asthma attacks), cardiovascular problems.<br>Long-term exposure: Heart disease, stroke, pulmonary embolism. |
| *Fine particulate matter (diameters less than 2.5 μm)* | Short-term exposure: Cardiovascular, respiratory, and cerebrovascular problems.<br>Long-term exposure: Cancer and cancer-related deaths, nervous system problems, increased risk of pre-term births. |
| *Ultra-fine particulate matter (diameters less than 0.1 μm)* | Short-term exposure: Nervous system problems.<br>Long-term exposure: Respiratory, cardiovascular, and central nervous system problems, Alzheimer's disease. |
| **Dangerous Gases** | |
| *Carbon monoxide* | Short-term exposure: Cardiovascular problems.<br>Long-term exposure: Increased risk of cardiac-related death. |
| *Nitrogen dioxide* | Short-term exposure: Trigger for asthma attacks.<br>Long-term exposure: Asthma, lung cancer, Type II diabetes, dementia, and Parkinson's Disease. Fetal exposure may be associated with autism spectrum disorder. |
| *Sulfur oxide* | Short-term exposure: Respiratory problems.<br>Long-term exposure: Increase in the severity of asthma in children. Exposure may also contribute to respiratory-related death. |
| **Hazardous Air Pollutants** | |
| *Formaldehyde* | Short-term exposure: Eye, nose, and throat irritation.<br>Long-term exposure: Changes in lung function, lung cancer. |
| *Acrolein* | Short-term exposure: Nose and throat irritation, as well as dizziness, nausea, and headache.<br>Long-term exposure: Lung cancer, congenital abnormalities. |
| *1, 3-butadiene* | Short-term exposure: Coughing, wheezing, headache, dizziness, and lightheadedness.<br>Long-term exposure: Lymph and blood cancers. |
| *Naphthalene* | Short-term exposure: Eye, nose, and throat irritation.<br>Long-term exposure: Vision damage, liver and kidney damage, anemia, cancer. |
| *Benzene* | Short-term exposure: Dizziness, rapid heart rate, drowsiness, tremors, and confusion.<br>Long-term exposure: Anemia, leukemia. |
| *Acetaldehyde* | Short-term exposure: Eye, skin, and respiratory tract irritation, increases in blood pressure. |

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

| POLLUTANT | HEALTH EFFECTS |
|---|---|
|  | <u>Long-term exposure</u>: Symptoms resembling those of alcoholism, pulmonary edema. |
| *Ethylbenzene* | <u>Short-term exposure</u>: Respiratory tract and eye irritation, dizziness. |
|  | <u>Long-term exposure</u>: Hearing and kidney damage. |
| **Toxic Heavy Metals** | |
| *Aluminum* | <u>Short-term exposure</u>: Irritation of respiratory tract, metal fume fever (symptoms include fever, chest tightness, muscle aches, headache, and cough). |
|  | <u>Long-term exposure</u>: Impaired lung function pulmonary fibrosis, neurobehavioral problems. |
| *Barium* | <u>Short-term exposure</u>: Nose, throat, and lung irritation, barium poisoning (symptoms include nausea, vomiting, diarrhea, irregular heartbeat, muscle weakness, tremors, and paralysis; can be fatal). |
| *Cadmium* | <u>Short-term exposure</u>: Irritation of respiratory tract. |
|  | <u>Long-term exposure</u>: Lung damage and lung cancer, kidney disease, decreased bone mineralization (increasing the risk of bone fractures). |
| *Copper* | <u>Short-term exposure</u>: Irritation of respiratory tract, metal fume fever. |
|  | <u>Long-term exposure</u>: Lung damage, damage to reproductive organs. |
| *Lead* | Exposure to lead over any period of time is associated with toxicity to every organ system that has been studied. |
|  | <u>Exposure among adults</u>: Decreased cognitive function, altered mood and behavior, renal problems, increased blood pressure, reproductive and fertility issues, cancer. |
|  | <u>Exposure among children</u>: Cognitive impairment, behavioral problems, autism, developmental issues. Lead exposure during gestation and infancy may result in impaired neurological development, neurobehavioral deficits, low birth weights, and other health problems. There is no safe blood lead threshold for the adverse effects of lead on infant or child neurodevelopment. |
| *Magnesium* | <u>Short-term exposure</u>: Metal fume fever. |
| *Silver* | <u>Short-term exposure</u>: Breathing problems, stomach pains. |
|  | <u>Long-term exposure</u>: Arygia (a condition in which a person's skin takes on a permanent blue-gray discoloration). |
| *Uranium* | <u>Short-term exposure</u>: Skin irritation and rash, cough, shortness of breath. |
|  | <u>Long-term exposure</u>: Lung cancer, bone cancer, kidney disease, reproductive damage. |
| *Zinc* | <u>Short-term exposure</u>: Metal fume fever. |
|  | <u>Long-term exposure</u>: Anemia, nervous system disorders, damage to the pancreas. |



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

52. Notably, the health effects of exposure to these pollutants are cumulative. That is, exposure to two or more pollutants simultaneously may cause greater cell damage or other harm than exposure to each pollutant individually.

**B. Aircraft emit dangerous pollutants as they fly, and these pollutants accumulate in places where planes routinely fly below 3,000 feet.**

53. Aircraft, including commercial jets of the type operated by Defendant Airlines, emit the dangerous pollutants described in Part IV(A) as they fly.[2]

54. A majority of these pollutants, including dangerous gases (such as carbon monoxide, nitrogen dioxide, and sulfur oxide), hazardous air pollutants (such as formaldehyde, acrolein, 1,3-butadiene, naphthalene, benzene, acetaldehyde, and ethylbenzene), and some heavy metals (such as barium) are expelled in aircraft exhaust.

55. In addition to aircraft exhaust, the bodies of aircraft themselves are also a source of pollution. The bodies of aircraft (called "fuselages") are constructed mostly of heavy metals. As a plane takes off and ascends to its cruising altitude, it experiences a drop in barometric pressure that causes the fuselage to expand. When the plane descends for landing, barometric pressure increases and the fuselage correspondingly contracts. This repeated expansion and contraction causes particulate matter—including aluminum, barium, cadmium, copper, lead, magnesium, silver, uranium, and zinc—to flake off the aircraft's body and to pollute the surrounding environment.

56. For most of the time airplanes are aloft, the pollutants they emit are dispersed by the wind, which can carry pollutants as far as 6,000 miles away from an airplane's route. This dispersion typically minimizes the buildup of pollutants in any one location.

57. However, when planes fly below 3,000 feet, there is not enough time for the wind to fully disperse the pollutants. Pollutants released below this altitude are sucked downwind and accumulate in local communities. This effect is magnified the closer an airplane flies to the

---

[2] Planes operated by non-Defendant airlines, as well as general aviation planes that fly in and out of Sea-Tac with the permission of the Port of Seattle, emit similar pollutants.



1  ground. As a result, airplane-generated pollutants become most concentrated in the areas directly

2  surrounding airports, where aircraft fly the lowest.

3       58.    This is precisely what has happened in the Contamination Zone. The following

4  graphic, taken from a 2019 University of Washington report titled the Mobile ObserVations of

5  Ultrafine Particles Study ("MOV-UP Study"), [3] illustrates the spatial distribution of planes that

6  flew below 750 meters—approximately 2,500 feet—over the course of 2018 in the Seattle

7  metropolitan area, clearly highlighting the large numbers of low over-flights in the

8  Contamination Zone:



Figure 11: The gridded spatial distribution of the number of arriving and departing flights that are below 750 m in altitude in the year 2018 for the Seattle metropolitan area.

