1

2

3

4

5

6

7

8

THE HONORABLE JAMAL N. WHITEHEAD

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

CINDY CODONI, MICHELLE GEER,
HORACE CATHCART, AMY FRANCE, and
TAMARA CHAKOS, individually and on
behalf of all others similarly situated,

Plaintiffs,

v.

PORT OF SEATTLE, ALASKA AIR
GROUP, and DELTA AIR LINES, INC.,

Defendants.

Case No. 2:23-cv-00795-JNW

**THE PORT OF SEATTLE'S MOTION
TO DISMISS PLAINTIFFS' SECOND
AMENDED COMPLAINT**

**NOTE ON MOTION CALENDAR:**
**To be determined per Dkt.45**

**Oral Argument Requested**

THE PORT OF SEATTLE'S MOTION TO DISMISS
PLAINTIFFS' SECOND AMENDED COMPLAINT
(2:23-cv-000795 JNW)

1

**TABLE OF CONTENTS**

2
                                                                                                **Page**

3
TABLE OF AUTHORITIES ................................................................................................ ii

4
I. INTRODUCTION ............................................................................................................ 1

II. STATEMENT OF THE CASE ....................................................................................... 2

5
    A.    Factual Background ................................................................................... 2

6
    B.    Regulatory Background ............................................................................. 3

7
        1.    The CAA .................................................................................... 3

            a.    Sections 231 and 233 of the CAA.................................. 3

8
            b.    EPA Has Prioritized International Uniformity and
9
                   Technological Feasibility in Setting Aircraft Emission
                   Standards ........................................................................ 4

10
        2.    The FAAct .................................................................................. 6

        3.    The ADA .................................................................................... 7

11
III. ARGUMENT ................................................................................................................ 7

12
    A.    Motion to Dismiss Standard...................................................................... 7

13
    B.    Preemption Doctrine ................................................................................. 8

    C.    The CAA Expressly Preempts Plaintiffs' Claims..................................... 8

14
        1.    Section 233 Preempts Standards That Are Not Identical to EPA's
15
            Standards ................................................................................... 10

        2.    Plaintiff's Artful Pleading Cannot Overcome Preemption ..................... 11

16
    D.    The FAAct Preempts Plaintiffs' Claims ................................................. 13

17
        1.    Conflict Preemption .................................................................. 13

18
        2.    Field Preemption ....................................................................... 16

    E.    Plaintiffs' Claims Are Expressly Preempted by the ADA................................. 18

19
    F.    Plaintiffs Fail to Show That They Have Standing to Bring an Inverse
20
        Condemnation Claim Against the Port ................................................... 21

21
IV. CONCLUSION............................................................................................................ 24

22

23

24

25

26

THE PORT OF SEATTLE'S MOTION TO DISMISS
PLAINTIFFS' SECOND AMENDED COMPLAINT
(2:23-CV-000795 JNW)          - i -

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
*Telephone 206.624.0900*

1

**TABLE OF AUTHORITIES**

2
**Page**

3
**Cases**

4
*Air Line Pilots Ass'n, Int'l v. Quesada,*
  276 F.2d 892 (2d Cir. 1960)..................................................................14

5
*Altria Grp., Inc. v. Good,*
6
  555 U.S. 70 (2008)..............................................................................13

7
*Am. Airlines, Inc. v. Wolens,*
  513 U.S. 219 (1995).........................................................................10, 19
8
*Am. Elec. Power Co. v. Connecticut,*
9
  564 U.S. 410 (2011)..............................................................................12

10
*Arizona v. United States,*
  132 S. Ct. 2492 (2012).............................................................................8
11
*Barnes v. U.S. Dep't of Transp.,*
12
  655 F.3d 1124 (9th Cir. 2011) ..............................................................23

13
*Big Stone Broad., Inc. v. Lindbloom,*
  161 F. Supp. 2d 1009 (D.S.D. 2001) ......................................................6
14
*British Airways Bd. v. Port Auth. of N.Y.,*
15
  558 F.2d 75 (2d Cir. 1977)....................................................................15

16
*California v. EPA,*
  72 F.4th 308 (D.C. Cir. 2023)..............................................................13
17
*Chae v. SLM Corp.,*
18
  593 F.3d 936 (9th Cir. 2010) ...............................................................13

19
*Chamber of Com. of U.S. v. Bonta,*
  62 F.4th 473 (9th Cir. 2023)...................................................................8
20
*Charas v. Trans World Airlines, Inc.,*
21
  160 F.3d 1259 (9th Cir. 1998) .............................................................20

22
*Cipollone v. Liggett Grp., Inc.,*
  505 U.S. 504 (1992).................................................................10, 11, 16
23
*City of Burbank v. Lockheed Air Terminal Inc.,*
24
  411 U.S. 624 (1973)...................................................................... passim

25
*City of L.A. v. FAA,*
  138 F.3d 806 (9th Cir. 1998) ...............................................................23
26

THE PORT OF SEATTLE'S MOTION TO DISMISS
PLAINTIFFS' SECOND AMENDED COMPLAINT
(2:23-CV-000795 JNW)                 - ii -

1

## TABLE OF AUTHORITIES
(continued)

2

Page

3   *City of New York v. Chevron Corp.*,
4       993 F.3d 81 (2d Cir. 2021)...................................................................11, 12, 18

   *Crosby v. Nat'l Foreign Trade Council*,
5       530 U.S. 363 (2000)..........................................................................13, 14

6   *Duncan v. Northwest Airlines, Inc.*,
7       208 F.3d 1112 (9th Cir. 2000) .....................................................................20

   *EagleMed LLC v. Cox*,
8       868 F.3d 893 (10th Cir. 2017) ......................................................................7

9   *Engine Manufacturers Association v. South Coast Air Quality*
        *Management District*,
10      541 U.S. 246 (2004).................................................................................9, 12

11  *Engine Mfrs. Ass'n v. U.S. EPA*,
        88 F.3d 1075 (D.C. Cir. 1996)......................................................................11
12
13  *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*,
        458 U.S. 141 (1982)....................................................................................16

14  *French v. Pan Am Exp., Inc.*,
        869 F.2d 1 (1st Cir. 1989)..............................................................................3
15
16  *Habeas Corpus Res. Ctr. v. U.S. Dep't of Justice*,
        816 F.3d 1241 (9th Cir. 2016) ........................................................................8

17  *Hoagland v. Town of Clear Lake, Ind.*,
        415 F.3d 693 (7th Cir. 2005) ........................................................................12
18
19  *Indus. Truck Ass'n v. Henry*,
        125 F.3d 1305 (9th Cir. 1997) ......................................................................15

20  *Kokkonen v. Guardian Life Ins., Co.*,
        511 U.S. 375 (1994)....................................................................................22
21
22  *Lamar, Archer & Cofrin, LLP v. Appling*,
        138 S. Ct. 1752 (2018).................................................................................9

23  *Lujan v. Defs. of Wildlife*,
        504 U.S. 555 (1992)................................................................................8, 22
24
25  *MacDonald v. Monsanto Co.*,
        27 F.3d 1021 (5th Cir. 1994) ........................................................................12

26  *Maslonka v. Pub. Util. Dist. No. 1 of Pend Oreille Cnty.*,
        533 P.3d 400 (Wash. 2023)..................................................................21, 22, 23

THE PORT OF SEATTLE'S MOTION TO DISMISS
PLAINTIFFS' SECOND AMENDED COMPLAINT
(2:23-CV-000795 JNW)                                    - iii -

**TABLE OF AUTHORITIES**
(continued)

Page

*Maya v. Centex Corp.*,
  658 F.3d 1060 (9th Cir. 2011) ...................................................................8

*McClellan v. I-Flow Corp.*,
  776 F.3d 1035 (9th Cir. 2015) .................................................................13

*Montalvo v. Spirit Airlines*,
  508 F.3d 464 (9th Cir. 2007) .................................................14, 16, 17

*Morales v. Trans World Airlines, Inc.*,
  504 U.S. 374 (1992) ...........................................................................7, 19

*Nat'l Ass'n of Clean Air Agencies v. EPA*,
  489 F.3d 1221 (D.C. Cir. 2007) ............................................................4, 5

*Nat'l Fed'n of the Blind v. United Airlines, Inc.*,
  813 F.3d 718 (9th Cir. 2016) .........................................................8, 16, 20

*Native Vill. of Kivalina v. Exxon Mobil Corp.*,
  696 F.3d 849 (9th Cir. 2012) .......................................................11, 12, 18

*Nw. Airlines, Inc. v. Minnesota*,
  322 U.S. 292 (1944) .................................................................................1

*Nw. Inc. v. Ginsberg*,
  572 U.S. 273 (2014) ..........................................................................19, 20

*Palazzolo v. Rhode Island*,
  533 U.S. 606 (2001) ...............................................................................21

*People of State of Cal. v. Dep't of the Navy*,
  624 F.2d 885 (9th Cir. 1980) ..........................................................9, 11, 12

*Price v. Charter Twp. of Fenton*,
  909 F. Supp. 498 (E.D. Mich. 1995) ...................................................17, 18