Flights below 750m

1
7
55
403
2,981
22,026
162,755

Figure 11 – The data includes flights from all local airports.

19       59.    As aircraft (including Defendants' commercial jets), take off from and land at

20  Sea-Tac Airport, they rain down pollutants on Contamination Zone communities from altitudes

21  lower than 3,000 feet. Without time for the wind to disperse these contaminants, pollutants

22  accumulate in ever-higher concentrations in the Contamination Zone.

23  **C.    Defendant Airlines' operations, conducted with the consent and support of the Port of Seattle, have caused these pollutants to contaminate the Contamination Zone.**

24      **1.    Defendants' operations have contaminated the air in the Contamination Zone.**

25       60.    Significant evidence, including two University of Washington Studies, a report by

26  Public Health – Seattle & King County, and studies of contamination around other international

---

[3] MOV-UP Study at 27.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

airports, indicate that Defendant Airlines' operations have caused air pollution in the Contamination Zone.

### a.  The University of Washington's MOV-UP Study Confirms Adverse Pollution in the Contamination Zone.

61.    The MOV-UP Study, published by researchers in the University of Washington's Environmental and Occupational Health Sciences Department, found that communities below aircraft flight paths, including communities in the Contamination Zone, are exposed to significant levels of ultrafine particulate matter air pollution.

62.    The Study was a culmination of two years' worth of work, funded by Washington State. Researchers conducted air sampling seasonally from February 2018 through March 2019 using both mobile sampling and fixed-site sampling designs. Samples were taken from defined routes at fixed latitudes north and south of the airport (termed "transects" in the Study, as seen in the graphic below). All samples were taken during the afternoon to increase the comparability between repeat samples and to minimize the effect of daily atmospheric changes.



Figure 1. A. Displayed on the map are the location of the five transects North of the airport, labeled N1-N5, and the six transects South of the airport, labeled S1-S6. In blue, the density of flights at an altitude of 750m or less is overlaid on the street map. B. Mobile platform with rooftop air inlet. C. Sampling manifold and monitoring instruments.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

63.     The results of this research indicate a close association between airplane landing paths and fine particulate matter contamination, as illustrated in the graphic below:



Figure 17 – Colors correspond to percentile values for the Ultra UF factor score.

64.     Based on these findings, the MOV-UP Study authors concluded that communities "underneath and downwind of landing aircraft"—which includes communities in the Contamination Zone—may be particularly at risk of exposure to particulate matter.[4] The Study's authors further noted that "those living within the area affected by landing aircraft emissions may be exposed to relatively higher concentrations of smaller sized ultra-UF particles"[5] as a result of airplane activity.

65.     A second diagram from the MOV-UP Study further illustrates the spatial distribution of ultrafine particulate matter recorded by the MOV-UP Study near Sea-Tac Airport,

---

[4] MOV-UP Study at 38.

[5] *Id.*

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1  again highlighting the connection between aircraft activity and air pollution in Contamination

2  Zone communities:



26       66.     The MOV-UP Study findings support the conclusion that communities

27  underneath and downwind of the flight path are exposed to aircraft-related particulate matter

28  pollution.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

### b.      The "Healthy Air, Healthy Schools Study" Confirms Adverse Pollution in the Contamination Zone

67.      Motivated by the findings of the 2019 study, University of Washington researchers undertook another project, the Healthy Air, Health Schools Study (the "Schools Study") to measure infiltration of outdoor air pollution into indoor classroom spaces in five schools near Sea-Tac Airport.[6] This study, too, found notable concentrations of pollution in the Contamination Zone.

68.      University of Washington researchers visited each school twice, each time measuring concentrations of air pollutants both inside and outside the schools, the exchange of air between indoor and out outdoor air, the infiltration of outdoor particles into the schools, and the impact of portable air filters on concentration of pollutants.



*Figure 4 - Instrument arrangement for indoor and outdoor air sampling.*

69.      As with the MOV-UP Study, the Schools Study found a significant concentration of fine particulate matter in the air outside Contamination Zone schools. Notably, the Schools Study also found that this outdoor pollution easily contaminates indoor air. The charts below summarize these findings:

---

[6] Env'tl & Occupational Health Sciences, Healthy Air, Healthy Schools Study: Phase 1 Report: Report to the Washington State Legislature (Dec. 2021), https://deohs.washington.edu/sites/default/files/2021-12/Healthy-air-healthy-schools-phase1-report%20FINAL%20121521.pdf. Three of these schools are within the Contamination Zone. All schools are within 7.5 miles of Sea-Tac Airport and are within 0.5 miles of an active flight path serving Sea-Tac Airport.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX





      c.     **The Public Health – Seattle & King County Report Confirms Adverse Pollution in the Contamination Zone**

     70.    In 2019, alarmed by the MOV-UP Report, the Washington State legislature commissioned a study on the health impacts of Sea-Tac Airport on local communities.[7] Public Health – Seattle & King County ("PHSKC") was charged with completing this study. On

---

[7] Engrossed Substitute House Bill 1109 (Apr. 28, 2019), https://lawfilesext.leg.wa.gov/biennium/2019-20/Pdf/Bills/House%20Passed%20Legislature/1109-S.PL.pdf?q=20230319104325. House Bill 1109 appropriated $150,000 for the Department of Commerce to "contract with a consultant to study the current and ongoing impacts of the SeaTac international airport." Sec. 129(30)(a). Specifically, the Washington State legislature requested information regarding "[t]he impacts that the current and ongoing airport operations have on quality of life" for individuals in impacted neighborhoods. Sec. 129(30)(b)(i).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

December 1, 2020, PHSKC released its conclusions in a report titled "Community Health and Airport Operations Related Noise and Air Pollution: Report to the Legislature in Response to Washington State HOUSE BILL 1109" (the "Public Health Report").[8]

71.     Although the Public Health Report authors did not collect their own samples, they concluded, based on an analysis of over 500 reports and journal articles, that "[a]irport operations result in . . . air pollution," and that this pollution includes, specifically, "particulate matter of various sizes, ozone, carbon monoxide (CO), nitrogen dioxide (NO$_2$), sulfur oxides (SO$_x$), and other hazardous air pollutants."[9]

72.     The Report also highlighted findings from a study of neighborhoods under the Boston Logan International Airport that outdoor pollutants penetrated indoors within minutes and that indoor and outdoor concentrations of these pollutants were similar (suggesting that penetration is substantial). In some cases, indoor concentrations were actually higher than those reported by area outdoor monitoring stations. Taken together with the findings from the Schools Study, it is therefore likely that residents within the Contamination Zone are exposed to pollutants inside their homes in nearly the same concentrations as outside.

**2.      Defendants' operations have contaminated the soil in the Contamination Zone.**

73.     Studies of at least four international airports from around the world support the conclusion that communities that live directly adjacent to such airports—including people living in the Contamination Zone near Sea-Tac Airport—are heavily contaminated.

74.     For instance, a study of Athens International Airport study found high concentrations of lead, copper, and zinc in the soil surrounding the airport.[10] A study of the Boryspil International Airport found high levels of manganese, copper, lead, zinc, chromium,

---

[8] Public Health – Seattle & King County, Community Health and Airport Operations Related Noise and Air Pollution: Report to the Legislature in Response to Washington State HOUSE BILL 1109 (Dec. 1, 2020), https://apps.leg.wa.gov/ReportsToTheLegislature/Home/GetPDF?fileName=Community%20Health%20and%20Airport%20Operations%20Related%20Pollution%20Report_c7389ae6-f956-40ef-98a7-f85a4fab1c59.pdf.