*R.J. Reynolds Tobacco Co. v. Durham County*,
  479 U.S. 130 (1986) ...............................................................................16

*S. Ferry LP, No. 2 v. Killinger*,
  542 F.3d 776 (9th Cir. 2008) ....................................................................7

*Schneidewind v. ANR Pipeline Co.*,
  485 U.S. 293 (1988) .................................................................................3

*Skysign Int'l, Inc. v. City & County of Honolulu*,
  276 F.3d 1109 (9th Cir. 2002) .................................................................18

THE PORT OF SEATTLE'S MOTION TO DISMISS
PLAINTIFFS' SECOND AMENDED COMPLAINT
(2:23-CV-000795 JNW)                    - iv -

**TABLE OF AUTHORITIES**
(continued)

Page

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016)..................................................................................22

*Sprewell v. Golden State Warriors*,
  266 F.3d 979 (9th Cir. 2001) ......................................................................7

*St. Mary's Parish v. EEOC*,
  No. C05-01297, 2005 WL 2347096 (W.D. Wash. Sept. 26, 2005)..................22

*People of State of Cal. ex rel. State Air Res. Bd. v. Dep't of Navy*,
  431 F. Supp. 1271 (N.D. Cal. 1977) ...........................................................9

*Tweed-New Haven Airport Auth. v. Tong*,
  930 F.3d 65 (2d Cir. 2019)........................................................................15

*United States v. $133,420.00 in U.S. Currency*,
  672 F.3d 629 (9th Cir. 2012) ......................................................................8

*United States v. Christensen*,
  419 F.2d 1401 (9th Cir. 1969) ....................................................................6

*Washington v. Gen. Motors Corp.*,
  406 U.S. 109 (1972) ..................................................................................9

*Wolfe v. State Dep't of Transp.*,
  293 P.3d 1244 (Wash. Ct. App. 2013) ........................................................21

**Statutes**

42 U.S.C. § 7401(a)(3).................................................................................4

42 U.S.C. § 7401(a)(4).................................................................................4

42 U.S.C. § 7401(b)(1).................................................................................3

42 U.S.C. § 7410..........................................................................................4

42 U.S.C. § 7416..........................................................................................4

42 U.S.C. §§ 7521-7590...............................................................................3

42 U.S.C. § 7543(a)......................................................................................9

42 U.S.C. § 7571(a)......................................................................................3

42 U.S.C. § 7571(b)......................................................................................4

42 U.S.C. § 7573.......................................................................................4, 9

THE PORT OF SEATTLE'S MOTION TO DISMISS
PLAINTIFFS' SECOND AMENDED COMPLAINT
(2:23-CV-000795 JNW)                    - v -

**STOEL RIVES** LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone 206.624.0900*

1

**TABLE OF AUTHORITIES**
(continued)

2                                                                                    **Page**

3  42 U.S.C. § 7607(b)(1) .................................................................................13

4  49 U.S.C. § 1371, *et seq.* .............................................................................19

5  49 U.S.C. § 40101(a)(6) ..................................................................................7

6  49 U.S.C. § 40101(a)(12) ...............................................................................19

7  49 U.S.C. § 40101(a)(12)(A) ...........................................................................7

8  49 U.S.C. § 40103(a)(1) ..................................................................................6

9  49 U.S.C. § 40103(b)(1) ..................................................................................6

10  49 U.S.C. § 40103(b)(2) ................................................................................18

11  49 U.S.C. § 40103(b)(2)(A) .............................................................................6

12  49 U.S.C. § 40103(b)(2)(B) .............................................................................6

13  49 U.S.C. § 41713(b) .......................................................................................7

14  49 U.S.C. § 41713(b)(1) ................................................................................19

15  Airline Deregulation Act of 1978, Pub. L. No. 95-504, 92 Stat. 1705 ................... passim

16  Clean Air Act ............................................................................................. passim

17  Clean Air Act § 209 .........................................................................................9

18  Clean Air Act § 231 ....................................................................................3, 4, 5

19  Clean Air Act § 231(a)(2)(A) ...........................................................................3

20  Clean Air Act § 231(b) ................................................................................3, 4

21  Clean Air Act § 233 .................................................................................... passim

22  Federal Aviation Act ................................................................................... passim

23  Federal Insecticide Fungicide and Rodenticide Act ..........................................12

24  Occupational Safety and Health Act .................................................................15

25  **Rules**

26  Fed. R. Civ. P. 12(b)(1) ....................................................................................8

THE PORT OF SEATTLE'S MOTION TO DISMISS
PLAINTIFFS' SECOND AMENDED COMPLAINT
(2:23-CV-000795 JNW)                      - vi -

**STOEL RIVES** LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone 206.624.0900*

1

**TABLE OF AUTHORITIES**
(continued)

2                                                                                          **Page**

3   Fed. R. Civ. P. 12(b)(6) ...................................................................................7

4   **Regulations**

5   14 C.F.R. ch. I, subch. E ................................................................................6

6   14 C.F.R. ch. I, subch. F ................................................................................7

7   14 C.F.R. ch. I, subch. I .................................................................................7

8   14 C.F.R. § 25.1, *et seq.* ..............................................................................6

9   14 C.F.R. § 25.107 .........................................................................................6

10  14 C.F.R. §§ 25.109-.125 ..............................................................................6

11  14 C.F.R. § 33.11, *et seq.* ...........................................................................6

12  25 Fed. Reg. 1764 ((Mar. 1, 1960) ............................................................16

13  87 Fed. Reg. 72312 (Nov. 23, 2022)...................................................4, 5, 13

14  **Constitutional Provisions**

15  U.S. Const. art. III .........................................................................................8

16  U.S. Const. art. VI, cl. 2 .........................................................................8, 13

17  **Other Authorities**

18  *Clean Air Act Handbook* § 5:51 (2002) .......................................................4

19  Convention on International Civil Aviation (the Chicago Convention), ratified by
20      the United States in 1946 .........................................................................5

21  Karie Riley et al., *A Systematic Review of the Impact of Commercial Aircraft
        Activity on Air Quality Near Airports*, 11 City & Env't Interactions 100066
22      (2021)........................................................................................................2

23  S. Rep. No. 1811, 85th Cong., 2d Sess. 5 (1958) .........................................6

24  *Webster's Second New International Dictionary* 2455 (1945)......................9

25  *Webster's Third New International Dictionary* 1122-23 (1963)...................9

26

THE PORT OF SEATTLE'S MOTION TO DISMISS
PLAINTIFFS' SECOND AMENDED COMPLAINT
(2:23-CV-000795 JNW)                    - vii -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

## I.  INTRODUCTION

Plaintiffs Cindy Codoni et al. ("Plaintiffs") have filed a purported class action lawsuit against the Port of Seattle (the "Port") claiming that emissions of "ultrafine particulate matter" allegedly emitted by aircraft operated by Alaska Air Group and Delta Air Lines, Inc. (the "Airlines") during takeoffs and landings from the Seattle-Tacoma International Airport ("SEA" or the "Airport") exposed Plaintiffs to adverse health effects and caused property contamination. Plaintiffs have asserted a suite of state common law claims against the Port, as SEA's owner and operator, and the Airlines for the cost of medical monitoring and property damages within a five-mile radius of the Airport.

All of Plaintiffs' claims against the Port fail as a matter of law.  Congress recognized "the national responsibility for regulating air commerce" and established federal control over air commerce that is both "intensive *and* exclusive."  *City of Burbank v. Lockheed Air Terminal Inc.*, 411 U.S. 624, 633 (1973) (emphasis added) (quoting *Nw. Airlines, Inc. v. Minnesota*, 322 U.S. 292, 303 (1944) (Jackson, J., concurring)).  Planes do not "wander about in the sky like vagrant clouds" but move "only by federal permission, subject to federal inspection, in the hands of federally certified personnel and under an intricate system of federal commands." *Id.* (quoting *Nw. Airlines*, 322 U.S. at 303).  The moment an airplane "taxis onto a runway" at SEA, it is subject to "an elaborate and detailed system" of federal controls and "[i]ts privileges, rights, and protection . . . [are] owe[d] to the Federal Government alone and not to any state government." *Id.* (citing *Nw. Airlines*, 322 U.S. at 303).

The Port has no regulatory authority over aircraft in flight, aircraft design, aircraft emissions, flight paths, frequencies, or altitudes—the concerns to which Plaintiffs attribute their alleged harm.  Congress vested the regulation of those aspects of the airline industry exclusively in the Environmental Protection Agency ("EPA") and the Federal Aviation Administration ("FAA") under a suite of federal statutes including the Clean Air Act ("CAA"), the Federal Aviation Act ("FAAct"), and the Airline Deregulation Act ("ADA").  These statutes leave no

THE PORT OF SEATTLE'S MOTION TO DISMISS
PLAINTIFFS' SECOND AMENDED COMPLAINT
(2:23-cv-000795 JNW)                    - 1 -

1   space for states to regulate, or for state-law claims to undermine, the exclusive federal

2   management of commercial air travel and regulation of aircraft in flight.  These statutes federally

3   preempt Plaintiffs' claims that must be dismissed in their entirety.