[9] Public Health Report at i-ii. Other studies have also reached similar conclusions. For example, a recent literature review of peer reviewed literature on air quality near commercial airports concluded that "[t]hese studies consistently showed that ultrafine particulate matter (UFP) is elevated in and around airports." Karie Riley et al., *A Systematic Review of the Impact of Commercial Aircraft Activity on Air Quality Near Airports*, 11 City & Env't Interactions 100066 (2021).

[10] Ioannis Massas et al., *Distribution of Heavy Metals Concentrations in Soils Around the International Athens Airport (Greece): An Assessment on Preliminary Data*, ResearchGate (May 2016).

AMENDED CLASS ACTION COMPLAINT - 21
011150-11/2240798 V1


1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

1  and iron pollution in the soil near the airport as compared with background soil concentrations of

2  these metals.[11] And studies of the Delhi International Airport,[12] as well as the Montreal Trudeau

3  Airport,[13] similarly found high levels of soil contamination.

4      75.    Upon information and belief, the soil surrounding Sea-Tac Airport is similarly

5  contaminated with high concentrations of pollutants.

6      **3.    Nothing else can explain the pollutants in the Contamination Zone.**

7      76.    There is no other plausible explanation for the high concentrations of pollution in

8  the Contamination Zone. Baseline studies of the Washington environment indicate low natural

9  levels of the pollutants implicated here,[14] pointing to an anthropologic source of the pollution.

10  And the MOV-UP Study specifically concluded that the types of fine-particulate matter that

11  pollute the Contamination Zone cannot be attributed to roadway traffic, another main source of

12  pollution in the Seattle area. Corroborating this conclusion, other researchers have concluded that

13  airport emissions may have distinct "chemical fingerprints."[15]

14      77.    It is clear, based on the evidence from the University of Washington Reports, the

15  Public Health Report, and other corroborating studies, that the high levels of pollution found in

16  the Contamination Zone are a result of Sea-Tac Airport activity, and particularly aircraft activity.

17  Because Defendant Airlines, with the permission of the Port, operate nearly 80% of all flights

18  into and out of Sea-Tac Airport, they are responsible for the majority of the airport-related

19  pollution. Furthermore, the Port, by virtue of its control over airlines' use of Sea-Tac Airport, is

20

21

22  [11] Margaryta Radomska et al., *Environmental Pollution in the Airport Impact Area: Case Study of the Boryspil International Airport*, 5 Env'tl Problems 76, 79 (2020), https://dspace.nau.edu.ua/bitstream/NAU/44242/1/200453maket18-24.pdf.

23  [12] Sharmila Ray et al., *The Effect of Aircraft Traffic Emissions on the Soil Surface: Contamination Analysis Around the International Airport in Delhi, India*, 6 Asian J. Atmospheric Env't 118, 123 (2012).

24  [13] Mayeesha F. Rahim et al., *Physicochemical Studies of Aerosols at Montreal Trudeau Airport: The Importance of Airborne nanoparticles Containing Metal Contaminants*, 246 Env'tl Pollution 734, 734 (Mar. 2019),

25  https://www.sciencedirect.com/science/article/abs/pii/S0269749118335449.

26  [14] *See, e.g.*, Kenneth C. Ames & Edmund A. Prych, *Background Concentrations of Metals in Soils from Selected Regions in the State of Washington*, U.S. Geological Survey, Water-Resources Investigations Report 95-4018 (1995).

27  [15] *See* Katja M. Bendtsen et al., *A Review of Health Effects Associated with Exposure to Jet Engine Emissions in and Around Airports*, 20 Env'tl Health (Feb. 2021), https://ehjournal.biomedcentral.com/articles/10.1186/s12940-020-00690-y.

28

AMENDED CLASS ACTION COMPLAINT - 22
011150-11/2240798 V1



responsible for the contamination within the Contamination Zone from *all* airlines that operate at Sea-Tac Airport.

**D.    Plaintiffs and other Class and Subclass members have been harmed by Defendants' actions.**

78.    Defendants' actions have increased the health risks faced by Plaintiffs and Class members. Defendants' actions have also damaged Plaintiffs' and Subclass members' property by contaminating it with dangerous pollutants.

**1.    Defendants have increased the health risks faced by Plaintiffs and Class members.**

79.    The pollution caused by Defendants' operations is dangerous to Plaintiffs' and Class members' health, and Class members have suffered measurable health consequences as a result of exposure to this pollution.

80.    The Public Health Report provides a particularly good summary of these known health consequences.[16] Overall, exposure to airport-related pollutants causes cancer and affects a range of organ systems, including an individual's cardiovascular, respiratory, reproductive, and central nervous systems. Exposure to these pollutants may also result in poor birth outcomes. The Report summarized these health effects in the following table:

| Health outcomes likely caused or caused by airport operations–related pollutants based on evidence to date | | |
|---|---|---|
| **Organ System** | **Noise Pollution** | **Air Pollutants** |
| Cardiovascular | Causal | Causal |
| Respiratory | Not examined | Causal |
| Reproductive & fertility | Not examined | Causal |
| Birth outcomes | No causal evidence | Likely causal |
| Cancer | Not examined | Causal |
| Central nervous system | No causal evidence | Causal |
| Metabolic system | No causal evidence | No causal evidence |

---

[16] In addition to the health consequences reported in the Report, residents in the Contamination Zone are also likely prone to other illnesses identified in the Table included in Section IV(A).

AMENDED CLASS ACTION COMPLAINT - 23
011150-11/2240798 V1



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

81.     The Report offers more detailed summaries of health effects on people living in the Contamination Zone in a series of additional tables. (For each of the following, the Contamination Zone includes both "Zone A" and "Zone B" as defined in the Public Health Report.)

(a)     People who live in the Contamination Zone are more likely to be hospitalized for asthma, chronic obstructive pulmonary disease (COPD), and heart disease than other King County residents:

| Chronic conditions: prevalence and hospitalization by Zone, 2014-2018 average | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Zone A: <1 mile from airport | | Zone B: 1 to <5 miles from airport | | Zone C: 5 to 10 miles from airport | | Balance of County |
| Cause | Rate[1] | Count | Rate[1] | Count | Rate[1] | Count | Rate[1] |
| *Prevalence* | | | | | | | |
| Has asthma now[2] | 5.6%* | 1,300 | 8.2% | 16,400 | 10.0% | 46,600 | 8.3% |
| Ever had stroke[2] | 2.8%* | 600 | 3.4% | 6,900 | 3.1% | 14,600 | 1.9% |
| Ever had heart attack[2] | 2.7%* | 600 | 3.6% | 7,100 | 3.4% | 16,000 | 2.5% |
| Chronic obstructive pulmonary disesase[2,3] | 2.9%* | 700 | 4.8% | 9,600 | 4.1% | 19,300 | 3.3% |
| Diabetes[2] | 11.8%* | 2,800 | 9.9% | 19,800 | 8.2% | 38,200 | 6.3% |
| Depression (school-age) | ^^ | ^^ | 34.4% | N/A | 33.5% | N/A | 29.4% |
| Depression (adults)[2] | 11.3%* | 2,600 | 20.5% | 40,900 | 22.2% | 103,600 | 21.5% |
| *Hospitalization* | | | | | | | |
| Asthma (adult) | ^^ | ^^ | 28.4 | ^^ | 28.5 | ^^ | 16.6 |
| Asthma (child) | ^^ | ^^ | 100.1 | ^^ | 86.8 | ^^ | 71.3 |
| Cerebrovascular diseases (stroke)[4] | 304.8 | 17 | 270.3 | 413 | 241.9 | 981 | 213.0 |
| COPD[3,4] | 81.7 | 5 | 59.4 | 94 | 68.3 | 286 | 52.3 |
| Diabetes[4] | 179.7 | 10 | 133.2 | 202 | 102.5 | 414 | 70.6 |
| Diseases of the heart[4] | 876.5 | 48 | 600.4 | 918 | 520.4 | 2,134 | 463.3 |

[1] Prevalence rate is percent (rate/100); hospitalization rate is rate/100,000.