4        In addition to being preempted, the inverse condemnation claim against the Port fails to

5   plead facts that can overcome the "subsequent purchaser" doctrine to demonstrate Plaintiffs'

6   standing to assert this claim.  Absent this constitutional prerequisite to suit, the Court lacks the

7   power to hear this claim and must dismiss it on jurisdictional grounds.

8                           **II.  STATEMENT OF THE CASE**

9   **A.    Factual Background**

10       Plaintiffs seek to represent a purported class of homeowners and lessees within a five-

11  mile radius of SEA, the area Plaintiffs refer to as the "Contamination Zone."  The Second

12  Amended Complaint ("SAC") seeks to impose liability on the Port and the Airlines for harm

13  allegedly caused by aircraft emissions and heavy metals, which supposedly "flake off" from

14  aircraft in flight, particularly at altitudes below 3,000 feet.  SAC ¶¶ 55, 57.  The claims against

15  all Defendants include negligence, nuisance, and trespass.  Plaintiffs also assert an inverse

16  condemnation claim against the Port, which they fault for expanding its airport facilities and

17  allegedly "allow[ing]" an increase in the number of flights at SEA.  *Id.* ¶¶ 41, 57, 59, 91.

18       Citing studies conducted by the University of Washington, Seattle, and King County,

19  Plaintiffs allege that persons residing within a five-mile radius of SEA are exposed to heightened

20  aircraft pollution.  *Id.* ¶¶ 60-78.  Plaintiffs seek tort remedies for illnesses they claim are

21  associated with the aircraft emissions and the alleged property damage.  *Id.* ¶¶ 55, 59, Prayer for

22  Relief.  Plaintiffs admit that their concerns are not unique to communities near SEA and cite

23  studies of ultrafine particulate emissions at airports in Boston, Athens, Delhi, Montreal, and

24  Kiev.  *Id.* ¶¶ 71,[1] 73-74.

25

26  [1] Citing Karie Riley et al., *A Systematic Review of the Impact of Commercial Aircraft Activity on
    Air Quality Near Airports*, 11 City & Env't Interactions 100066 (2021).

THE PORT OF SEATTLE'S MOTION TO DISMISS
PLAINTIFFS' SECOND AMENDED COMPLAINT
(2:23-cv-000795 JNW)                    - 2 -

**STOEL RIVES** LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
Telephone 206.624.0900

**B.      Regulatory Background**

In the area of aviation, "federal control is intensive and exclusive." *Burbank*, 411 U.S. at 633.  Recognizing that the global nature of the industry requires a uniform approach to regulation, Congress wanted to ensure that airports, domestic aircraft manufacturers, airlines, and the traveling public are subject to uniform standards of safety, airworthiness, and environmental regulation anywhere in the United States.  *See French v. Pan Am Exp., Inc.*, 869 F.2d 1, 5 (1st Cir. 1989) ("The legislative history underlying the original Act stressed the importance of a single uniform system of regulation, especially with regard to air safety. . . .  [E]stablishment of a single uniform system of regulation in the area of air safety was one of the primary 'object[s] sought to be obtained' by passage of the [FAAct]." (second brackets in original) (quoting *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 300 (1988))).  To this end, Congress has promulgated a series of statutes regulating the aviation industry, including the CAA, the FAAct, and the ADA.

**1.      The CAA**

**a.      Sections 231 and 233 of the CAA**

The overall purpose of the CAA is "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population."  42 U.S.C. § 7401(b)(1).  In Title II of the CAA, 42 U.S.C. §§ 7521-7590, Congress authorized EPA to issue national emission standards for mobile sources of air pollution including aircraft and national emission standards for the fuels used by those mobile sources.  CAA section 231(a)(2)(A) directs the Administrator of EPA to propose aircraft engine emission standards applicable to the emission of any air pollutant from aircraft engines that may reasonably be anticipated to endanger public health or welfare, and directs EPA to consult with the Administrator of the FAA on such standards.  42 U.S.C. § 7571(a).  Under CAA section 231(b), EPA is required to ensure that the effective date of any standard provides the necessary time to permit the development and application of the requisite technology, giving appropriate

THE PORT OF SEATTLE'S MOTION TO DISMISS
PLAINTIFFS' SECOND AMENDED COMPLAINT
(2:23-cv-000795 JNW)                  - 3 -

**STOEL RIVES LLP**
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone 206.624.0900*

1    consideration to the cost of compliance within such period.  *Id.* § 7571(b).  Section 231 provides

2    the EPA Administrator wide discretion to determine what standards are appropriate, after

3    consideration of the statute and other relevant factors, such as applicable international standards.

4    *See Nat'l Ass'n of Clean Air Agencies v. EPA*, 489 F.3d 1221, 1229-30 (D.C. Cir. 2007) (EPA's

5    authority under section 231 is "both explicit and extraordinarily broad").

6         In section 233 of the CAA, Congress granted EPA ***exclusive*** authority to balance the

7    health and environmental effects of emission standards against aircraft safety, cost, and noise.

8    42 U.S.C. § 7573.  "This power . . . resides in EPA alone . . . ."  *Nat'l Ass'n of Clean Air*

9    *Agencies*, 489 F.3d at 1225 (citing 42 U.S.C. § 7573).  The CAA preemption provisions track the

10   hierarchy of federal control over various emission sources.  Section 233 expressly preempts the

11   states' authority respecting aircraft emission standards that differ from the federal standards.  42

12   U.S.C. § 7573; *see also* Control of Air Pollution From Aircraft Engines: Emissions Standards

13   and Test Procedures, 87 Fed. Reg. 72312, 72335 (Nov. 23, 2022).  In contrast, Congress

14   established a program of cooperative federalism allowing for state regulation of ***stationary***

15   sources (such as factories), which operate solely within state boundaries and have predominantly

16   local effects.  *See* 42 U.S.C. § 7401(a)(3), (4), § 7410, § 7416 (CAA subch. I).

17        **b.    EPA Has Prioritized International Uniformity and Technological**
            **Feasibility in Setting Aircraft Emission Standards**
18

19        Since 1973, EPA has issued a series of increasingly stringent aircraft emission standards

20   for particulate matter,[2] greenhouse gas emissions, nitrogen oxides, carbon monoxide, and other

21   conventional pollutants.[3]  It has committed to evaluating whether more stringent greenhouse gas

22   regulations are necessary and whether lead emissions from certain piston engine aircraft

23   _____

24   [2] "Particulate matter ('PM') is a highly complex mixture of solid particles and liquid droplets
     distributed among numerous atmospheric gases which interact with solid and liquid phases. . . .
25   [U]ltrafine particles (UFPs[]) [are] generally considered as particulates with a diameter less than
     or equal to 0.1 μm . . . ."  87 Fed. Reg. at 72319.  A strand of human hair is 70 μm.  *Id.*
26
     [3] *See Clean Air Act Handbook* § 5:51 (2002) ("Aircraft emission standards").

     THE PORT OF SEATTLE'S MOTION TO DISMISS
     PLAINTIFFS' SECOND AMENDED COMPLAINT
     (2:23-cv-000795 JNW)              - 4 -

endanger public health and require further regulation. EPA has explained the importance of "[u]niformity in international aviation regulations and standards because it ensures that passengers and the public can expect similar levels of protection for safety and human health and the environment regardless of manufacturer, airline, or point of origin of flight."[4] 87 Fed. Reg. at 72325.

In issuing aircraft emission standards, EPA must ensure that such standards are technologically feasible. *Id.* at 72318, 72325 (explaining that manufacturers need "enough lead time . . . to respond to more stringent standards that would require them to develop and implement new technologies"); *see Nat'l Ass'n of Clean Air Agencies*, 489 F.3d at 1224 ("Section 231 of the CAA requires the Administrator . . . to study . . . the 'technological feasibility' of controlling [emissions].").

In keeping with this principle, and its goal of adopting standards that are consistent with those adopted by ICAO, EPA's most recent aircraft emissions rule changed its approach from "regulating aircraft PM emissions from past smoke measurements to the measurement of nvPM mass concentration, nvPM mass, and nvPM number for the first time," consistent with ICAO standards. 87 Fed. Reg. at 72325. The new rule's focus on PM mass necessarily includes ultrafine PM and metallic PM. *See id.* at 72312, 72319, 72339 n.145. Importantly, EPA referenced a "systematic . . . review" of 70 peer-reviewed studies of emissions at airports nationally and globally, including the same studies referenced in the SAC, in determining the appropriate emissions standards for aircraft. *Id.* at 72320-24. EPA explained that "international cooperation on aircraft emissions brings substantial benefits overall to the United States" and that "a decision . . . to deviate from [ICAO standards] might well undermine future efforts by the United States to seek international consensus on aircraft emission standards." *Id.* at 72326.

---

[4] The International Civil Aviation Organization ("ICAO") was established pursuant to the Convention on International Civil Aviation (the Chicago Convention), ratified by the United States in 1946. 87 Fed. Reg. at 72316.