[2] Age 18 and older.

[3] COPD is chronic obstructive pulmonary disease.

[4] Rates are age-adjusted.

Higher than Balance of County
*Lower* than Balance of County
Not different from Balance of County

*Rate is unstable; use with caution.

^^Data suppressed to meet confidentiality standard.

N/A: counts not available.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

(b)     Babies born in the Contamination Zone are more often premature and

have lower birthweights than those born elsewhere in the County:

| Birth risk factors | | | | | | |
| by Zone, 2014-2018 average | | | | | | |
| Indicator | Zone A: <1 mile from airport | | Zone B: 1 to <5 miles from airport | | Zone C: 5 to 10 miles from airport | | Balance of County |
| | Percent of live births | Count | Percent of live births | Count | Percent of live births | Count | Percent of live births |
| Early and adequate prenatal care[2] | 63.9% | 300 | 68.8% | 2,367 | 71.1% | 5,042 | 75.0% |
| Premature births (singleton)[2] | 9.8% | 48 | 9.4% | 334 | 8.2% | 593 | 6.6% |
| Low birthweight (singleton)[3] | 5.8% | 28 | 6.1% | 217 | 5.5% | 400 | 4.7% |

[1] "Early and adequate prenatal care" based on Kotelchuck Index (>= 80% of expected prenatal care visits).

[2] A low birth weight is a weight at birth of less than 2500g.

[3] A premature birth is a birth at less than 37 weeks gestation.

| | |
| --- | --- |
| Higher | than Balance of County |
| Lower | than Balance of County |
| Not different | from Balance of County |

(c)     People who live in the Contamination Zone have a shorter life expectancy

at birth than other residents of King County:

| Life expectancy at birth | | | |
| by Zone, 2014-2018 average | | | |
| Indicator | Zone A: <1 mile from airport | Zone B: 1 to <5 miles from airport | Zone C: 5 to 10 miles from airport | Balance of County |
| | Years | Years | Years | Years |
| Life expectancy | 77.9 | 79.4 | 81.2 | 82.9 |

| | |
| --- | --- |
| Higher | than Balance of County |
| Lower | than Balance of County |
| Not different | from Balance of County |

(d)     People who live in the Contamination Zone die more often of all causes

than do other King County residents. In particular, they die more often

from cancer, heart disease, and chronic lower respiratory diseases:

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

| Leading causes of death[1] by Zone, 2014-2018 average | | | | | | |
| Cause Of Death | Zone A: <1 mile from airport | | Zone B: 1 to <5 miles from airport | | Zone C: 5 to 10 miles from airport | | Balance of County |
| | Rate[2] | Count | Rate[2] | Count | Rate[2] | Count | Rate[2] |
|---|---|---|---|---|---|---|---|
| All causes | 808.6 | 248 | 723.4 | 1,901 | 639.1 | 3,950 | 572.2 |
| Cancer | 158.7 | 48 | 160.9 | 428 | 138.6 | 878 | 135.3 |
| Diseases of heart | 187.7 | 59 | 142.9 | 374 | 126.6 | 783 | 115.3 |
| Alzheimer's disease | 52.2 | 17 | 38.1 | 96 | 43.7 | 259 | 47.8 |
| Accidents (Unintentional injuries) | 45.8 | 14 | 39.1 | 106 | 35.7 | 222 | 30.4 |
| Cerebrovascular diseases (stroke) | 32.7 | 11 | 34.9 | 90 | 34.5 | 209 | 28.8 |
| Chronic lower respiratory diseases | 38.5 | 10 | 34.9 | 90 | 27.6 | 168 | 22.5 |
| Diabetes mellitus | 33.9 | 10 | 26.3 | 70 | 22.0 | 137 | 14.4 |
| Intentional self-harm (suicide) | 9.8 | 3 | 13.1 | 35 | 11.8 | 75 | 11.8 |
| Chronic liver disease and cirrhosis | 18.8 | 6 | 13.1 | 37 | 10.2 | 69 | 7.9 |
| Influenza and pneumonia | 14.3 | 4 | 13.5 | 35 | 10.0 | 61 | 8.6 |
| Essential hypertension and hypertensive renal disease | 10.9 | 4 | 10.6 | 28 | 9.1 | 55 | 6.8 |
| Nephritis[3] | ^^ | ^^ | 8.6 | 22 | 6.6 | 41 | 4.6 |
| Septicemia | 7.0* | 2 | 9.1 | 24 | 7.0 | 42 | 4.1 |
| Assault (homicide) | 6.6* | 2 | 7.9 | 20 | 4.0 | 24 | 1.1 |
| Certain conditions originating in the perinatal period | ^^ | ^^ | 4.0 | 11 | 3.2 | 17 | 1.8 |

[1] The list of leading causes was developed by including any cause of death that is one of the 10 leading causes in any race group.

[2] Rates are age-adjusted rates per 100,000 population.

[3] Nephritis, nephrotic syndrome and nephrosis

Higher    than Balance of County
Lower    than Balance of County
Not different    from Balance of County

*Rate is unstable; use with caution.

^^Data suppressed to protect confidentiality.

(e)    Finally, communities within the Contamination Zone experience over 100 excess deaths per year on average as a result of their proximity to the airport:

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

| Excess deaths in airport communities[1] | | | | |
|---|---|---|---|---|
| 5 leading causes of King County deaths, 2014-2018 average | | | | |
| Cause Of Death | Observed per year[2] | Expected per year[3] | Excess per year[4] | Mortality ratio[5] |
| **Zone A: Less than 1 mile from airport** | | | | |
| Cancer | 35 | 25 | 10 | **1.4** |
| Diseases of heart | 28 | 12 | 16 | **2.3** |
| Alzheimer's disease | 2 | 1 | 0 | 1.3 |
| Accidents (Unintentional injuries) | 12 | 7 | 5 | **1.8** |
| Cerebrovascular diseases (stroke) | 5 | 2 | 2 | **1.9** |
| **Zone B: 1 to less than 5 miles from airport** | | | | |
| Cancer | 299 | 234 | 65 | **1.3** |
| Diseases of heart | 181 | 113 | 69 | **1.6** |
| Alzheimer's disease | 11 | 13 | 0 | 0.8 |
| Accidents (Unintentional injuries) | 82 | 58 | 24 | **1.4** |
| Cerebrovascular diseases (stroke) | 40 | 22 | 18 | **1.8** |
| **Zone C: 5 to 10 miles from airport** | | | | |
| Cancer | 600 | 569 | 31 | **1.1** |
| Diseases of heart | 359 | 275 | 85 | **1.3** |
| Alzheimer's disease | 32 | 32 | 0 | 1.0 |
| Accidents (Unintentional injuries) | 170 | 138 | 32 | **1.2** |
| Cerebrovascular diseases (stroke) | 76 | 54 | 22 | **1.4** |

[1] Calculations exclude age 80 and older. See Appendix A for details.