THE PORT OF SEATTLE'S MOTION TO DISMISS
PLAINTIFFS' SECOND AMENDED COMPLAINT
(2:23-cv-000795 JNW)           - 5 -

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
Telephone 206.624.0900

1

2.      **The FAAct**

2      "[A]viation is unique among transportation industries in its relation to the federal

3  government—it is the only one whose operations are conducted almost wholly within federal

4  jurisdiction and are subject to little or no regulation by States or local authorities.  In fact, the

5  federal government bears virtually complete responsibility for the promotion and supervision of

6  this industry in the public interest."  *Big Stone Broad., Inc. v. Lindbloom*, 161 F. Supp. 2d 1009,

7  1017 (D.S.D. 2001) (brackets in original) (quoting S. Rep. No. 1811, 85th Cong., 2d Sess. 5

8  (1958)).

9      Congress vested the United States government with exclusive sovereignty of the airspace

10 of the United States and granted to the FAA Administrator the exclusive power to develop plans

11 and policy for the use of the navigable airspace to ensure the safety of aircraft and the efficient

12 use of airspace.  49 U.S.C. § 40103(a)(1) & (b)(1).  The FAA Administrator must prescribe

13 regulations controlling the flight of aircraft and their altitudes and in so doing must ensure the

14 protection of both aircraft and "individuals and property on the ground."  *Id.* § 40103(b)(2)(A) &

15 (B); *see also Burbank*, 411 U.S. at 639 (noting the interconnection of emissions and safety

16 "requires a uniform and exclusive system of federal regulation if the congressional objectives

17 underlying the [FAAct] are to be fulfilled"); *United States v. Christensen*, 419 F.2d 1401, 1404

18 (9th Cir. 1969) (stating that the whole tenor and purpose of FAA is "to create and enforce one

19 unified system of flight rules").

20     The safety regulations promulgated by the FAA are broad and voluminous.  They

21 include, without limitation, construction and performance requirements, 14 C.F.R. § 25.1, *et

22 seq.*; the calculation of takeoff speeds, 14 C.F.R. § 25.107; the speed, slope, distance, and

23 configuration of the takeoff and landing paths, 14 C.F.R. §§ 25.109-.125; the construction and

24 design of the engine, 14 C.F.R. § 33.11, *et seq.*; the different classes of airspace areas, air traffic

25 service routes, and mandatory aircraft reporting points for all directions of flight, 14 C.F.R. ch. I,

26 subch. E; operating rules for air traffic within the United States, including airspeeds and

THE PORT OF SEATTLE'S MOTION TO DISMISS
PLAINTIFFS' SECOND AMENDED COMPLAINT
(2:23-cv-000795 JNW)                    - 6 -

1    minimum altitudes, 14 C.F.R. ch. I, subch. F; and procedures and standards for airport noise

2    compatibility planning and federal aid for airport construction, 14 C.F.R. ch. I, subch. I.  These

3    federal regulations perfectly mirror the allegations of Plaintiffs' complaint, which include

4    concerns regarding the construction of aircraft, SAC ¶55; the altitudes of aircraft taking off and

5    landing, *id.* at ¶59; and flight paths, *id.* at ¶75.

6         **3.    The ADA**

7         In 1978 Congress enacted the ADA, seeking to promote the "efficiency, innovation, and

8    low prices" in the airline industry through maximum reliance on competitive market forces and

9    on actual and potential competition.  49 U.S.C. § 40101(a)(6), (12)(A); *see EagleMed LLC v.*

10   *Cox*, 868 F.3d 893, 903 (10th Cir. 2017) (noting "the congressional purpose of 'further[ing]

11   efficiency, innovation, and low prices' was a motivating force behind the Airline Deregulation

12   Act" (brackets in original) (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 378

13   (1992)).  In light of this purpose, Congress included a preemption provision to ensure that the

14   states would not undo federal deregulation with regulation of their own.  *Morales*, 504 U.S. at

15   378.  Under 49 U.S.C. § 41713(b), no state or political subdivision may enact or enforce "a law,

16   regulation, or other provision having the force and effect of law related to a price, route, or

17   service of an air carrier that may provide air transportation under this subpart."

18                          **III.  ARGUMENT**

19   **A.    Motion to Dismiss Standard**

20        A court should dismiss a complaint if it fails "to state a claim upon which relief can be

21   granted." Fed. R. Civ. P. 12(b)(6).  At this stage, courts "must accept as true all well-pleaded

22   allegations in the complaint." *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 782 (9th Cir. 2008).

23   But the Court is not "required to accept as true allegations that are merely conclusory,

24   unwarranted deductions of fact, or unreasonable inferences." *Sprewell v. Golden State Warriors*,

25   266 F.3d 979, 988 (9th Cir. 2001).

26

THE PORT OF SEATTLE'S MOTION TO DISMISS
PLAINTIFFS' SECOND AMENDED COMPLAINT
(2:23-cv-000795 JNW)              - 7 -

1    Independently, a lack of Article III standing requires dismissal for lack of subject matter

2    jurisdiction under Federal Rule of Civil Procedure 12(b)(1). *Maya v. Centex Corp.*, 658 F.3d

3    1060, 1067 (9th Cir. 2011). "Each element of standing 'must be supported . . . with the manner

4    and degree of evidence required at the successive stages of the litigation.'" *Id.* at 1068 (ellipsis

5    in original) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). The "irreducible

6    constitutional minimum of standing" requires a showing that the plaintiff has suffered an "injury

7    in fact." *Habeas Corpus Res. Ctr. v. U.S. Dep't of Justice*, 816 F.3d 1241, 1248 (9th Cir. 2016)

8    (quoting *Lujan*, 504 U.S. at 560). Plaintiffs bear the burden of proof in establishing standing.

9    *United States v. $133,420.00 in U.S. Currency*, 672 F.3d 629, 638 (9th Cir. 2012).

10   **B.      Preemption Doctrine**

11          The power of Congress to preempt state law derives from the Supremacy Clause, which

12   provides that "the laws of the United States . . . shall be the supreme Law of the Land; . . . any

13   Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art.

14   VI, cl. 2. Congress may preempt state law in three ways. First, Congress may withdraw

15   specified powers from the states by enacting a statute containing "an express preemption

16   provision." *Arizona v. United States*, 132 S. Ct. 2492, 2495 (2012). Second, "[s]tates are

17   precluded from regulating conduct in a field that Congress, acting within its proper authority, has

18   determined must be regulated by its exclusive governance." *Id.* at 2501. Finally, "state laws are

19   preempted when they conflict with federal law," when "compliance with both federal and state

20   regulations is a physical impossibility, or when the challenged state law stands as an obstacle to

21   the accomplishment and execution of the full purposes and objectives of Congress." *Nat'l Fed'n*

22   *of the Blind v. United Airlines, Inc.*, 813 F.3d 718, 724 (9th Cir. 2016) (alterations and citation

23   omitted).

24   **C.      The CAA Expressly Preempts Plaintiffs' Claims**

25          Congress preempts state-law claims by enacting a clear statement to that effect. *Chamber*

26   *of Com. of U.S. v. Bonta*, 62 F.4th 473, 482 (9th Cir. 2023). In section 233 of the CAA Congress

THE PORT OF SEATTLE'S MOTION TO DISMISS
PLAINTIFFS' SECOND AMENDED COMPLAINT
(2:23-cv-000795 JNW)          - 8 -

1   expressly stated its intent to preempt any emission standards that are different from the federal

2   standards:

3           No State or political subdivision thereof may adopt or attempt to
            enforce *any standard[⁵] respecting[⁶] emissions of any air*
4           *pollutant from any aircraft or engine* thereof *unless such*
            *standard is identical[⁷]* to a standard applicable to such aircraft
5           under this part.

6

7   42 U.S.C. § 7573 (emphasis added); *see generally Washington v. Gen. Motors Corp.*, 406 U.S.

8   109, 114-15 (1972) ("To be sure, Congress has . . . pre-empted the field so far as emissions from

9   airplanes are concerned."); *People of State of Cal. v. Dep't of the Navy*, 624 F.2d 885, 889 (9th

10  Cir. 1980) (state regulation of emissions from engines in flying aircraft is barred by section 233;

11  this serves the "purposes of federal preemption . . . namely, aviation safety and uniformity of

12  standards."); *People of State of Cal. ex rel. State Air Res. Bd. v. Dep't of Navy*, 431 F. Supp.

13  1271, 1275 (N.D. Cal. 1977) (stating that EPA has "general and exclusive authority . . . to set

14  emission limitations for aircraft").

15

16

17

18  ⁵ In *Engine Manufacturers Association v. South Coast Air Quality Management District*, 541
    U.S. 246 (2004), the U.S. Supreme Court held that "standard" in section 209 of the CAA, 42
19  U.S.C. § 7543(a), means that which "is established by authority, custom, or general consent, as a
    model or example; criterion; test." *Id.* at 246 (quoting *Webster's Second New International*
20  *Dictionary* 2455 (1945)). A "standard" broadly "relate[s] to the emission characteristics of a
    vehicle or engine"; to meet them "the vehicle or engine must not emit more than a certain
21  amount of a given pollutant, must be equipped with a certain type of pollution-control device, or
    must have some other design feature related to the control of emissions." *Id.* at 252-53. The
22  broad interpretation of preemption is necessary so as not to undo "Congress's carefully
    calibrated regulatory scheme." *Id.* at 255.