[2] Observed per year is the number of actual deaths.

[3] Expected per year is the number of deaths that would have occured if the death rate was the same as the death rate in Balance of County. See Appendix A for details.

[4] Excess per year is the number of observed deaths minus the number of expected deaths. Numbers may not total due to rounding.

[5] Mortality ratio is the Zone's death rate divided by the death rate in Balance of County. See Appendix A for details.

*Higher* than Balance of County
*Lower* than Balance of County
Not different from Balance of County

82.     The Public Health Report confirms that living in the Contamination Zone is dangerous and, in some cases, may even be deadly.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

2. **Defendants' actions have damaged Plaintiffs' and Subclass members' property by contaminating it with dangerous pollutants.**

83.     In addition to increasing Plaintiffs' and Class members' health risks, Defendants actions have caused property damage by contaminating all residential property in the Contamination Zone with harmful pollutants. In particular, Plaintiffs and other Subclass members who own their homes suffer a continual decline in the value of their property as Defendant Airlines, with the consent and support of the Port, dump more and more pollution onto their property.

84.     It is widely recognized that pollution affects property values; homes in areas with less pollution command higher prices.[17] For example, one µg/m$^3$ decline in particulate matter pollution results in a 0.4-0.5% increase in home values.[18] Conversely, an increase in pollution leads to lower prices.[19] Given the ever-increasing burden of pollution that contaminates Plaintiffs' and Subclass members' properties, the value of their property is continually in decline.

E.     **Defendants knew or should have known that their activities were harming Plaintiffs and other Class members, and yet they continued to engage in these activities.**

85.     It is implausible that Defendant Airlines and the Port were unaware that their actions were harming Plaintiffs and other Class members. The MOV-UP Study has been publicly available since 2019. The Public Health Report has been publicly available since 2020. And the Schools Study has been publicly available since 2021. All Defendants are sophisticated entities that would have reason to keep abreast of scientific research regarding the impacts of airport and airplane pollution, and the MOV-UP Study in particular generated significant publicity that would have been hard for Defendants to miss. The following appeared in the Seattle Times:

---

[17] *See, e.g.*, Kenneth Y. Chay & Michael Greenstone, *Does Air Quality Matter? Evidence from the Housing Market*, 113 J. Pol. Econ. 376 (Apr. 2005); Ramesh Chandra Das, Tonmoy Chatterjee & Enrico Ivaldi, *Nexus Between Housing Prices and Magnitude of Pollution: Evidence from the Panel of Some High- and Low- Polluting Cities of the World*, 14 Sustainability 9283 (2022).

[18] Chay & Greenstone, *supra* note 17, at 1.

[19] *See, e.g., id.* One study of the impact of fine particulate matter pollution in residential areas in China recently concretized this concept, determining that every 1% increase in particulate matter causes an approximately 0.5% decrease in house prices. Wenhao Xue et al., *Are House Prices Affected by PM2.5 Pollution? Evidence from Beijing, China*, 19 Int'l J. Environ. Res. Public Health 8461 (July 2022).

AMENDED CLASS ACTION COMPLAINT - 28
011150-11/2240798 V1



86.     Other news outlets, including KOMO News, KIRO 7 News, and FOX13 Seattle, have also run similar stories:

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Sea-Tac Airport exposes communities to unique kind of pollution, UW study says**

by Karina Mazhukhina | KOMO News | Sat, December 7th 2019, 2:14 PM PST 



Delta Airlines flies out of Sea-Tac Airport (Photo: Daniel Jensen / SlickPix Photography)

LOCAL

**Communities near Sea-Tac Airport exposed to unique mix of air pollution, UW study finds**

By KIRO 7 News Staff
December 06, 2019 at 12:31 pm PST



FOX13    Live    Good Day    Studio 13    Spotlight    Weather    Sports    Contests    More ⋮

# UW study looks at 'unique' pollution around Sea-Tac Airport

By Jennifer Lee | Published December 5, 2019 | FOX13 News | Seattle & Western Washington | Formerly Q13 News | ↱

AMENDED CLASS ACTION COMPLAINT - 30

011150-11/2240798 V1

87.     At the very least, there is evidence that all Defendants knew of the Public Health

Report's findings (and consequently of the MOV-UP Study findings as well) by mid-2021.

88.     The Port must have learned of the Public Health Report by Spring 2021 because,

on or about April 27, 2021, a consultant—Ramboll Group A/S—presented a review of the Public

Health Report commissioned by the Port.[20] The Port, of course, could not have commissioned

Ramboll's review had it been unaware of the Public Health Report's existence. The Port

therefore knew by the Spring of 2021 that its operations were contaminating the Contamination

Zone, and that this contamination is harmful to human health.

89.     Despite this knowledge, the Port did not act to prevent future contamination of the

Contamination Zone. To the contrary, the Port forged ahead with the construction of a new

International Arrivals Facility at Sea-Tac Airport, with plans to "more than double" international

passenger capacity.[21] The Facility opened in March 2022.[22]

90.     Defendant Airlines, for their part, must have learned of the Report on June 23,

2021, at the latest. On that date, the Seattle-Tacoma Airport Stakeholder Advisory Round Table

held a Zoom meeting from 5:00 p.m. to 7:00 p.m. at which Dr. Kris Johnson, one of the authors

of the Public Health Report, provided an overview of the Report's key findings.[23]

Representatives from both Alaska and Delta—Randy Fiertz and Scott Ingham, respectively—

were present at the meeting.[24] Defendant Airlines therefore knew by the Summer of 2021 that

their operations were contaminating the Contamination Zone, and that this contamination is

harmful to human health.

---

[20] Complaint at ¶ 4.15, *Edmiston v. Port of Seattle*, No. 22-2-15797-6 SEA (King Cty. Super. Ct. Sept. 29, 2022).

[21] Port of Seattle, Seattle-Tacoma International Airport International Arrivals Facility (Apr. 2021), https://www.portseattle.org/sites/default/files/2021-04/POS_2021-3_IAF_1Pager.pdf.

[22] Port of Seattle, *SEA Airport Reveals Dramatic New International Arrivals Facility* (Mar. 3, 2022), https://www.portseattle.org/news/sea-airport-reveals-dramatic-new-international-arrivals-facility#:~:text= March%203%2C%202022,leading%20tourism%20and%20business%20gateway.

[23] StART, Meeting Summary (June 23, 2021), https://www.portseattle.org/sites/default/files/2021-07/StART-MeetingSummary-20210623.pdf.

[24] *Id.* Randy Fiertz is the Director of Airport Affairs at Alaska Airlines. https://www.linkedin.com/in/randy-fiertz-48a6568 (last visited Apr. 18, 2023). Scott Ingham works as external government relations counsel to Delta Air Lines. https://www.linkedin.com/in/scottingham1 (last visited Apr. 18, 2023).