23  ⁶ "Use of the word 'respecting' . . . has a ***broadening effect***, ensuring that the scope of a
    provision covers not only its subject but also matters relating to that subject." *Lamar, Archer &*
24  *Cofrin, LLP v. Appling*, 138 S. Ct. 1752, 1760 (2018) (emphasis added).

25  ⁷ *See Webster's Third New International Dictionary* 1122-23 (1963) (defining "identical" in
    pertinent part as "having such close resemblance and such minor differences as to be essentially
26  the same").

THE PORT OF SEATTLE'S MOTION TO DISMISS
PLAINTIFFS' SECOND AMENDED COMPLAINT
(2:23-cv-000795 JNW)                    - 9 -

1          **1.    Section 233 Preempts Standards That Are Not Identical to EPA's Standards**

2          The preemption directive in section 233 is explicit and categorical: no state or local

3    jurisdiction can impose emissions standards from aircraft and their engines that are in any way

4    different from those imposed by EPA nationally.  This categorical preemption applies equally to

5    states and local jurisdictions and private parties who may seek to enforce different standards

6    through state-law claims.  *See Am. Airlines, Inc. v. Wolens*, 513 U.S. 219, 239 (1995) (O'Connor,

7    J., concurring) (preempting class action claims based on state consumer protection act and

8    emphasizing that the preemption provision in the ADA that "no State . . . shall . . . enforce any

9    law" means that *no one* may enforce state law against an airline concerning airline rates, routes,

10   or services (ellipses in original; citation omitted)); *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504

11   (1992) (statutory prohibition against any advertising relating to the health effects of cigarette

12   smoking applies to both "positive enactments" such as statutes or regulations as well as common

13   law damages claims).

14         Here, Plaintiffs do not allege a violation of any currently applicable aircraft emissions

15   standards imposed by EPA.  Yet they seek tort damages for alleged harm caused by ultrafine

16   particulate emissions from aircraft engines and heavy metals flaking off aircraft fuselages.  As

17   such, Plaintiffs necessarily seek to impose on the Port and the Airlines emission standards that

18   are "not identical" to the standards that EPA has imposed, an attempt that is expressly preempted

19   by section 233.  Just as the state of Washington or the SEA City Council cannot set their own

20   emission standards for ultrafine particulate matter or alleged metal "flaking off" aircraft

21   fuselages that are different from the standards imposed by EPA, neither can private plaintiffs do

22   so by asserting state-law claims that effectively seek the same result.  *See* SAC ¶¶ 8, 50, 55, 115.

23   Because these claims plainly relate to emission standards of pollutants from aircraft and their

24   engines that are different from the national standards imposed by EPA, they are expressly

25   preempted by CAA section 233.[8]  *See also Engine Mfrs. Ass'n v. U.S. EPA*, 88 F.3d 1075, 1079

26   ───────────────────────
[8] The SAC makes a passing reference to emissions from "terminal activity," SAC ¶ 2 n.1, but
nowhere links such "activity" to any alleged harm experienced by Plaintiffs.  Because emissions

THE PORT OF SEATTLE'S MOTION TO DISMISS
PLAINTIFFS' SECOND AMENDED COMPLAINT
(2:23-cv-000795 JNW)              - 10 -

(D.C. Cir. 1996) (the "possibility of 50 different state regulatory regimes 'raised the spectre of an anarchic patchwork of federal and state regulatory programs, a prospect which threatened to create nightmares for the manufacturers'") (citation omitted).

### 2. Plaintiff's Artful Pleading Cannot Overcome Preemption

This result does not change because Plaintiffs seek damages rather than an injunction seeking to abate or decrease the emissions themselves. Because "regulation can be as effectively exerted through an award of damages as through some form of preventive relief" the U.S. Supreme Court has eliminated any distinction between an attempt to enforce a standard through a regulatory action or a state-law damages action. *Cipollone*, 505 U.S. at 521 ("The obligation to pay compensation . . . is designed to be[] a potent method of governing conduct and controlling policy.") (citation omitted); *see also Native Vill. of Kivalina v. Exxon Mobil Corp.*, 696 F.3d 849, 857 (9th Cir. 2012) ("[T]he type of remedy asserted is not relevant to the applicability of the doctrine of displacement."); *accord City of New York v. Chevron Corp.*, 993 F.3d 81, 96 (2d Cir. 2021) (holding that CAA preempted state law nuisance claims against oil companies for damages caused by global greenhouse gas emissions; "whether styled as an action for injunctive relief against the Producers to stop them from producing fossil fuels, or an action for damages that would have the same practical effect, the City's claims are clearly barred by the Clean Air Act").

Given the expansive scope of preemption under section 233, the specific remedy sought is irrelevant. What matters is that Plaintiffs link their alleged harm to ***emissions from aircraft in flight***. To paraphrase *Burbank*: for preemption purposes, to ban the emissions is to ban the aircraft and its engines that generated those emissions, because the aircraft and its emissions are

---

from aircraft in flight, to which Plaintiffs attribute their harm, can only be controlled by modifying aircraft engines, CAA section 233 preempts Plaintiffs' claims. *Dep't of the Navy*, 624 F.2d at 885, 888 n.6 (holding that section 233 preempts state attempts to set emission standards that would require aircraft engine modification and contrasting such attempts with those involving regulation of emissions from a stationary test cell that housed aircraft engines undergoing repair in a factory setting).

THE PORT OF SEATTLE'S MOTION TO DISMISS
PLAINTIFFS' SECOND AMENDED COMPLAINT
(2:23-cv-000795 JNW)              - 11 -

1    indivisible in the same way.  *Cf. Burbank*, 411 U.S. at 628.  *Id.*  Reducing the emissions

2    Plaintiffs complain of would require changing the aircraft engines, fuel, and/or installing new

3    equipment on the aircraft, all of which are "standards" within the exclusive jurisdiction of EPA

4    and the FAA, which the Port has no authority to differ from or regulate.  *Engine Mfrs. Ass'n v. S.*

5    *Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 252-53 (2004); *Dep't of the Navy*, 624 F.2d at 889.

6    Section 233 preempts Plaintiffs' attempt to police these standards through state-law claims.  *See*

7    *Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410 (2011) (CAA displaces any common law

8    attempt to abate carbon dioxide emissions); *see also Kivalina*, 696 F.3d at 857 (holding that

9    common law tort claims to redress greenhouse gas emissions were "displaced by" the CAA and

10   rejecting any distinction between abating the emissions and seeking "damages for harm caused

11   by past emissions"); *City of New York*, 993 F.3d at 96 (displacement is an "all-or-nothing

12   proposition" that does not depend on the remedy sought).

13          Because an award of damages is as powerful as direct regulation in controlling conduct,

14   *see City of New York*, 993 F.3d at 97, Plaintiffs' claims, if allowed to proceed, would operate as

15   *de facto* regulation of these emissions.  *See MacDonald v. Monsanto Co.*, 27 F.3d 1021, 1022

16   (5th Cir. 1994) (allowing damages recovery under state common law tort claims would have the

17   effect of imposing supplemental state standards under Federal Insecticide Fungicide and

18   Rodenticide Act, which (like CAA section 233) expressly prohibits additional or different

19   standards).  And because states will "invariably differ" in their assessment of such claims, *see*

20   *City of New York*, 993 F.3d at 93, Congress chose to vest the regulation of emissions from

21   aircraft and aircraft engines exclusively in EPA and the FAA, *see Hoagland v. Town of Clear*

22   *Lake, Ind.*, 415 F.3d 693, 698 (7th Cir. 2005) (stating that "[i]t would be unmanageable—say

23   nothing of terrifying—to have local control of flight routes or of flight times" that require

24   national coordination).

25          In short, in adopting the most recent national aircraft emission standards, EPA balances

26   several factors including uniformity with international standards and technological feasibility.

THE PORT OF SEATTLE'S MOTION TO DISMISS
PLAINTIFFS' SECOND AMENDED COMPLAINT
(2:23-cv-000795 JNW)          - 12 -

1    87 Fed. Reg. at 72312, 72325-26; *see also California v. EPA*, 72 F.4th 308, 312 (D.C. Cir. 2023)

2    ("EPA and FAA must coordinate regulation of aircraft pollutants to meet both the requirements

3    of the Clean Air Act and the international standards set by ICAO.").  The proper avenue for

4    challenging the balance struck in EPA's final rule is to file a petition for review with EPA

5    seeking different standards, or judicial review under 42 U.S.C. § 7607(b)(1), not a state law

6    damages claim that is expressly preempted by CAA section 233.