91.     Despite this knowledge, Defendant Airlines did not act to prevent future contamination of the Contamination Zone. Instead, Alaska has since outlined "aggressive growth plans" for 2023, with much of this growth centered in the Pacific Northwest (which includes Sea-Tac Airport).[25] And Delta has been "closely engaged with the Port of Seattle on the construction of the [International Arrivals Facility]," where it serves more international destinations from Seattle than any other carrier.[26] Delta is now planning for a spike in international traffic to Sea-Tac Airport.[27]

**F.      Plaintiffs and Class members will require professional assistance to redress the harm Defendants have caused.**

**1.      Appropriate diagnosis and treatment of airport-related illnesses among Plaintiffs and other Class members will require ongoing medical monitoring by healthcare professionals.**

92.     Some of the harm people suffer as a result of their exposure to Airport-related pollution can be mitigated by early treatment of resulting illnesses and other health conditions.

93.     For example, early treatment of asthma can help prevent irreversible lung damage. Treating COPD, pulmonary fibrosis, heart failure, and cancers early in the course of disease progression can prolong survival, and, in the case of cancer, increase the chances of complete remission. Early intervention in the course of Parkinson's Disease and chronic kidney disease can result in a decrease in symptoms and slow the progression of these illness. Finally, access to prenatal care reduces preterm births and low birth weights.

94.     But for people to benefit from early treatment for these diseases and health conditions, they must be diagnosed near the onset of their disease, which requires regular screening and medical monitoring by a trained healthcare professional.

---

[25] Dominic Gates, *Despite Setbacks, Alaska Air Is Profitable, Plans to Hire and grow*, SEATTLE TIMES (Jan. 26, 2023), https://www.seattletimes.com/business/boeing-aerospace/alaska-reports-higher-profits-in-fourth-quarter-signaling-recovery.

[26] Delta News Hub, *At Delta's Seattle hub, a new experience for international travelers* (Mar 4., 2022), https://news.delta.com/deltas-seattle-hub-new-experience-international-travelers#:~:text=The%20450%2C000%20square%20foot%20facility,(up%20from%201%2C000%20today).

[27] Marissa Nall, Delta Air Lines exec plans for spike in international traffic to Seattle, PUGET SOUND BUS. J. (Feb. 13, 2023), https://www.bizjournals.com/seattle/news/2023/02/13/delta-air-lines-joan-wang-international-flights.html.

AMENDED CLASS ACTION COMPLAINT - 32
011150-11/2240798 V1


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

**2.    Decontaminating Plaintiffs' and Subclass members' property will require specialized equipment and skills.**

95.    Rehabilitating an area that has been affected by pollutants including particulate matter, harmful gases, hazardous air pollutants, and toxic heavy metals is possible, but doing so requires specialized equipment and skills and can therefore be expensive. Methods for removing pollutants from the air include biofiltration, and methods for removing soil pollutants from a contaminated environment include chlorination, chemical extraction, electrokinetics, ion exchange, membrane separation, bioleaching, adsorption, and phytoremediation. This is not a case where Plaintiffs and other Subclass members can easily fix the problem by wiping down their homes with soap and water.

## V.    CLASS ACTION ALLEGATIONS

96.    Plaintiffs bring this action pursuant to CR 23 of the Washington Rules of Civil Procedure on behalf of themselves and as a class action on behalf of the following Class and Subclass:

> **Resident Class:** All current residents of the Contamination Zone as depicted in Figure 1.

> **Homeowner and Renter Subclass:** All current renters and owners of residential real property located in the Contamination Zone as depicted in Figure 1, reprinted below:



AMENDED CLASS ACTION COMPLAINT - 33
011150-11/2240798 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

97.     Plaintiffs assert claims under the laws of Washington State as set forth below.

98.     Excluded from the Class and Subclass are: (a) the officers and directors of the Defendants; (b) any judge or judicial officer assigned to this matter and their immediate family; (c) any legal representative, successor, or assign of any excluded persons or entities; (d) any Class counsel or their immediate family members; and (e) any State or any of its agencies.

**A.      All requirements of CR 23(a) are met.**

99.     A class action is warranted in this case because the Class and Subclass are so numerous that joinder of all members is impracticable; there are questions of law or fact common to the Class and Subclass; the claims of the representative parties are typical of the claims of the Class and Subclass; and the Plaintiffs named in this Complaint will fairly and adequately protect the interests of the Class and Subclass.

100.    **Numerosity**: The members of the Class and Subclass are so numerous that individual joinder of all Class members is impracticable. For purposes of this Complaint, Plaintiffs allege that there are approximately 300,000 people who live in the Contamination Zone. The disposition of the claims asserted through this class action will enhance efficiency and will benefit the parties and the Court.

101.    **Commonality**: The Class should be certified because the negligence claims asserted in this action are common to all members of the Class and individual complaints otherwise may result in inconsistent or varying adjudications. Similarly, the Subclass should be certified because the claims asserted in this action, including negligence, trespass, nuisance, and inverse condemnation, are common to all members of the Subclass and individual complaints otherwise may result in inconsistent or varying adjudications.

102.    **Typicality**: Plaintiffs' claims are typical of the claims of the Class and Subclass because all claims arise from the same operative facts and are based on the same legal theories.

103.    **Adequacy**: The Plaintiffs will fairly and adequately protect the interests of the Class and Subclass. Plaintiffs have retained competent counsel experienced in matters such as these. Plaintiffs and their counsel are committed to prosecuting this action vigorously on behalf

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1    of the Class and Subclass and have the financial resources to do so. Neither Plaintiffs nor their

2    counsel have interests adverse to those of the Class or Subclass.

3    **B.      All requirements of CR 23(b)(3) are met.**

4           104.    In addition to satisfying the prerequisites of CR 23(a), this case qualifies for class

5    action treatment because questions of law or fact common to the Class and Subclass predominate

6    over any questions affecting only individual Class members, and because a class action suit is a

7    superior to other available methods for adjudicating the controversy.

8           105.    **Predominance**: Questions of law or fact common to the Class and Subclass

9    predominate in this case. These questions include, but are not limited to:

10                  (a)    Whether pollutants including particulate matter, harmful gases, hazardous

11                         air pollutants, and toxic heavy metals contaminate the air and soil in the

12                         Contamination Zone;

13                  (b)    Whether Defendants' operations have caused these pollutants to

14                         contaminate the air and soil in the Contamination Zone;

15                  (c)    Whether the measures Defendants have implemented to prevent the

16                         release of pollutants including particulate matter, harmful gases, hazardous

17                         air pollutants, and toxic heavy metals on Contamination Zone

18                         communities are effective and sufficient;

19                  (d)    Whether Defendant Airlines breached a duty of reasonable care in their

20                         operations by allowing pollutants including particulate matter, harmful

21                         gases, hazardous air pollutants, and toxic heavy metals to contaminate the

22                         air and soil in the Contamination Zone;

23                  (e)    Whether Defendant Airlines trespassed on Plaintiffs' and other Subclass

24                         members' properties intentionally or negligently;

25                  (f)    Whether Defendant Airlines created a nuisance with respect to Plaintiffs'

26                         and other Subclass members' properties by unreasonably interfering with

27                         their use and enjoyment of their respective properties;

28



(g)     Whether Defendant Port of Seattle is liable for damaging or taking property belonging to Plaintiffs and other Class and Subclass members although the Port, itself, operates no aircraft;

(h)     Whether Plaintiffs and other Class and Subclass members are entitled to equitable relief, including, but not limited to, injunctive relief and medical monitoring; and

(i)     Whether Plaintiffs and other Class and Subclass members are entitled to damages and other monetary relief and, if so, in what amount.