7    **D.**    **The FAAct Preempts Plaintiffs' Claims**

8          Independent of the CAA, Plaintiffs' claims are preempted by the FAAct under the

9    doctrines of conflict and field preemption.  "A state law, whether arising from statute or common

10    law, is preempted if it creates an 'obstacle to the accomplishment and execution of the full

11    purposes and objectives of Congress.'"  *Chae v. SLM Corp*., 593 F.3d 936, 943 (9th Cir. 2010)

12    (citation omitted).  Courts "discern congressional objectives by 'examining the federal statute as

13    a whole and identifying its purpose and intended effects.'"  *Id.* (quoting *Crosby v. Nat'l Foreign*

14    *Trade Council*, 530 U.S. 363, 373 (2000)).  Congress has left absolutely no room for states or

15    state-law claims to interfere with the federal supremacy over the national airspace.

16    **1.**    **Conflict Preemption**

17          The doctrine of conflict preemption bars Plaintiffs' suit in its entirety.  "The Supremacy

18    Clause of the Constitution makes evident that 'state laws that conflict with federal law are

19    'without effect.'"  *McClellan v. I-Flow Corp.*, 776 F.3d 1035, 1039 (9th Cir. 2015) (quoting

20    *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008)).  Any such law, "whether arising from statute

21    or common law," is also "preempted if it creates an 'obstacle to the accomplishment and

22    execution of the full purposes and objectives of Congress.'"  *Chae*, 593 F.3d at 943 (quoting

23    *Crosby*, 530 U.S. at 373).  Plaintiffs' lawsuit is preempted both because it would effectively

24    impose different, more stringent emission standards at SEA than anywhere else in the country

25    and because, if suits like it were allowed to move forward, it would undermine Congress's

26    uniformity goals by causing chaos and uncertainty in air travel across the country.

THE PORT OF SEATTLE'S MOTION TO DISMISS
PLAINTIFFS' SECOND AMENDED COMPLAINT
(2:23-cv-000795 JNW)    - 13 -

**STOEL RIVES** LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone 206.624.0900*

1    The FAAct "was passed by Congress for the purpose of centralizing in a *single*

2 authority . . . the power to frame rules for the safe and efficient use of the nation's airspace." *Air*

3 *Line Pilots Ass'n, Int'l v. Quesada*, 276 F.2d 892, 894 (2d Cir. 1960) (emphasis added).  Because

4 the FAAct "requires a delicate balance between safety and efficiency and the protection of

5 persons on the ground," the "interdependence of these factors requires a *uniform and exclusive*

6 system of federal regulation if the congressional objectives underlying the [FAAct] are to be

7 fulfilled." *Burbank*, 411 U.S. at 638-39 (emphasis added; citation omitted).  The U.S. Supreme

8 Court held that the City of Burbank's ordinance that limited flight takeoff and landing to reduce

9 noise was preempted, stating that "[i]f we were to uphold the Burbank ordinance and a

10 significant number of municipalities followed suit, it is obvious that fractionalized control of the

11 timing of takeoffs and landings would severely limit the flexibility of FAA in controlling air

12 traffic flow.  The difficulties of scheduling flights to avoid congestion and the concomitant

13 decrease in safety would be compounded." *Id*. at 639 (footnote omitted); *see also Montalvo v.*

14 *Spirit Airlines*, 508 F.3d 464, 471-72 (9th Cir. 2007) ("[t]he purpose, history, and language of the

15 [FAAct]" and its legislative history lead to the conclusion that Congress intended "to make the

16 Federal Aviation Administration the sole arbiter of air safety").

17    Plaintiffs blame their alleged harm from emissions on the amount of air traffic at SEA

18 and the flight paths and altitudes of the Airlines' aircraft during takeoffs and landings.  In

19 essence, Plaintiffs argue that more aircraft should fly in and out of other airports and fewer

20 aircraft should use SEA.  But the Port has no regulatory control over aircraft flight frequency,

21 much less flight paths, or the altitudes at which planes take off and land, which are things the

22 FAA alone regulates.  As discussed in *Burbank*, were the Port to attempt to impermissibly

23 intervene in these areas, it "could create critically serious problems to all air transportation

24 patterns." 411 U.S. at 640.  The airport network is "essential to the maintenance of a sound air

25 transportation system" that "cannot be inhibited if the best interest of the public is to be served."

26 *Id.*; *see also British Airways Bd. v. Port Auth. of N.Y.*, 558 F.2d 75, 83 (2d Cir. 1977)

THE PORT OF SEATTLE'S MOTION TO DISMISS
PLAINTIFFS' SECOND AMENDED COMPLAINT
(2:23-cv-000795 JNW)                    - 14 -

1    (recognizing broad preemptive scope of the FAAct and holding that the "likelihood of multiple,

2    inconsistent rules would be a dagger pointed at the heart of commerce and the rule applied might

3    come literally to depend on which way the wind was blowing"); *Tweed-New Haven Airport*

4    *Auth. v. Tong*, 930 F.3d 65, 74 (2d Cir. 2019) ("[T]he FAAct impliedly preempts the entire 'field

5    of air safety.'") (citation omitted).

6    By seeking state-law tort damages for federally regulated and approved use of airspace at

7    SEA, Plaintiffs put Washington tort law in direct conflict with the full purpose and objectives of

8    Congress. Plaintiffs request that the Court impose liability on the Defendants ***despite*** Plaintiffs'

9    conspicuous failure to allege that Defendants have violated ***any*** applicable[9] federal law.  The

10   Court should decline to allow Plaintiffs' lawsuit to undermine the uniform federal regulations

11   that Congress thought indispensable for the administration of air travel for the public's benefit.

12   Plaintiffs' lawsuit threatens to create precisely the "patchwork" of inconsistent state rules that

13   would severely disrupt or even threaten the commercial air travel industry.  If successful,

14   Plaintiffs' claims would impose controls under Washington State law that are different from, and

15   conflict with, domestic and international aircraft emission standards.  This will cause airlines to

16   avoid SEA and other plaintiffs to seek their own distinct sets of rules and regulations, creating a

17   chaotic situation where "the rule applied might come literally to depend on which way the wind

18   was blowing." *British Airways*, 558 F.2d at 83.

19   As explained in *Burbank*, Congress assumed control of the nation's airspace and aircraft

20   emissions precisely to avoid this threat,

21              If we were to uphold the Burbank ordinance and a significant
               number of municipalities followed suit, it is obvious that
22              fractionalized control of the timing of takeoffs and landings would
               severely limit the flexibility of the FAA in controlling air traffic
23

---

24   [9] Plaintiffs repeat the allegation that their properties have been exposed to levels of heavy metals
     "that exceed permissible OSHA limits."  SAC ¶¶ 18, 24, 38, 32, 38.  However, the Occupational
25   Safety and Health Act applies only to "***occupational*** safety and health standards." *Indus. Truck
     Ass'n v. Henry*, 125 F.3d 1305, 1306 (9th Cir. 1997) (emphasis added).  None of the Plaintiffs
26   allege that they work for any Defendant.  The allegations that heavy metal exposure at home
     exceeds federal workplace standards are irrelevant and legally meaningless.

THE PORT OF SEATTLE'S MOTION TO DISMISS
PLAINTIFFS' SECOND AMENDED COMPLAINT
(2:23-cv-000795 JNW)                    - 15 -

flow.  The difficulties of scheduling flights to avoid congestion and the concomitant decrease in safety would be compounded. . . .

. . . The practice of prohibiting the use of various airports during certain specific hours could create critically serious problems to all air transportation patterns.  *The network of airports throughout the United States and the constant availability of these airports are essential to the maintenance of a sound air transportation system. The continuing growth of public acceptance of aviation as a major force in passenger transportation and the increasingly significant role of commercial aviation in the nation's economy are accomplishments which cannot be inhibited if the best interest of the public is to be served*.

411 U.S. at 639-40 (footnote omitted; emphasis added) (quoting 25 Fed. Reg. at 1764-65).  For all these reasons, the Court should decline to allow Plaintiffs' lawsuit to undermine the uniform federal regulations that Congress thought indispensable for the administration of air travel for the public's benefit.

### 2.    Field Preemption

State laws are also preempted "if federal law so thoroughly occupies a legislative field 'as to make reasonable the inference that Congress left no room for the States to supplement it.'" *Nat'l Fed'n of the Blind*, 813 F.3d at 733 (quoting *Cipollone*, 505 U.S. at 516).  When evaluating field preemption, courts recognize that "[f]ederal regulations have no less pre-emptive effect than federal statutes."  *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982). Accordingly, courts "look to the pervasiveness of the regulations enacted pursuant to the relevant statute to find preemptive intent."  *Montalvo*, 508 F.3d at 470; *see also R.J. Reynolds Tobacco Co. v. Durham County*, 479 U.S. 130, 149 (1986) ("[W]here . . . Congress has entrusted an agency with the task of promulgating regulations to carry out the purposes of a statute . . . as part of the preemption analysis we must consider whether the regulations evidence a desire to occupy a field completely.").  So "when an agency administrator promulgates pervasive regulations pursuant to his Congressional authority," courts may "infer a preemptive attempt unless it appears from the underlying statute or its legislative history that Congress would not have sanctioned the preemption."  *Montalvo*, 508 F.3d at 471.