106.    **Superiority**: A class action is superior to other available methods for the fair and efficient adjudication of this controversy. *First*, the expense and burden of litigation would substantially impair the ability of many Class and Subclass members to pursue individual cases to protect their rights. Absent class treatment, Plaintiffs and other Class and Subclass members will continue to suffer harm as a result of Defendants' unlawful and wrongful conduct. *Second*, Plaintiffs are unaware of any litigation concerning the controversy already commenced by other members of the Class or Subclass. *Third*, this Court is the proper forum for concentrating the litigation given that the harm affecting all Plaintiffs and Class and Subclass members occurred within this Court's jurisdiction. *Finally*, Plaintiffs do not expect that managing this class action will cause difficulties for the Court, particularly given this Court's experience managing other class actions.

# VI.    CLAIMS

## A.    Resident Class Claims

### COUNT ONE
### NEGLIGENCE

**(Alleged by Plaintiffs against Defendant Airlines on behalf of the Resident Class)**

107.    Plaintiffs and the Class incorporate by reference all the foregoing allegations.



108.    Defendant Airlines have breached their duty to exercise ordinary care, and that breach proximately caused Plaintiffs' and other Class members' increased risk of developing life-threatening illnesses.[28]

109.    A reasonably careful company exercising ordinary care would not shower pollutants on neighboring communities in quantities that pose serious health risks.

110.    Defendant Airlines knew or should have known that their operations caused pollutants, including particulate matter, harmful gases, hazardous air pollutants, and toxic heavy metals, to rain down on and contaminate the neighborhoods surrounding Sea-Tac Airport.

111.    Defendant Airlines also knew or should have known that these pollutants are hazardous to human health.

112.    Despite this knowledge, Defendant Airlines continued acting in ways that caused pollutants to rain down on communities near Sea-Tac Airport in the Contamination Zone.

113.    Defendant Airlines' decision to engage in activities that they knew or should have known would harm people living in the Contamination Zone constitutes a breach of Defendant Airlines' ordinary duty of care.

114.    As a direct and proximate result of Defendant Airlines' breach, Plaintiffs and the Class have suffered injury. Plaintiffs' and Class members breathe air and come in contact with soil that is contaminated with pollutants as a direct consequence of Defendant Airlines' actions. No superseding cause breaks this chain of causation. Were it not for Defendant Airlines' negligent actions, Plaintiffs and other Class members would not have been exposed to this pollution, and they would not thereby be at an increased risk of developing life-threatening illnesses such as cancer and heart disease.

---

[28] *See Ranger Ins. Co. v. Pierce Cty.*, 164 Wn.2d 545, 552–53, 192 P.3d 886 (2008) ("In an action for negligence a plaintiff must prove four basic elements: (1) the existence of a duty, (2) breach of that duty, (3) resulting injury, and (4) proximate cause.").



**B.     Homeowner and Renter Subclass Claims**

**COUNT TWO**
**NEGLIGENCE**

**(Alleged by Plaintiffs against Defendant Airlines**
**on behalf of the Homeowner and Renter Subclass)**

115.    Plaintiffs and the Subclass incorporate by reference all the foregoing allegations.

116.    Defendant Airlines have breached their duty to exercise ordinary care, and that breach proximately caused Plaintiffs' and other Subclass members' property injuries.[29]

117.    A reasonably careful company exercising ordinary care would not shower pollutants on neighboring communities in quantities that cause property damage.

118.    Defendant Airlines knew or should have known that their operations caused pollutants, including particulate matter, harmful gases, hazardous air pollutants, and toxic heavy metals, to rain down on and contaminate property in the neighborhoods surrounding Sea-Tac Airport.

119.    Despite this knowledge, Defendant Airlines continued acting in ways that caused pollutants to rain down on communities near Sea-Tac Airport in the Contamination Zone.

120.    Defendant Airlines' decision to engage in activities that they knew or should have known would harm property belonging to people living in the Contamination Zone constituted a breach of Defendant Airlines' ordinary duty of care.

121.    As a direct and proximate result of Defendant Airlines' breach, Plaintiffs and the Subclass have suffered injury. Plaintiffs' and Subclass members' homes and other property are contaminated with pollutants as a direct consequence of Defendant Airlines' actions. No superseding cause breaks this chain of causation. Were it not for Defendant AIrlines' negligent actions, Plaintiffs' and Subclass members' homes and property would not have been subject to this contamination.

---

[29] *See Ranger Ins. Co.*, 164 Wn.2d at 552–53 ("In an action for negligence a plaintiff must prove four basic elements: (1) the existence of a duty, (2) breach of that duty, (3) resulting injury, and (4) proximate cause.").


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1

2

## COUNT THREE
## CONTINUING INTENTIONAL TRESPASS

### (Alleged by Plaintiffs against Defendant Airlines
### on behalf of the Homeowner and Renter Subclass)

3

4

122.    Plaintiffs and the Subclass incorporate by reference all the foregoing allegations.

5

123.    Defendant Airlines have caused, and continue to cause, pollutants to enter onto

6

real property owned or rented by Plaintiffs and Subclass members.[30] This trespass was

7

intentional because Defendant Airlines knew that the entry of pollutants onto Plaintiffs' and

8

Subclass members' property was certain, or substantially certain, to result from their operations.

9

Despite this substantial certainty, Defendant Airlines still went ahead with their operations.[31]

10

124.    Such intrusions re-occur many times each day as Defendant Airlines' aircraft

11

headed to or leaving from Sea-Tac Airport fly over or near Plaintiffs' and Subclass members'

12

property and cause pollutants to be deposited on that property.

13

125.    Defendant Airlines knew that their operations caused pollutants to rain down on

14

the neighborhoods surrounding Sea-Tac Airport, including the Contamination Zone. It was

15

therefore reasonably foreseeable that their operations would disturb Plaintiffs' and Subclass

16

members' possessory interests.

17

126.    Defendant Airlines' trespass is without right or license and violates the exclusive

18

property rights of Plaintiffs and Subclass members. The pollutants that Defendant Airlines cause

19

to spread through the air and to contaminate Plaintiffs' and Subclass members' properties

20

constitute an unreasonable interference with possessory use of their respective properties.

21

127.    Defendant Airlines' intentional trespass has resulted in actual and substantial

22

damages to the real property owned or rented by Plaintiffs and Subclass members because this

23

property is now contaminated with pollutants in concentrations that are hazardous to human

24

25

26

---

[30] *See Crystal Lotus Enters. Ltd. v. City of Shoreline*, 167 Wn. App. 501, 506, 274 P.3d 1054 (2012) ("To establish intentional trespass, a plaintiff must show (1) invasion of property affecting an interest in exclusive possession, (2) an intentional act, (3) reasonable foreseeability the act would disturb the plaintiff's possessory interest, and (4) actual and substantial damages. . . . A cause of action for continuing intentional trespass (as opposed to permanent trespass) arises when an intrusive substance remains on a person's land, causes actual and substantial harm to that person's property, and is abatable.").

27

28

[31] *See Bradley v. Am. Smelting & Ref. Co.*, 104 Wn.2d 677, 709 P.3d 782 (1985) (quoting the Restatement (Second) of Torts, which says "The word 'intent' is used . . . to denote that the actor desires to cause consequences of his act, or that he believes that the consequences are substantially certain to result from it.").

AMENDED CLASS ACTION COMPLAINT - 39

011150-11/2240798 V1


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1    health. Abating this damage will require decontaminating Plaintiffs' and Subclass members'

2    property through expensive cleanup efforts.