THE PORT OF SEATTLE'S MOTION TO DISMISS
PLAINTIFFS' SECOND AMENDED COMPLAINT
(2:23-cv-000795 JNW)                            - 16 -

1    However framed, Plaintiffs' complaint is preempted by the pervasive FAA regulations.

2    If viewed as an assertion that "aircraft arriving or departing from SEA Airport" "endanger . . .

3    safety" because heavy metals "flake off" planes and harm Plaintiffs, SAC ¶¶ 55, 131, 138, the

4    FAA's regulations preempt their claims.  The field of "aviation safety" has "long been

5    dominated by federal interests."  *Montalvo*, 508 F.3d at 471.  "The purpose, history, and

6    language of the FAA"—as well as its legislative history—lead to the conclusion that Congress

7    intended "to make the Federal Aviation Administration the sole arbiter of air safety."  *Id.* at 471-

8    72.  This intent, combined with the "pervasive regulations" enacted by the FAA Administrator,

9    led the Ninth Circuit to hold that "the regulations enacted by the [FAA] . . . sufficiently

10   demonstrate an intent to occupy exclusively the entire field of aviation safety and carry out

11   Congress' intent to preempt all state law in this field."  *Id.* at 471; *see also Burbank*, 411 U.S. at

12   633, 638-39 (holding that "the pervasive nature of the scheme of federal regulation of aircraft

13   noise" leaves "no room for local curfews or other local controls" and further holding that

14   because the FAA "requires a delicate ***balance*** between safety and efficiency," the

15   "interdependence of these factors requires a uniform and ***exclusive*** system of federal regulation

16   if the congressional objectives" underlying the FAAct "are to be fulfilled" (emphasis added)).

17   The federal regulation of flight paths is also exclusive and preempts Plaintiffs' claims.

18   *Price v. Charter Twp. of Fenton*, 909 F. Supp. 498, 502-03 (E.D. Mich. 1995) ("Federal courts,

19   in the wake of *Burbank*, have held that various attempts by local governments to enforce their

20   police powers to control noise or ***otherwise affect flight paths*** are preempted.") (emphasis

21   added) (collecting cases from district courts in the Second, Sixth, and Seventh Circuits).  The

22   *Price* court clarified that there can be no distinction between state law that attempts to regulate

23   takeoffs and landings, but not flight paths, as "[i]t is difficult, if not impossible, to draw a

24   distinction between regulation concerning the 'flight' of aircraft and regulation concerning the

25   takeoff and landing of aircraft.  Obviously, there cannot be one without the other two."  *Id.* at

26   503; *see also Skysign Int'l, Inc. v. City & County of Honolulu*, 276 F.3d 1109, 1117 (9th Cir.

THE PORT OF SEATTLE'S MOTION TO DISMISS
PLAINTIFFS' SECOND AMENDED COMPLAINT
(2:23-cv-000795 JNW)                    - 17 -

1   2002) (holding that 49 U.S.C. § 40103(b)(2) precludes local regulation that reaches "into the

2   forbidden, exclusively federal areas, such as flight paths, hours, or altitudes").

3        Plaintiffs seek to hold the Port liable based on the flight paths used by aircraft landing

4   and taking off at SEA, insisting that particular diseases are "significantly higher in the

5   Contamination Zone than in other Seattle communities not under a flight path" because

6   pollutants released below an altitude of 3,000 feet allegedly "accumulate in local communities."

7   SAC ¶¶ 4, 57.  In other words, Plaintiffs seek to hold the Port liable because the Airlines follow

8   federal flight paths at federally approved altitudes and frequencies.  Their complaint necessarily

9   encroaches on the "forbidden, exclusively federal" domain of flight paths, flight frequencies, and

10  takeoffs and landings, and is therefore preempted.

11       Finally, whether in the context of conflict or field preemption, this result does not change

12  because of the strategic decision Plaintiffs made in determining what relief to seek.  Plaintiffs'

13  lawsuit is federally preempted under the FAAct despite being "artfully pled" to avoid explicitly

14  requesting a change in flight patterns or activity, a change in flight paths or frequency, or a re-

15  routing of air traffic to other airports in the Pacific Northwest.  As explained *supra* at 11-13, the

16  Ninth Circuit and other courts have eliminated any distinction between an action for injunctive

17  relief and an action for damages when it comes to the applicability of the preemption doctrine.

18  *Kivalina*, 696 F.3d at 857 ("[T]he type of remedy asserted is not relevant to the applicability of

19  the doctrine of displacement."); *City of New York*, 993 F.3d at 96-97 (holding lawsuit preempted

20  because an award of damages is as powerful as direct regulation controlling conduct).  The fact

21  that Plaintiffs explicitly seek damages and medical monitoring instead of a change in flight paths

22  or flight frequency is legally irrelevant for federal preemption purposes.

23  **E.    Plaintiffs' Claims Are Expressly Preempted by the ADA**

24       In 1978 Congress enacted the ADA, having determined that "maximum reliance on

25  competitive market forces" would best further "efficiency innovation, and low prices," as well as

26  "variety and quality of . . . air transportation services."  Pub. L. No. 95-504, 92 Stat. 1705, 1706;

THE PORT OF SEATTLE'S MOTION TO DISMISS
PLAINTIFFS' SECOND AMENDED COMPLAINT
(2:23-cv-000795 JNW)    - 18 -

49 U.S.C. § 40101(a)(12); 49 U.S.C. § 1371, *et seq.* To ensure that states would not undo the

statute's broad pre-emptive purpose, Congress preempted states from "enact[ing] or enforc[ing] a

law, regulation, or other provision having the force and effect of law related to [an air carrier's]

price, route, or service." 49 U.S.C. § 41713(b)(1). The U.S. Supreme Court has specifically

rejected the notion that the ADA preemption only prohibits states from "actually prescribing

rates, routes, or services." *Morales*, 504 U.S. at 385. Rather, preemption applies if a state law

significantly impacts Congress's deregulatory and preemption-related objectives of ensuring that

transportation rates, routes, and services reflect maximum reliance on competitive market forces.

*Id.* at 390. By prohibiting states from regulating airline routes, rates, or services, Congress

intended to preclude individuals from attempting the same. *Am. Airlines*, 513 U.S. at 238 ("no

State . . . shall . . . enforce any law" means that "*no one* may enforce state law against an airline

when the enforcement action has a connection with, or reference to, airline rates, routes, or

services" (O'Connor, J., concurring).

State common law claims fall expressly within the ambit of the ADA's preemption

provision. *Nw. Inc. v. Ginsberg*, 572 U.S. 273, 281-82 (2014) ("state common-law rules fall

comfortably within the language of the ADA preemption provision," and "we see no basis for

holding that such standards must be based on a statute or regulation as opposed to the common

law"). The Court explained that "[w]hat is important . . . is the effect of a state law, regulation or

provision, not its form, and the ADA's deregulatory aim can be undermined just as surely by a

state common-law rule as it can by a statute or regulation." *Id.* at 283.

In *Ginsberg*, the U.S. Supreme Court held that "services" as used in the ADA preemption

provision of "rates, routes or services" includes "***access to flights***." *Id.* at 284 (emphasis added);

*Charas v. Trans World Airlines, Inc.*, 160 F.3d 1259, 1265 (9th Cir. 1998) ("services" in ADA

context includes regularity or frequency of flights between given destinations); *Nat'l Fed'n of*

*the Blind*, 813 F.3d at 726 ("service" refers to schedules, origins, and destinations of the point-to-

point transportation of passengers, cargo or mail—in other words, the provision of air

THE PORT OF SEATTLE'S MOTION TO DISMISS
PLAINTIFFS' SECOND AMENDED COMPLAINT
(2:23-cv-000795 JNW)                          - 19 -

1    transportation to and from various markets at various times).  And in *Duncan v. Northwest*

2    *Airlines, Inc.*, 208 F.3d 1112 (9th Cir. 2000), the Ninth Circuit further held that

3    > [a]irlines' "rates" and "routes" generally refer to the point-to-point
     > transport of passengers.  "Rates" indicates price; "routes" refers to
4    > courses of travel.  It therefore follows that "service," when
     > juxtaposed to "rates" and "routes," refers to such things as the
5    > frequency and scheduling of transportation, and to the selection of
     > markets to or from which transportation is provided. . . .

6
     > . . . Congress used "service". . . to refer to the provision of air
7    > transportation to and from various markets at various times.

8    *Id*. at 1114-15 (first and second ellipses in original; brackets and citation omitted).

9          Plaintiffs filed state-law claims against the Port alleging harm from exposure to aircraft

10   emissions from an increase in takeoffs and landings at SEA.  SAC ¶¶ 4, 8, 41, 59.  Plaintiffs

11   blame the Port for purportedly disregarding the adverse impacts these emissions allegedly have

12   on those closest to the Airport and for somehow "allowing" the Airlines to increase their flight

13   activity to and from SEA.  Plaintiffs go so far as to blame the Port for improving its International

14   Arrivals Facility and generally claim that this alleged increased economic activity is the reason

15   that those in the so-called "contamination zone" are disproportionately impacted.  *Id.* ¶¶ 41, 50,

16   91.