3    **COUNT FOUR**<br>**PUBLIC NUISANCE**

4

5    **(Alleged by Plaintiffs against Defendant Airlines**<br>**on behalf of the Homeowner and Renter Subclass)**

6        128.    Plaintiffs and the Subclass incorporate by reference all the foregoing allegations.

7        129.    Defendant Airlines' unlawful dispersal of pollutants onto Plaintiffs' and Subclass

8    members' property constitutes a public nuisance as defined by Washington law.[32]

9        130.    Defendant Airlines have acted unlawfully by causing dangerous and harmful

10    pollutants to be deposited on neighborhoods surrounding Sea-Tac Airport. As described above,

11    Defendant Airlines' actions are unlawful because they are negligent and constitute trespass.

12        131.    Defendant Airlines' unlawful acts have annoyed, injured, and endangered the

13    comfort, repose, health, and safety of Plaintiffs and Subclass members. As a result of Defendant

14    Airlines' actions, Plaintiffs and Subclass members now live in conditions where the surfaces of

15    their property are contaminated, and the very air they breathe is full of pollutants that pose

16    significant health risks. Defendant Airlines' unlawful actions have therefore rendered Plaintiffs

17    and Subclass members insecure in life and in the use of their property.

18        132.    Although Defendant Airlines' actions are a nuisance to anyone whose property is

19    thereby polluted, these actions have been especially injurious to Plaintiffs and Subclass members

20    who reside within the Contamination Zone. Defendant Airlines' actions have caused Plaintiffs'

21    and Subclass members' properties to become extensively contaminated, resulting in significant

22    health risks that are different in kind from the harm suffered by the public generally.

23        133.    As a direct and proximate result of Defendant Airlines' actions, Plaintiffs and the

24    Subclass have suffered injury. Plaintiffs' and Subclass members' homes and other property are

25    all now contaminated with pollutants as a direct consequence of Defendant Airlines' actions. No

26    superseding cause breaks this chain of causation. Were it not for Defendant Airlines' actions,

27

28    [32] RCWA §§ 7.48.010, 7.48.120 *et seq.*

AMENDED CLASS ACTION COMPLAINT - 40
011150-11/2240798 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1  Plaintiffs' and Subclass members' homes and property would not have been subject to this
2  contamination.

3      134.    The balance of interests here is clear. Plaintiffs and other members of the Subclass
4  have the right to live in safe homes. They have the right to breathe clean air and live on
5  properties that are not heavily contaminated with pollutants rained down on them by large
6  corporations. Plaintiffs and the Subclass should not have to resign themselves to watching their
7  children become sick and die while Defendant Airlines rake in profits. Defendant Airlines'
8  interests in avoiding the costs of cleanup does not outweigh the Plaintiffs' and other Subclass
9  members' interests in living safe, healthy lives.

10                              **COUNT FIVE**
11                        **INVERSE CONDEMNATION**

12                    **(Alleged by Plaintiffs against the Port**
                  **on behalf of the Homeowner and Renter Subclass)**

13      135.    Plaintiffs and the Subclass incorporate by reference all the foregoing allegations.

14      136.    Article I, Section 16 (Amendment 9) of the Washington Constitution requires the
15  State to pay just compensation when taking or damaging property.

16      137.    To support operations at Sea-Tac, a public airport, the Port has permitted airlines,
17  including Defendant Airlines, to operate in a manner that causes pollutants to be dumped on
18  Plaintiffs' and Subclass members' private property.

19      138.    The Port's actions have caused substantial damage to Plaintiffs' and Subclass
20  members' property, which is now contaminated with airport-related pollutants.

21      139.    Despite damaging Plaintiffs' and Subclass members' private property, the Port
22  has not paid Plaintiffs and Subclass members just compensation. Nor has the Port instituted
23  proceedings to formally acquire rights to the property through eminent domain. The Port's
24  failure to pay just compensation or formally acquire rights to the property is a violation of the
25  Washington Constitution.

26

27

28


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

# VII.   REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the Class and Subclass,
respectfully request judgment as follows:

A.      An Order certifying the Class and Subclass; designating Plaintiffs as
representatives of the Class and Subclass and designating Plaintiffs' counsel as Class counsel;
and requiring Defendants to pay the costs of notice to the Class and Subclass;

B.      An Order declaring that Defendant Airlines have (i) been negligent in their Sea-
Tac Airport operations by engaging in activity that increases the risk of disease and death among
all Class members; (ii) been additionally negligent in their Sea-Tac airport operations by
engaging in activity that has damaged Subclass members' property; (ii) committed trespass by
causing pollutants to enter onto the properties of Plaintiffs and other Subclass members; and
(iii) created a nuisance by causing pollutants to contaminate neighborhoods near Sea-Tac
Airport;

C.      An Order declaring that the Port has violated Article I, Section 16 (Amendment 9)
of the Washington Constitution;

D.      An Order for injunctive relief and/or for damages against all three Defendants
reflecting the cost to remediate Plaintiffs' and Subclass members' properties of the
contamination caused by Defendant's conduct;

E.      An Order for monetary damages against Defendant Airlines sufficient to
compensate Plaintiffs and Subclass members for the loss of the use and enjoyment of their
properties caused by Defendant Airlines' conduct;

F.      An Order for injunctive relief against Defendant Airlines creating a Court-
supervised, Defendant-funded medical monitoring program which will:

(i)      Establish a trust fund, in an amount to be determined, to pay for appropriate
medical monitoring as frequently as necessary to facilitate the diagnosis of
Class members with illnesses associated with exposure to airport-related
pollution (including exposure to carbon monoxide, nitrogen dioxide, sulfur
oxide, formaldehyde, acrolein, 1,3-butadiene, naphthalene, benzene,

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

acetaldehyde, ethylbenzene, aluminum, barium, cadmium, copper, lead, magnesium, silver, uranium, and zinc, as well as to fine, ultrafine, and ultra-ultrafine particulate matter);

(ii)  Notify all Class members, in writing, that they may require frequent medical monitoring for the purposes of diagnosis; and

(iii)  Provide information to treating physicians to aid them in determining when a Class member is subjected to an increased risk of harm; and

G.  An Order for any further relief as this Court may deem just and proper.

## VIII.  JURY DEMAND

Plaintiffs hereby demand a trial by jury on any and all matters so triable.

DATED this 21st day of April, 2023.                    Respectfully submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP

By: */s/ Steve W. Berman*
 Steve W. Berman, WSBA #12536
Sean R. Matt, WSBA #21972
Thomas E. Loeser, WSBA #38701
Shelby R. Smith, WSBA #31377
Martin D. McLean, WSBA #33269
Jerrod C. Patterson, WSBA #43325
Garth D. Wojtanowicz, WSBA #30822
Jacob P. Berman (*pro hac vice* forthcoming)
1301 2nd Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com
sean@hbsslaw.com
toml@hbsslaw.com
shelby@hbsslaw.com
martym@hbsslaw.com
jerrodp@hbsslaw.com
jakeb@hbsslaw.com



1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Abigail D. Pershing (*pro hac vice* forthcoming)
HAGENS BERMAN SOBOL SHAPIRO LLP
301 North Lake Avenue, Suite 920
Pasadena, CA 91101
Telephone: (213) 330-7150
abigailp@hbsslaw.com

*Attorneys for Plaintiffs Cindy Codoni,
Michelle Geer, and the Putative Class*

AMENDED CLASS ACTION COMPLAINT - 44
011150-11/2240798 V1