17         In effect, Plaintiffs' claims against the Port seek to curtail takeoffs and landings from

18   SEA and to generally reduce the amount of flight activity at the Airport.  These claims

19   necessarily "relate to" airline "routes, and services" as construed by the U.S. Supreme Court in

20   *Ginsberg* and the Ninth Circuit in *Duncan*.  By blaming the frequency of takeoffs and landings at

21   SEA for their alleged harm, Plaintiffs' claims threaten to impact "access to flights," "schedules,"

22   "origins and destinations of the transportation of passengers," as well as the specific routes that

23   the Airlines use when flying in and out of SEA.  In short, Plaintiffs' attempt to impose a

24   significant economic burden on market forces and substantially interfere with the ADA's

25   deregulatory goals falls squarely within the ambit of the ADA's preemption provision, which

26   explicitly prohibits Plaintiffs from exercising any control over the Airlines' choice of destination

THE PORT OF SEATTLE'S MOTION TO DISMISS
PLAINTIFFS' SECOND AMENDED COMPLAINT
(2:23-cv-000795 JNW)                           - 20 -

1    or frequency of flights in and out of SEA.

2    **F.      Plaintiffs Fail to Show That They Have Standing to Bring an Inverse
             Condemnation Claim Against the Port**

3

4            As demonstrated above, the preemption doctrine bars all of Plaintiffs' claims against the

5    Port.  But there is a second and independent reason why Plaintiffs' inverse condemnation claim

6    against the Port must be dismissed.  It is foreclosed by the "subsequent purchaser rule" as

7    interpreted by the Washington Supreme Court.  This rule "prohibits landowners from suing for

8    property damage caused by governmental conduct that occurred prior to their ownership."

9    *Maslonka v. Pub. Util. Dist. No. 1 of Pend Oreille Cnty.*, 533 P.3d 400, 406 (Wash. 2023); *see*

10   *also id.* ("[I]t is a general rule of the law of eminent domain that any award goes to the owner at

11   the time of the taking, and that the right to compensation is not passed to a subsequent

12   purchaser") (brackets in original) (quoting *Palazzolo v. Rhode Island*, 533 U.S. 606, 628

13   (2001))); *Wolfe v. State Dep't of Transp.*, 293 P.3d 1244, 1247 (Wash. Ct. App. 2013) ("[I]t is

14   the original owner who suffers from the true harm. . . .  [A] subsequent purchaser pays a price

15   that presumably reflects the diminished property value in light of this earlier taking . . . .").

16           Importantly, in Washington the rule "is a doctrine of standing and not an affirmative

17   defense."  *Maslonka*, 533 P.3d at 406-07.  When the challenged conduct occurred prior to the

18   plaintiff's purchase, "any cause of action for inverse condemnation belongs to the prior owner

19   and the [subsequent owners] lack standing to maintain an action for the taking."  *Id.* (citation

20   omitted).  This accords with the federal constitutional standing requirement that a plaintiff

21   demonstrate an "injury-in-fact"—that is, "an invasion of a legally protected interest which is

22   (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical."

23   *Lujan*, 504 U.S. at 560 (citations and internal quotation marks omitted).

24           The burden is on Plaintiffs to establish standing at the pleading stage.  *Maslonka*, 533

25   P.3d at 407-08; *see also Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (holding that a

26   "plaintiff must clearly allege facts demonstrating each element" of standing).  "Federal courts are

THE PORT OF SEATTLE'S MOTION TO DISMISS
PLAINTIFFS' SECOND AMENDED COMPLAINT
(2:23-cv-000795 JNW)                    - 21 -

1   courts of limited jurisdiction" and as such "there is a presumption against jurisdiction which the

2   party asserting jurisdiction must overcome in order to maintain a claim in federal court." *St.*

3   *Mary's Parish v. EEOC*, No. C05-01297, 2005 WL 2347096, at *2 (W.D. Wash. Sept. 26, 2005)

4   (citing *Kokkonen v. Guardian Life Ins., Co.*, 511 U.S. 375, 377 (1994)).  To establish standing

5   here, Plaintiffs "must prove *a new* governmental action or taking occurred *after* their purchase."

6   *Maslonka*, 533 P.3d at 407 (emphasis added).  To illustrate, "when a governmental action causes

7   known flooding prior to a plaintiff's acquisition, a new cause of action does not arise with each

8   flood absent additional governmental action."  *Id.*

9          The SAC fails to overcome this doctrinal bar to suit as it does not plead what new

10  governmental action by the Port, after each Plaintiff purchased his or her property, allegedly

11  resulted in a taking.  Absent such pleading, none of the Plaintiffs have standing to bring the

12  inverse condemnation claim against the Port.  Plaintiffs try to overcome this pleading and

13  jurisdictional deficiency by blaming, generically, the Port's so-called "authority to grant airlines

14  rights and privileges concerning the occupancy and use of . . . [the] Airport."  SAC ¶ 42.[10]  This

15  does not suffice, as a matter of law.  The SAC points to nothing to suggest that this "authority"

16  materialized for the first time after each Plaintiff purchased their home.

17         To illustrate, Michelle Geer and Tamara Chakos allege that they each purchased their

18  home within the past two years.  *See id.* ¶¶ 20, 34.  But Plaintiffs fail to plead what specific new

19  action by the Port in the past two years confers on them—as opposed to the prior owners—the

20  standing to bring an inverse condemnation claim against the Port.  The vague reference to the

21  "construction of a new International Arrivals Facility," which "opened in March 2022," does not

22  satisfy their burden to affirmatively establish their standing at the pleading stage, as Washington

23  Supreme Court precedent now requires, because the improvement of an airport terminal in no

24

25  [10] Whatever "rights and privileges" Plaintiffs refer to do not vest the Port with any authority to
    turn flights away, and do not provide the Port with any authority over flight paths and altitudes
26  during takeoffs and landings, much less engine or fuselage design or the ability to control air
    emissions.

THE PORT OF SEATTLE'S MOTION TO DISMISS
PLAINTIFFS' SECOND AMENDED COMPLAINT
(2:23-cv-000795 JNW)                    - 22 -

1    way implies increased air traffic or demand. *Maslonka*, 533 P.3d at 407-08; *see also Barnes v.*

2    *U.S. Dep't of Transp.*, 655 F.3d 1124, 1138 (9th Cir. 2011) ("[I]mproving a terminal . . .

3    increase[s] demand only marginally, if at all."); *City of L.A. v. FAA*, 138 F.3d 806, 807-08 (9th

4    Cir. 1998) (agreeing with the FAA's determination that "a larger, more convenient terminal will

5    not attract more passengers" because demand "depends much more on location, runways and

6    ticket prices than on how nifty the terminal is").

7        By failing to plead facts showing that they satisfy the subsequent purchaser rule,

8    Plaintiffs have failed to show that they have suffered ***any*** injury for the purposes of the inverse

9    condemnation rule, and therefore have no standing to bring this claim against the Port. Instead,

10   they are presumed to have purchased their properties at a reduced price reflecting the damage

11   done to those properties ***prior*** to their purchase. For these reasons, the Court lacks jurisdiction to

12   hear this claim and Plaintiffs cannot proceed with this cause of action.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

THE PORT OF SEATTLE'S MOTION TO DISMISS
PLAINTIFFS' SECOND AMENDED COMPLAINT
(2:23-cv-000795 JNW)                - 23 -

1

### IV.  CONCLUSION

2   For the foregoing reasons, Plaintiffs' SAC should be dismissed in its entirety.

3

4   I certify that this memorandum contains 8,237 words, in compliance with the Local Civil Rules.

5

DATED:  October 27, 2023            STOEL RIVES LLP

6

7                                   *s/ Beth S. Ginsberg*
                                    BETH S. GINSBERG, WSBA No. 18523
8                                   beth.ginsberg@stoel.com
                                    MAREN R. NORTON, WSBA No. 35435
9                                   maren.norton@stoel.com
                                    RITA V. LATSINOVA, WSBA No. 24447
10                                  rita.latsinova@stoel.com
                                    VANESSA SORIANO POWER, WSBA No. 30777
11                                  vanessa.power@stoel.com
                                    MICHAEL P. RUBIN, WSBA No. 59598
12                                  michael.rubin@stoel.com

13                                  Stoel Rives LLP
                                    600 University Street, Suite 3600
14                                  Seattle, WA  98101
                                    Telephone:  206.624.0900
15                                  Facsimile:  206.386.7500

16                                  PORT OF SEATTLE

17                                  *Attorneys for Defendant Port of Seattle*

18  121275249.3 0065738-00092

19

20

21

22

23

24

25

26

THE PORT OF SEATTLE'S MOTION TO DISMISS
PLAINTIFFS' SECOND AMENDED COMPLAINT
(2:23-cv-000795 JNW)            - 24 -