THE HONORABLE JAMAL N. WHITEHEAD

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**SEATTLE DIVISION**

| | |
|---|---|
| CINDY CODONI, MICHELLE GEER, ACE CATHCART, AMY FRANCE, and TAMARA CHAKOS, individually and on behalf of all others similarly situated,<br><br>             Plaintiffs,<br><br>    v.<br><br>PORT OF SEATTLE, ALASKA AIR GROUP, INC., and DELTA AIR LINES, INC.,<br><br>             Defendants. | Case No.: 2:23-cv-00795 JNW<br><br>**PLAINTIFFS' OMNIBUS OPPOSITION TO THE PORT OF SEATTLE'S MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT AND TO ALASKA AIR GROUP AND DELTA AIR LINES, INC.'S JOINT MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT**<br><br>**NOTE ON MOTION CALENDAR:**<br>**To be determined per Dkt. 45**<br><br>**ORAL ARGUMENT REQUESTED** |

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ................................................................................. 1

II.   FACTUAL AND PROCEDURAL BACKGROUND ........................................ 3

III.  STANDARD OF REVIEW ...................................................................... 5

IV.   ARGUMENT ...................................................................................... 5

      A.    Plaintiffs' claims are not preempted. ........................................... 5

            1.    No federal statute expressly preempts Plaintiffs' state law
                  claims. ...................................................................... 7

                  a.    The Airline Deregulation Act does not expressly
                        preempt Plaintiffs' claims. ................................... 7

                  b.    The Clean Air Act does not expressly preempt
                        Plaintiffs' claims. ............................................ 10

            2.    No federal law conflicts with the state law on which
                  Plaintiffs base their claims. ......................................... 12

                  a.    Defendants can physically comply with both state
                        and federal law. ............................................... 12

                  b.    Requiring Defendants to compensate Plaintiffs for
                        state tort law violations does not thwart
                        congressional objectives in enacting the Federal
                        Aviation Act or the Clean Air Act. ....................... 14

                        (1)   Plaintiffs' claims do not undermine
                              Congress's goals in enacting the Federal
                              Aviation Act. ......................................... 14

                        (2)   Plaintiffs' claims do not undermine—and in
                              fact support—Congress's goals in enacting
                              the Clean Air Act. .................................. 16

            3.    The federal aviation regulatory scheme is not so expansive
                  as to manifest Congressional intent to preempt all state law
                  tort remedies in the field. ........................................... 17

                  a.    The "legislative fields" at issue in this case are
                        matters historically within state control. .................. 18

                  b.    The Federal Government has not fully preempted
                        the fields of aviation safety, airspace management,
                        aircraft design, and aircraft emissions so as to
                        preclude Plaintiffs' claims for damages. .................. 19

4.    Preemption does not apply to and cannot be used as a ground for dismissal of Plaintiffs' claims by the Port in its role as the proprietor of SeaTac Airport. ................................... 21

5.    The anticommandeering doctrine prevents the Federal Government from compelling the State to enforce a federal regulatory program .................................................................. 23

B.    The collateral attack doctrine—limited in scope—is inapplicable to this case and does not bar Plaintiffs' claims. ......................................... 25

1.    Plaintiffs do not seek to revisit, reverse, attack, or evade any agency order or regulation. ............................................. 25

2.    Plaintiffs seek tort damages from non-federal defendants that neither the federal agencies nor the Courts of Appeals can provide; their claims are properly before *this* Court. ........................ 28

3.    The Airlines' novel, maximalist interpretation of the collateral attack doctrine would foreclose all meaningful review of Plaintiffs' claims and constructs a wall of immunity for all manner of claims against airlines. ............................... 30

C.    The subsequent purchaser rule does not bar Plaintiffs' inverse condemnation claims against the Port .................................................... 31

1.    Excessive and unmitigated contamination caused by recent and more frequent activity of Defendant Airlines—as permitted by the Port—after Plaintiffs purchased their homes, gives rise to new inverse condemnation causes of action. ............................................................................... 32

2.    Plaintiffs have standing to bring inverse condemnation claims against the Port notwithstanding the subsequent purchaser rule. ......................................................... 34

V.    CONCLUSION ............................................................................................ 35


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

**TABLE OF AUTHORITIES**

Page(s)

CASES

*Air Transp. Ass'n of Am. v. City & Cnty. of San Francisco*,
266 F.3d 1064 (9th Cir. 2001) ......................................................................8, 9

*Aircraft Owners & Pilots Ass'n v. Port Auth.*,
305 F. Supp. 93 (E.D.N.Y. 1969) .......................................................................22

*Altria Grp., Inc. v. Good*,
555 U.S. 70 (2008).............................................................................................7

*Am. Airlines, Inc. v. Wolens*,
513 U.S. 219 (1995).........................................................................................8

*Americopters, LLC v. F.A.A.*,
441 F.3d 726 (9th Cir. 2006) ......................................................................26, 28

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)...........................................................................5, 27, 34

*Beins v. United States*,
695 F.2d 591 (D.C. Cir. 1982)..........................................................................29

*Bell v. Cheswick Generating Station*,
734 F.3d 188 (3d Cir. 2013).............................................................................17

*Bernstein v. Virgin Am., Inc.*,
3 F.4th 1127 (9th Cir. 2021), *cert. denied*, 142 S. Ct. 2903 (2022)........................17

*Bethman v. City of Ukiah*,
265 Cal. Rptr. 539 (Ct. App. 1989).....................................................................18

*Brit. Airways Bd. v. Port Auth. of N.Y.*,
558 F.2d 75 (2d Cir. 1977)...............................................................................21

*Brown v. Alaska Air Grp., Inc.*,
2011 WL 2746251 (E.D. Wash. July 14, 2011).....................................................19

*Buxel v. King County*,
374 P.2d 250 (Wash. 1962)..............................................................................32

*Cal. Div. of Labor Standards Enforcement v. Dillingham Constr., N.A., Inc.*,
519 U.S. 316 (1997).....................................................................................9, 10

*Cal. Trucking Ass'n v. Su*,
903 F.3d 953 (9th Cir. 2018) .............................................................................9



*California Dump Truck Owners Ass'n v. Nichols,*
    784 F.3d 500 (9th Cir. 2015) ...................................................................26

*Californians for Safe & Competitive Dump Truck Transp. v. Mendonca,*
    152 F.3d 1184 (9th Cir. 1998) ...................................................................9

*Cavner v. Cont'l Motors, Inc.,*
    2012 WL 4467171 (W.D. Wash. Sept. 27, 2012)............................16, 21

*Chae v. SLM Corp.,*
    593 F.3d 936 (9th Cir. 2010) ....................................................................7

*Chamber of Com. of the United States of Am. v. Bonta,*
    62 F.4th 473 (9th Cir. 2023) ...................................................................14

*City of Burbank v. Lockheed Air Terminal Inc.,*
    411 U.S. 624 (1973)........................................................................8, 9, 21

*City of Cleveland v. City of Brook Park,*
    893 F. Supp. 742 (N.D. Ohio 1995).........................................................20

*City of Houston v. FAA,*
    679 F.2d 1184 (5th Cir.1982) ..................................................................22

*City of L.A. v. FAA,*
    138 F.3d 806 (9th Cir.1998) ..............................................................34, 35

*City of Tacoma v. Taxpayers of Tacoma,*
    357 U.S. 320 (1958)............................................................................28, 29

*Cohen v. Apple Inc.,*
    46 F.4th 1012 (9th Cir. 2022) .................................................................15

*N. Carolina ex rel. Cooper v. Tenn. Valley Auth.,*
    615 F.3d 291 (4th Cir. 2010) ..................................................................26

*Crist v. Leippe,*
    138 F.3d 801 (9th Cir. 1998) ..................................................................26

*Crosby v. Nat'l Foreign Trade Council,*
    530 U.S. 363 (2000)..................................................................................12

*Crystal Lotus Enters. Ltd. v. City of Shoreline,*
    274 P.3d 1054 (Wash. Ct. App. 2012) .....................................................34

*Ctr. for Biological Diversity v. Envtl. Prot. Agency,*
    847 F.3d 1075 (9th Cir. 2017) ...........................................................25, 31

*CTS Corp. v. Waldburger,*
    573 U.S. 1 (2014)........................................................................................6

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

*Davel Commc'ns, Inc. v. Qwest Corp.*,
  460 F.3d 1075 (9th Cir. 2006) ................................................................5

*Depuy v. Aircraft Spruce & Specialty Co.*,
  2018 WL 376701 (C.D. Cal. Jan. 10, 2018) .........................................19

*Dilts v. Penske Logistics, LLC*,
  769 F.3d 637 (9th Cir. 2014) ..................................................................9

*Dougherty v. Carver Fed. Sav. Bank*,
  112 F.3d 613 (2d Cir. 1997)...................................................................26

*Duncan v. Nw. Airlines, Inc.*,
  208 F.3d 1112 (9th Cir. 2000) ...............................................................10

*Elassaad v. Indep. Air, Inc.*,
  613 F.3d 119 (3d Cir. 2010)...................................................................20

*Fla. Lime & Avocado Growers, Inc. v. Paul*,
  373 U.S. 132 (1963) ..........................................................................6, 12

*Flores v. SkyWest, Inc.*,
  2022 WL 193011 (9th Cir. Jan. 20, 2022) .......................................15, 20

*GATX/Airlog Co. v. United States*,
  286 F.3d 1168 (9th Cir. 2002) ...............................................................21

*Gilmore v. Gonzales*,
  435 F.3d 1125 (9th Cir. 2006) ...............................................................26

*Gilstrap v. United Air Lines, Inc.*,
  709 F.3d 995 (9th Cir. 2013) ..........................................................*passim*

*Greater Westchester Homeowners Assn. v. City of Los Angeles*,
  603 P.2d 1329 (Cal. 1979) ...............................................................18, 21

*Green v. Brantley*,
  981 F.2d 514 (11th Cir. 1993) ...............................................................26

*Gregory v. Ashcroft*,
  501 U.S. 452 (1991)..................................................................................1

*Gustafson v. City of Lake Angelus*,
  76 F.3d 778 (6th Cir. 1996) ...................................................................20

*Harbor Fumigation, Inc. v. Cnty. of San Diego Air Pollution Control Dist.*,
  50 Cal. Rptr. 2d 874 (Ct. App. 1996) ....................................................11

*Martin ex rel. Heckman v. Midwest Exp. Holdings, Inc.*,
  555 F.3d 806 (9th Cir. 2009) ..............................................................7, 19

*Her Majesty the Queen in Rt. of Prov. of Ontario v. City of Detroit*,
    874 F.2d 332 (6th Cir. 1989) ...............................................................................17

*Highline School Dist. v. Port of Seattle*,
    548 P.2d 1085 (Wash. 1976)...........................................................................32, 33

*Hodges v. Delta Air Lines, Inc.*,
    2010 WL 5463832 (W.D. Wash. Dec. 29, 2010) .......................................5, 15, 20

*Hoover v. Pierce Cnty.*,
    903 P.2d 464 (Wash. Ct. App. 1995) ..............................................................32, 34

*Huron Portland Cement Co. v. Detroit*,
    362 U.S. 440 (1960)...........................................................................................6, 19

*Int'l Paper Co. v. Ouellette*,
    479 U.S. 481 (1987)...............................................................................................17

*Jewel v. Nat'l Sec. Agency*,
    673 F.3d 902 (9th Cir. 2011) .................................................................................33

*Krauss v. FAA*,
    2016 WL 1162028 (N.D. Cal. Mar. 24, 2016)......................................................26

*Levine v. Vilsack*,
    587 F.3d 986 (9th Cir. 2009) .................................................................................33

*Little v. Louisville Gas & Elec. Co.*,
    805 F.3d 695 (6th Cir. 2015) .................................................................................17

*Little v. Piper Aircraft Co.*,
    2009 WL 10670536 (C.D. Cal. Mar. 13, 2009) ....................................................21

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992)...............................................................................................33

*Mace v. Skinner*,
    34 F.3d 854 (9th Cir. 1994) ...................................................................................26

*Magassa v. Mayorkas*,
    52 F.4th 1156 (9th Cir. 2022) ................................................................................28

*Maslonka v. Pub. Util. Dist. No. 1 of Pend Oreille Cnty.*,
    533 P.3d 400 (Wash. 2023).............................................................................31, 34

*McKay v. City & Cnty. of San Francisco*,
    2016 WL 7425927 (N.D. Cal. Dec. 23, 2016)................................................26, 27

*Mecinas v. Hobbs*,
    30 F.4th 890 (9th Cir. 2022) ............................................................................13, 35

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

*Medtronic, Inc. v. Lohr*,
    518 U.S. 470 (1996)..........................................................................5, 6, 7

*Merrick v. Diageo Americas Supply, Inc.*,
    805 F.3d 685 (6th Cir. 2015) .....................................................................16

*Merritt v. Shuttle, Inc.*,
    245 F.3d 182 (2d Cir. 2001)..................................................................28, 29

*In re Mexico City Aircrash*,
    708 F.2d 400 (9th Cir. 1983) .................................................................15, 20

*Morales v. Trans World Airlines, Inc.*,
    504 U.S. 374 (1992) ....................................................................................8

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
    138 S. Ct. 1461 (2018) ..........................................................................23, 24

*New England Legal Found. v. Costle*,
    666 F.2d 30 (2d Cir. 1981).........................................................................26

*New York v. United States*,
    505 U.S. 144 (1992)...................................................................................23

*Nw., Inc. v. Ginsberg*,
    572 U.S. 273 (2014)....................................................................................8

*Oxygenated Fuels Ass'n Inc. v. Davis*,
    331 F.3d 665 (9th Cir. 2003) ..................................................................6, 16

*Pac. Merch. Shipping Ass'n v. Goldstene*,
    639 F.3d 1154 (9th Cir. 2011) .....................................................................6

*Palazzolo v. Rhode Island*,
    533 U.S. 606 (2001)..................................................................................35

*Patriotic Veterans, Inc. v. Indiana*,
    736 F.3d 1041 (7th Cir. 2013) ...................................................................17

*People of State of Cal. v. Dep't of the Navy*,
    624 F.2d 885 (9th Cir. 1980) ............................................................10, 11, 12

*Petersen v. Port of Seattle*,
    618 P.2d 67 (Wash. 1980)......................................................................32, 33

*Peterson v. King Cnty.*,
    252 P.2d 797 (Wash. 1953)........................................................................13

*R.J. Reynolds Tobacco Co. v. Cnty. of Los Angeles*,
    29 F.4th 542 (9th Cir. 2022), *cert. denied*, 143 S. Ct. 979 (2023)............................14

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

*Rice v. Norman Williams Co.*,
    458 U.S. 654 (1982)..................................................................13

*Rowe v. N.H. Motor Transp. Ass'n*,
    552 U.S. 364 (2008)...................................................................8

*Santa Monica Airport Ass'n v. City of Santa Monica*,
    659 F.2d 100 (9th Cir. 1981) ...................................................21

*Silkwood v. Kerr-McGee Corp.*,
    464 U.S. 238 (1984).................................................................29

*Sprietsma v. Mercury Marine*,
    537 U.S. 51 (2002)...................................................................12

*People of State of Cal. ex rel. State Air Res. Bd. v. Dep't of Navy*,
    431 F. Supp. 1271 (N.D. Cal. 1977) .............................10, 11, 12, 21

*Thunder Basin Coal Co. v. Reich*,
    510 U.S. 200 (1994).........................................................28, 29, 30

*Tur v. F.A.A.*,
    104 F.3d 290 (9th Cir. 1997) ...................................................26

*United Air Lines, Inc. v. Occupational Safety & Health Appeals Bd.*,
    654 P.2d 157 (Cal. 1982) ........................................................18

*United States v. Al-Nouri*,
    983 F.3d 1096 (9th Cir. 2020) .................................................28

*US Airways, Inc. v. O'Donnell*,
    627 F.3d 1318 (10th Cir. 2010) ...............................................17

*Virginia v. United States*,
    74 F.3d 517 (4th Cir. 1996) .....................................................26

*W. Air Lines, Inc. v. Port Auth. of N.Y. & N.J.*,
    658 F. Supp. 952 (S.D.N.Y. 1986) ...........................................22

*Williford v. City of Portland*,
    320 F. App'x 513 (9th Cir. 2009) ..............................................5

*Wolfe v. State Dep't of Transp.*,
    293 P.3d 1244 (Wash. 2013)...............................................32, 34

*Wyeth v. Levine*,
    555 U.S. 555 (2009)...............................................................6, 12



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1

**STATUTES**

2

5 U.S.C. § 706................................................................................................29

3

28 U.S.C. § 1291.............................................................................................29

4

42 U.S.C. § 7401(c)........................................................................................17

5

42 U.S.C.A. § 7571.........................................................................................16

6

42 U.S.C. § 7607(b)(1)..............................................................................28, 30

7

49 U.S.C. § 40101...........................................................................................15

8

49 U.S.C.A. § 40103(B)(2)(b).......................................................................15

9

49 U.S.C. § 41713(b)(1)...................................................................................7

10

49 U.S.C. § 44701.....................................................................................15, 21

11

49 U.S.C. § 46110...................................................................................28, 29, 30

12

49 U.S.C. § 47102(7)......................................................................................24

13

14

**OTHER AUTHORITIES**

15

34 Fed. Reg. 18,355 (Nov. 18, 1969).............................................................22

16

The Federalist No. 45 (James Madison) (C. Rossiter ed., 1961) .....................1

17

H.R. Rep. No. 85-2360 (1958), *as reprinted in* 1958 U.S.C.C.A.N. 3741.....................15

18

Restatement (Second) of Torts § 197 (1965).................................................13

19

S. Rep. No. 90-1353 (1968), *as reprinted in* 1968 U.S.C.C.A.N. 2688 .......................22

20

U.S. Const. amend. X.........................................................................................1

21

22

23

24

25

26

27

28

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1

## I.    INTRODUCTION

2       "As every schoolchild learns, our Constitution establishes a system of dual sovereignty

3   between the States and the Federal Government." *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991).

4   By design, "[t]he Constitution created a Federal Government of limited powers." *Id*. Under our

5   federalist structure, "powers not delegated to the United States . . . are reserved to the States

6   respectively, or to the people." U.S. Const. amend. X. This protection of State sovereignty, so

7   central to our American system of governance, is a "check on abuses of government power" and

8   "ensure[s] the protection of our fundamental liberties." *Gregory*, 501 U.S. at 458 (citation

9   omitted).

10      Plaintiffs seek to apply Washington state law to quintessentially local issues of property

11  rights and personal injury. *See* Pls.' 2d Am. Compl. ("SAC") at ¶¶ 110-147, ECF No. 43. These

12  are precisely the types of concerns over which State governments retain power in our system of

13  dual sovereignty. As James Madison observed,

14              The powers delegated by the proposed Constitution to the federal
                government are few and defined. Those which are to remain in the
15              State governments are numerous and indefinite. . . . The powers
                reserved to the several States will extend to all the objects which, in
16              the ordinary course of affairs, concern the lives, liberties, and
                properties of the people, and the internal order, improvement, and
17              prosperity of the State.

18  The Federalist No. 45, at 292–93 (C. Rossiter ed., 1961).

19

20      Throughout their Motions to Dismiss, Alaska Air Group, Inc., Delta Air Lines, Inc., and

21  the Port of Seattle (collectively, "Defendants")[1] try to wrest these prototypical state powers from

22  Washington State, accusing Plaintiffs of "intrud[ing] on the exclusive and unified federal

23  regulatory regime" of aviation operations. *See* Alaska Air Group and Delta Air Lines, Inc.'s Jt.

24  Mot. to Dismiss Pls.' 2d Am. Compl. ("Airlines' MTD") at 1, ECF No. 49; The Port of Seattle's

25  Mot. to Dismiss Pls.' 2d Am. Compl. ("Port's MTD") at 1-2, ECF No. 50 (stating that federal

26

27  _____

28  [1] Plaintiffs intend to add Alaska Airlines, Inc. and Horizon Air Industries, Inc. as Defendants
    in this case. Both entities are wholly owned subsidiaries of Alaska Air Group, Inc.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

law "leave[s] no space for states to regulate, or for state-law claims to undermine, the exclusive federal management of commercial air travel and regulation of aircraft in flight").

But this case does not challenge or otherwise threaten federal regulation of commercial air travel. Plaintiffs do not, contrary to Defendants' protests, ask this Court to alter in any way the Airlines' flight paths, flight volumes, flight altitudes, or any other aspect of their day-to-day flight services. *Cf.* Port's MTD at 14 ("In essence, Plaintiffs argue that more aircraft should fly in and out of other airports and fewer aircraft should use SEA."). Plaintiffs do not dispute the modern necessity of air travel or challenge the operations of Seattle-Tacoma International Airport ("Sea-Tac")—nor do they challenge *any* federal regulation or order. Rather, relying exclusively upon state tort law established over the course of centuries, Plaintiffs ask only for a remedy familiar to any student of law and economics: that Defendants bear the costs of the harm they cause Plaintiffs. *See* SAC ¶¶ 1, 7, 8, Request for Relief ¶¶ A-E (requesting, among other things, damages reflecting the cost to remediate Class members' properties of excess contamination caused by Defendants' conduct, and requesting a medical monitoring program for Class members exposed to airport-related pollution). Defendants should not be permitted to continue shifting costs to Plaintiffs, who are not responsible for Defendants' actions and are among those least able to bear associated costs.

Against this historic legal backdrop and simple economic logic, each of Defendants' arguments must be rejected. First, Plaintiffs' state-law claims are not preempted, either on express, conflict, or field preemption grounds, because the state and federal laws at issue govern separate fields. *See infra*, Section IV(A)(1)-(3) (contrasting the state-law fields of property rights and general personal injury protection with the federally controlled field of in-flight safety of airline passengers). Plaintiffs' claims against the Port must also survive a preemption attack thanks to both the Proprietor Exception to preemption (which allows airport proprietors like the Port to issue rules pertaining to nuisances and dangers caused by aircraft use of the airport), and the anticommandeering doctrine (which, grounded in the Tenth Amendment's protection of State powers, prevents the federal government from commanding the States or their subdivisions). *See infra*, Section IV(A)(4)-(5).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

Second, Plaintiffs' claims cannot be dismissed as a "collateral attack" on agency orders because Plaintiffs do not seek to revisit, reverse, attack, or evade any agency order or regulation; they seek damages grounded purely in state law. *See infra*, Section IV(B). Furthermore, accepting Defendant's radical, sweeping application of this limited doctrine would, in effect, confer *de facto* immunity on Defendants for any claims of injury by stripping residents of any means to use state law to protect themselves or their property from harm, entirely contrary to Congress's intent. *See id.*

Finally, and despite the Port's last attempt to undermine Washington's authority to protect its citizens, the subsequent purchaser rule does not bar Plaintiffs' inverse condemnation claims because Plaintiffs allege the Port continued to cause unmitigated damage to Plaintiffs' property *after* Plaintiffs had purchased their homes. *See infra*, Section IV(C).

In sum, granting dismissal at the pleading stage of this litigation—and without any challenge by Defendants to the elements of *any* of Plaintiff's state law causes of action—would expand and elevate doctrines of preemption and other jurisdictional limitation to an unprecedented degree not warranted by any legal authority. Dismissal would also strip Plaintiffs of their right to seek remedy in reliance on state tort law and would force them to litigate a dizzying array of federal agency actions in federal court, even when the harm at issue is entirely local. And this absent any mandate from Congress to limit state law so radically. Such a finding would undermine the respect for state law inherent in our federalist system and would impermissibly allow the federal government to intrude on traditional areas of state control, turning the Tenth Amendment on its head. Plaintiffs therefore respectfully request that Defendants' Motions to Dismiss be denied.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

Every day, hundreds of airplanes belonging to Defendant Airlines fly in and out of Sea-Tac, with the Port's permission. *See* SAC ¶ 41. Defendant Airlines' planes deposit several pollutants on Plaintiffs' property, ranging from lead and barium particulate matter to benzene and formaldehyde gases. *Id*. ¶¶ 2, 53-79. Over time, these pollutants accumulate on thousands of homes within a five-mile radius of the airport (the "Contamination Zone"). *Id.* ¶¶ 57-59. Without

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1    decontamination efforts, the concentration of dangerous pollutants can rise to toxic levels,

2    poisoning the air residents breathe and the soil where their children play. *Id*. ¶¶ 2, 97.

3        Defendants have long known that their activities produce dangerous pollutants, harmful

4    particulate matter, dangerous gases, hazardous air pollutants, and toxic heavy metals. *Id*. ¶¶ 6,

5    51-52, 86-92. And they have known since at least 2021 that the pollution they generate is

6    accumulating at toxic levels on Plaintiffs' homes and properties within the Contamination Zone.

7    *Id.* Knowing the damage they were causing to Plaintiffs and the putative class, Defendants could

8    have paid to mitigate and remove excess pollutants from the air and soil in the Contamination

9    Zone. *Id*. ¶ 97. But they chose not to. *Id*. ¶ 6. Instead, Defendants left a working-class, majority-

10   minority community of nearly 300,000 people, including 60,000 children, to live amidst

11   increasing concentrations of toxic pollution and to bear the costs of harm to themselves and their

12   property. *Id*. ¶ 3.

13       Residents of the Contamination Zone are now paying the price—sometimes with their

14   lives—for Defendants' failure to internalize the cost of contaminating Plaintiffs' homes. *Id*.

15   ¶¶ 79-85. In 2020, a government health report published by Public Health – Seattle & King

16   County concluded that pollution caused by Defendants' activity results in significant health

17   consequences for Plaintiffs and others who live in the Contamination Zone, and dramatically so

18   relative to King County residents generally. *Id*. ¶¶ 82-83. Residents suffer from cancer, heart

19   disease, and respiratory illnesses at higher-than-expected rates. *Id*. Babies born in the

20   Contamination Zone have a higher chance of being premature or of being underweight. *Id*. And

21   residents of the Contamination Zone have lower life expectancies than those who live outside the

22   Zone. *Id*. In fact, researchers have concluded that exposure to the concentration of dangerous

23   contaminants generated by the Defendants leads to hundreds of excess deaths in the

24   Contamination Zone per year. *Id*. In addition to these serious, and sometimes fatal, health

25   consequences, residents who own homes or otherwise reside in the Contamination Zone suffer an

26   accumulation of measurable damages to their homes and property. *Id*. ¶¶ 84-85.

27       Because Defendants have refused to take responsibility for their actions and to internalize

28   the costs of their economic activity as it concerns pollution of Plaintiffs' properties, Plaintiffs

now turn to the courts for the remedies afforded them under traditional state law. In their

Complaint, Plaintiffs bring claims for negligence, battery, continuing intentional trespass, and

public nuisance against the Airlines and the Port, as well as inverse condemnation claims against

the Port. *Id*. ¶¶ 110-147. And for the reasons argued below, these claims should be permitted to

move to discovery; Defendants' motions to dismiss should be denied.

### III.    STANDARD OF REVIEW

It is well established that "federal courts may not dismiss a complaint unless it is clear

that no relief could be granted under any set of facts that could be proved consistent with the

allegations." *Davel Commc'ns, Inc. v. Qwest Corp.*, 460 F.3d 1075, 1088 (9th Cir. 2006)

(quotation omitted). On a motion to dismiss, the complaint survives challenge if it contains

sufficient "factual allegations, taken as true, [that] state a claim for relief that is plausible on its

face." *Gilstrap v. United Air Lines, Inc.*, 709 F.3d 995, 1003 (9th Cir. 2013) (quotation omitted).

A claim is "facially plausible" when facts are pled that "allow[] the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S.

662, 678 (2009). And a court must "[a]ccept[] the facts in the complaint as true and in the light

most favorable to the plaintiff." *Gilstrap*, 709 F.3d at 1003. For Defendants' motions to be

granted, "it must appear to a certainty that the plaintiff would not be entitled to relief under any

set of facts that could be proved." *Williford v. City of Portland*, 320 F. App'x 513, 515 (9th Cir.

2009) (citation omitted).

### IV.    ARGUMENT

**A.    Plaintiffs' claims are not preempted.**

The Supreme Court has made plain that "because the States are independent sovereigns

in our federal system, we have long presumed Congress does not cavalierly pre-empt state law

causes of action." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996); *accord Hodges v. Delta Air

Lines, Inc.*, 2010 WL 5463832, at *2 (W.D. Wash. Dec. 29, 2010) ("[T]he Court must also begin

with the assumption that that Congress does not 'cavalierly' preempt status law causes of

action." (quoting *Charas v. Trans World Airlines, Inc.*, 160 F.3d 1259, 1265 (1998)). Because

the States are "independent sovereigns in our federal system," courts have long held they must

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

"start with the assumption that the historic police powers of the States were not to be superseded . . . ." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (quotation omitted); *see also CTS Corp. v. Waldburger*, 573 U.S. 1, 18–19 (2014). Only an unambiguous congressional mandate to the contrary can overcome this presumption. *See Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 146–47 (1963) (courts "are not to conclude" that state law is preempted "in the absence of an unambiguous congressional mandate to that effect").

The presumption against preemption is particularly strong in cases where Congress has "legislated . . . in a field which the States have traditionally occupied." *Wyeth*, 555 U.S., 565 (alteration in original) (internal citations omitted); *see also Oxygenated Fuels Ass'n Inc. v. Davis*, 331 F.3d 665, 673 (9th Cir. 2003) ("We are required to presume that Congress did not intend to preempt areas of law that fall within the traditional exercise of the police powers of the states."). And individual property rights and protection from injury—the "fields" at the heart of Plaintiffs' Complaint—are among the core areas of traditional state control. *See Medtronic*, 518 U.S. at 475 ("States traditionally have had great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons." (citation omitted)); *Huron Portland Cement Co. v. Detroit*, 362 U.S. 440, 442, (1960) ("Legislation designed to free from pollution the very air that people breathe clearly falls within the exercise of even the most traditional concept of what is compendiously known as the police power."); *Pac. Merch. Shipping Ass'n v. Goldstene*, 639 F.3d 1154, 1167 (9th Cir. 2011) (noting "'[a]ir pollution prevention falls under the broad police powers of the states, which include the power to protect the health of citizens in the state'" and that "'[e]nvironmental regulation traditionally has been a matter of state authority'" (alterations in original) (citations omitted)); *Oxygenated Fuels Ass'n Inc.*, 331 F.3d at 673 ("Environmental regulation is an area of traditional state control."). This presumption holds even when "the Federal Government has regulated [the field] for more than a century." *Wyeth*, 555 U.S. at 565 & n.3.

So, at the outset, Plaintiffs' state-law claims are presumptively valid at the pleading stage. Defendants bear the heavy burden of showing that Congress intended to prevent Plaintiffs from availing themselves of ordinary Washington State tort law remedies in the fields of property

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

rights and personal injury. And, contrary to Defendants' claims, neither the Clean Air Act ("CAA") nor the Federal Aviation Act ("FAAct") nor the Airline Deregulation Act ("ADA") indicates such an intent.

### 1. No federal statute expressly preempts Plaintiffs' state law claims.

Express preemption arises when Congress "indicate[s] its intent to displace state law through express language." *Chae v. SLM Corp.*, 593 F.3d 936, 942 (9th Cir. 2010) (citing *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008)). The scope of an express preemption provision depends on "the text of the provision, the surrounding statutory framework, and Congress's stated purposes in enacting the statute." *Id.* Federalism considerations support a "narrow interpretation" of express commands where, as here, the federal statutes in question touch upon fields traditionally reserved to the States. *See Medtronic*, 518 U.S. at 485. When the text of an express preemption provision "is susceptible of more than one plausible reading, courts ordinarily accept the reading that disfavors pre-emption." *Altria*, 555 U.S. at 76 (quotation omitted).

Here, contrary to Defendants' arguments, *see* Airlines' MTD at 13-17; Port's MTD at 8-11; 18-20, there is no indication Congress intended to displace the state law at issue in this case through either the ADA or the CAA.[2] As such, Plaintiffs' claims cannot be dismissed on this ground.

### a. The Airline Deregulation Act does not expressly preempt Plaintiffs' claims.

The ADA's express preemption provision, codified at 49 U.S.C. § 41713(b)(1), reads:

> Except as provided in this subsection, a State, political subdivision of a State, or political authority of at least 2 [two] States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier that may provide air transportation under this subpart.

---

[2] The Ninth Circuit has confirmed that "[t]he Federal Aviation Act has no express preemption clause." *Martin ex rel. Heckman v. Midwest Exp. Holdings, Inc.*, 555 F.3d 806, 808 (9th Cir. 2009). Neither the Airlines nor the Port dispute this.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1    This language means state law is preempted *only where* that law "acts immediately and

2    exclusively upon price, route or service or where the existence of a price, route or service is

3    essential to the law's operation." *Air Transp. Ass'n of Am. v. City & Cnty. of San Francisco*, 266

4    F.3d 1064, 1071 (9th Cir. 2001) (quotations omitted) (applying *Cal. Div. of Labor Standards*

5    *Enforcement v. Dillingham Constr., N.A., Inc.*, 519 U.S. 316, 325 (1997) in the ADA context).

6    By its plain terms, then, the ADA does not preempt state laws concerning nuisance,

7    negligence, battery, and inverse condemnation because these laws do not act "immediately and

8    exclusively" upon an air carrier's "price, route or service." *Id.* Rather, state common law and

9    constitutional law are general background rules that apply universally. *See Gilstrap*, 709 F.3d at

10   1010 (quoting *Am. Airlines, Inc. v. Wolens*, 513 U.S. 219, 236–37 (1995) (Stevens, J., concurring

11   in part and dissenting in part)). They do not specifically target air carriers. And certainly

12   Washington's common law and state constitution do not depend for their operation on "the

13   existence" of a particular price, route, or service among air carriers; these state laws predate the

14   advent of flight.

15   Defendants object that Plaintiffs' action should nevertheless be preempted—even if the

16   state law at issue has no *direct* connection to price, routes, or services—because these laws have

17   an *indirect* impact on routes and services of the kind prohibited under Section 41713(b)(1). *See*

18   Airlines' MTD at 15, 17 (objecting that requiring adherence to state common law would bind

19   carriers to "different routes" and would foreclose "service to Sea-Tac"); Port's MTD at 20

20   (protesting that a finding in Plaintiffs' favor would impermissibly "curtail takeoffs and landings"

21   from Sea-Tac).

22   But Plaintiffs do not challenge the Defendant Airlines' routes or services, even indirectly.

23   Nor would the relief Plaintiffs seek have any such impact. Defendants' argument that Plaintiffs'

24   claims would shut down Sea-Tac air travel is facially implausible. Unlike in *Morales v. Trans*

25   *World Airlines, Inc.*, 504 U.S. 374 (1992), to which the Airlines and the Port cite repeatedly,

26   Plaintiffs are not seeking injunctive relief as it relates to air carriers' flight operations. *Cf. also*

27   *Nw., Inc. v. Ginsberg*, 572 U.S. 273 (2014); *Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364

28   (2008); *Am. Airlines, Inc.*, 513 U.S. 219. And unlike in *City of Burbank v. Lockheed Air*

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

*Terminal Inc.*, 411 U.S. 624 (1973), Plaintiffs are not asking that any flight paths be altered or that curfews be imposed on flights into Sea-Tac. Simply put, Plaintiffs are not asking Defendants to change their daily flight operations in any way (much less shut down services to Sea-Tac entirely).

Instead, Plaintiffs ask only that Defendants—like any other tortfeasor causing damage to persons in Washington—pay the cost associated with the injury they cause to persons and property. *See* SAC at 48-49, Request for Relief at A-F (seeking mitigation of property contamination and support for medical monitoring for Plaintiffs and putative class members). Such measures are not "related to" airlines' routes or services because they do not "directly or indirectly . . . bind[] the carrier to a particular price, route or service." *Dilts v. Penske Logistics, LLC*, 769 F.3d 637, 646 (9th Cir. 2014); *see also Air Transp. Ass'n of Am.*, 266 F.3d at 1072. The Airlines (in conjunction with the Port) remain free to set their own routes and services as permitted by federal law.[3]

The Port also argues that finding in Plaintiffs' favor would inevitably impose "a significant economic burden" on the airline industry, *see* Port's MTD at 20, implying that Plaintiffs' claims also indirectly (and impermissibly) relate to "price." But the Ninth Circuit has rejected arguments that state law can be preempted simply because its application might indirectly prompt a carrier to increase its prices. *See Cal. Trucking Ass'n v. Su*, 903 F.3d 953, 965 (9th Cir. 2018); *Californians for Safe & Competitive Dump Truck Transp. v. Mendonca*, 152 F.3d 1184, 1189 (9th Cir. 1998) (noting that a law that causes an increase of 25% in a carrier's prices was "no more than indirect, remote, and tenuous" because the law did not "acutely interfere[e] with the forces of competition"). Even state laws that "alter[] the incentives" a carrier

---

[3] Only in the most tenuous sense could asking Defendants to bear the cost of damages "relate to" routes and services of airlines. But as Justice Scalia noted in his concurrence in *Dillingham*, "applying the 'relate to' provision according to its terms was a project doomed to failure, since, as many a curbstone philosopher has observed, everything is related to everything else." 519 U.S. at 335. It cannot be that any thread ultimately linking back to "routes and services" is preempted, or we would be left with very little state law indeed. *See id.* at 334 (noting "Congress could not possibly have intended to eliminate" myriad state laws simply by including a "relate to" provision in an express preemption clause).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

faces are not preempted, so long as those laws "do[] not dictate" the carriers' choices.

*Dillingham*, 519 U.S. at 334.

Here, none of the relief Plaintiffs seek interferes with or dictates the prices air carriers must set. Plaintiffs' claims under state common law "do[] not sufficiently interfere with the objectives of airline deregulation [under the ADA] to warrant preemption of the action." *Duncan v. Nw. Airlines, Inc.*, 208 F.3d 1112, 1115 (9th Cir. 2000). Even the potential economic cost of a "successful class-action tort suit[]" is "simply too tenuous" a connection to require preemption. *Id.* Many legal obligations that airlines face can result in a cost imposed upon them; Defendant Airlines' choice to raise prices as a result is far too attenuated and voluntary to trigger express preemption.

### b.    The Clean Air Act does not expressly preempt Plaintiffs' claims.

Defendants also argue with equal lack of authority that Section 233 of the CAA expressly preempts Plaintiffs' claims. *See* Airlines' MTD at 17-19; Port's MTD at 8-10. But the Ninth Circuit has already determined that Section 233 "was not intended to be preclusive of all state regulation," *People of State of Cal. v. Dep't of the Navy*, 624 F.2d 885, 888 (9th Cir. 1980). In *Navy*, the State of California brought an action claiming that levels of air pollution from certain Navy jet engine test cells violated California air quality standards promulgated under the CAA. After engaging in a textual analysis and examining Congress's intent in enacting the statute, the Ninth Circuit concluded that Section 233 does not prohibit regulation of pollution *after it has left the aircraft*, and so found that Plaintiffs' claims in *Navy* were not preempted. *Id.* at 889.

The decision in *Navy* is controlling and the same analysis applies here. Looking first to the language at issue, Section 233 reads:

> No State or political subdivision thereof may adopt or attempt to enforce any standard respecting emissions of any air pollutant from any aircraft or engine thereof unless such standard is identical to a standard applicable to such aircraft under this part.

The focus of this text is "preemption of state regulation *of the engine* and not preemption of state regulation of emissions *once they have left the engine*." *People of State of Cal. ex rel. State Air Res. Bd. v. Dep't of Navy*, 431 F. Supp. 1271, 1283 (N.D. Cal. 1977) (emphasis added), *aff'd sub*

1   *nom. People of State of Cal. v. Dep't of the Navy*, 624 F.2d 885 (9th Cir. 1980). Facially, Section

2   233 "focuses, preemptively, upon standards for aircraft engine emissions in a way which implies

3   *modification of the engine* so as either to prevent creation of certain emissions (via internal

4   alteration) or to prevent those emissions from leaving the engine (via external attachment of

5   antipollution devices, etc.)." *Id.* (emphasis added).

6       Here, Plaintiffs are not requesting injunctive relief that would require internal alterations

7   of any aircraft or engine thereof. They are also not requesting that the Defendant Airlines use

8   antipollution devices to prevent particulate matter from flaking off their aircraft's fuselages or

9   catch emissions as they leave the aircrafts' engines. Instead, Plaintiffs' sole focus is on

10  compensation for (i) contamination caused by emissions "once they have left" the aircraft or

11  aircraft engine, and (ii) contamination caused by flaking of heavy metals and other contaminants

12  from the plane itself. *See* SAC ¶¶ 54-55. Because Plaintiffs are not seeking to enforce any

13  standard respecting emissions from the aircraft or engines themselves, *see id.*, Request for Relief

14  at 48-49, Section 233's plain language does not preempt Plaintiffs' state law claims. *See State*

15  *Air Res. Bd.*, 431 F. Supp. at 1283; *Harbor Fumigation, Inc. v. Cnty. of San Diego Air Pollution*

16  *Control Dist.*, 50 Cal. Rptr. 2d 874, 882 (Ct. App. 1996) (finding the San Diego Air Pollution

17  Control District had regulatory jurisdiction over waste gas that a pesticide "emitted into the

18  ambient air," even though the District was preempted from regulating "how [the] pesticide is

19  used.").

20      The legislative history of Section 233 further highlights the statute's limited preemption

21  scope. Although "[t]here is little legislative history on the scope" of Section 233, what history

22  does exist emphasizes "preventing states from imposing emissions standards as a condition

23  precedent in the sale, titling, or registration of aircraft or engines." *Navy*, 624 F.2d at 888 (citing

24  H.R. Rep. No. 91-1146, at 4, *as reprinted in* 1970 U.S.C.C.A.N. 5356, 5370 ("No State may

25  require certification, inspection, or any other approval relating to the control of emissions from

26  any aircraft or engines as a condition precedent to the initial sale, titling, or registration of

27  aircraft or engines.")). In enacting Section 233, Congress was focused on "regulation of the

28  engines themselves," not on circumscribing States' historic police power to regulate or otherwise

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

address pollution. *State Air Res. Bd.*, 431 F. Supp. at 1283. Plaintiffs' claims here are plainly distinct from the scope of actions covered by the preemption language.

Thus, so long as a state law does not "affect[] the design, structure, operation, or performance of the aircraft engine"—remedies that Plaintiffs are not seeking—"then the state emission regulations are not preempted" by Section 233. *Navy*, 624 F.2d at 888. This approach respectful of local control is, as the Ninth Circuit noted, "an appropriate means to accommodate the dual congressional purposes of allowing broad state sovereignty in air pollution regulation and of protecting certain paramount federal aviation interests." *Id.* at 889. Plaintiffs' claims are therefore not preempted under Section 233 of the Clean Air Act.

### 2. No federal law conflicts with the state law on which Plaintiffs base their claims.

Defendants also erroneously argue that Plaintiffs' claims "conflict with federal law." *See* Airlines' MTD at 26 (quoting *Arizona v. United States*, 567 U.S. 387, 399 (2012)); Port's MTD at 13 (making similar arguments). But there is no conflict here: it is straightforwardly possible for Defendants to comply with both state and federal law, and dual compliance would not thwart any congressional objectives. *See Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 363 (2000) (noting that conflict preemption can take the form either of impossibility preemption or obstacle preemption).

### a. Defendants can physically comply with both state and federal law.

To successfully argue impossibility preemption, Defendants must show that dual compliance with state and federal laws would be a "physical impossibility." *Fla. Lime & Avocado Growers, Inc.*, 373 U.S. at 143. As the Supreme Court has recognized, "[i]mpossibility pre-emption is a demanding defense." *Wyeth*, 555 U.S. at 573. The fundamental question is: Can Defendants comply with federal regulations without incurring liability under state law? *See Sprietsma v. Mercury Marine*, 537 U.S. 51, 65 (2002). If yes, then dual compliance is possible, and impossibility preemption does not lie. And here, the answer is undoubtedly yes.

Plaintiffs assert that Defendants have a duty, under Washington common-law, to not cause property damage or personal injury to Plaintiffs. *See* SAC at 42-47. Defendants argue it is

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

impossible to avoid causing this harm because federal law *compels* airlines to act in such a way (*e.g.*, use certain flight paths, fly at certain altitudes, land at certain airports) that of necessity causes them to contaminate and injure Plaintiffs and their property. *See* Airlines' MTD at 26; Port's MTD at 14.

This is simply untrue. Federal law does not compel the Defendant Airlines to emit dangerous concentrations of pollutants and cause heavy metals and other contaminants from its airplane fuselages to fall upon Plaintiffs and their property. Further, Defendants' argument wrongly assumes that the *only* way for Defendants to avoid measurable injury to Plaintiffs is to change something about aircraft design or flight operations. On a motion to dismiss, that suggestion is hardly ripe for consideration. It also fails common sense. As discovery will make plain, a host of mitigation efforts can address Plaintiffs' claims here. Plaintiffs do not contend that Defendants are required to prevent all pollution from ever reaching local communities. Rather, Washington negligence law imposes a duty on Defendants, as it does on all persons natural and non-natural, not to cause harm by allowing an excessive build-up of concentrated contamination. *See Peterson v. King Cnty.*, 252 P.2d 797, 800 (Wash. 1953) (finding negligence where a defendant failed to prevent detritus from building up in a drainage system, thereby causing a landslide). Among other things, mitigation work to prevent excess accumulation of contaminants on Plaintiffs' properties satisfies the demands of the negligence, battery, and nuisance state law claims here without offending in any way the demands of federal regulation.[4]

As to Defendants' liability for state trespass claims, even if "entry" was itself somehow demanded by federal requirements (which it is not), Defendants remain liable for the damage done in the exercise of this privilege. *See* Restatement (Second) of Torts § 197 (1965) (an actor

---

[4] Again, to the extent Defendants dispute whether regular clean-up efforts could remove *enough* of its toxic contamination to absolve them of liability under state law, this is a factual question inappropriate for resolution at this stage. *See Mecinas v. Hobbs*, 30 F.4th 890, 905 (9th Cir. 2022) ("[F]actual questions . . . cannot be resolved on a motion to dismiss."). Any such arguments would be purely hypothetical. And as the Supreme Court has noted, the mere "existence of a hypothetical or potential conflict is insufficient to warrant the pre-emption of the state statute." *Rice v. Norman Williams Co.*, 458 U.S. 654, 659 (1982).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

remains "subject to liability for any harm done in the exercise of the privilege [to enter or remain on land in the possession of another]"). Thus, where Defendants, through emissions and flaking of contaminants from airplane fuselages, cause these toxic pollutants to accumulate to the degree that it damages Plaintiffs' property, they remain liable under a state-law theory of trespass. But here, too, Defendants could avoid liability by simply paying the costs to mitigate through remediation the excess contamination of Plaintiffs' property.

Therefore, because Defendants face no difficulty—let alone an insurmountable physical impossibility—in complying with both state and federal law at issue in this case, impossibility preemption is no ground for dismissal of the claims here. Compliance may be expensive, but such expense is not a basis for preemption.

> **b.      Requiring Defendants to compensate Plaintiffs for state tort law violations does not thwart congressional objectives in enacting the Federal Aviation Act or the Clean Air Act.**

Obstacle preemption occurs only "when a state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *R.J. Reynolds Tobacco Co. v. Cnty. of Los Angeles*, 29 F.4th 542, 561 (9th Cir. 2022) (quotation omitted), *cert. denied*, 143 S. Ct. 979 (2023). Unless "the purpose and intended effects of the federal statute are blocked by the state law," there is no obligation for state law to yield. *See Chamber of Com. of the United States of Am. v. Bonta*, 62 F.4th 473, 482 (9th Cir. 2023) (*quoting Crosby*, 530 U.S. at 373). The first question, then, is what Congress's purpose or objective was in enacting a particular statute, and the second question is whether applying state common law in a particular case would undermine Congress's objective. Because applying state law in this case would not undermine Congress's purpose in enacting either the FAAct or the CAA, state law is not preempted here.

> **(1)      Plaintiffs' claims do not undermine Congress's goals in enacting the Federal Aviation Act.**

In enacting the FAAct, Congress was concerned primarily with prescribing certain minimum safety standards to prevent plane crashes and ensuring the security of aircraft passengers. The text of the FAAct itself (including the specific portions to which Defendants

cite), the legislative history, and subsequent judicial interpretation of the statute bear this out. In 49 U.S.C. § 44701(a), Congress specifically directed the Federal Aviation Administration ("FAA") Administrator to "promote *safe flight* of civil aircraft" by prescribing certain "minimum standards required in the interest of safety." *See also* 49 U.S.C. § 44701(c) (directing the Administrator to "carry out this chapter in a way that best tends to reduce or eliminate the possibility or recurrence of *accidents in air transportation*") (emphasis added); 49 U.S.C. §§ 40101(c)-(e) (addressing, among other things, promoting "safety and efficiency" in "the navigable airspace"). The legislative history underscores that Congress's purpose was to "establish a new federal agency with powers adequate to provide for the safe and efficient use of the navigable airspace by both civil and military operations." H.R. Rep. No. 85-2360, at 1 (1958), *as reprinted in* 1958 U.S.C.C.A.N. 3741, 3741. And the Ninth Circuit has stated Congress's purpose in enacting the FAAct was "to promote safety in aviation and thereby protect the lives of *persons who travel on board aircraft.*" *In re Mexico City Aircrash*, 708 F.2d 400, 406 (9th Cir. 1983) (emphasis added); *see also Flores v. SkyWest, Inc.*, 2022 WL 193011, at *2 (9th Cir. Jan. 20, 2022); *Hodges*, 2010 WL 5463832, at *3 ("[T]he primary purpose of the FAA was to prevent accidents and promote passenger safety *in flight*." (emphasis in original)).[5]

Thus, while 49 U.S.C.A. § 40103(B)(2)(b) requires the Administrator to prescribe regulations "protecting individuals and property on the ground," the best reading of this language, considered in context, is that Congress intended the FAAct to prevent *air transportation accidents*, like plane crashes, from harming individuals and property on the

---

[5] This focus on in-air safety differentiates the FAAct from other statutes, including the Communications Act of 1934. *See* Airlines' MTD at 27-28 (*citing Cohen v. Apple Inc.*, 46 F.4th 1012 (9th Cir. 2022)). Although the FAAct requires some balancing between competing policy objectives, the Ninth Circuit has confirmed that the FAAct's *primary* focus is on in-air safety of airline passengers. By contrast, the Ninth Circuit has concluded that the 1934 Act has three equally important purposes: "(1) national defense, (2) promoting safety of life and property through the use of wire and radio communications, and (3) . . . centralizing authority previously granted to multiple agencies and granting additional authority with respect to interstate and foreign commerce in wire and radio communication." *Cohen*, 46 F.4th at 1017 (quotations omitted), *cert. denied*, 143 S. Ct. 2513 (2023). The competing primary purposes of the 1934 Act requires balancing in a way the singular primary purpose of the FAAct does not.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

ground. The Act does not give the FAA unbounded authority to promulgate rules that bear upon the safety of individuals and property in every community under every flight path. And any residual agency authority to set "minimum standards" does not preclude additional state-law safety requirements. *See Cavner v. Cont'l Motors, Inc.*, 2012 WL 4467171, at *2 (W.D. Wash. Sept. 27, 2012) ("The Administrator of the FAA is charged with prescribing 'minimum standards required in the interest of safety,' suggesting that other sources, such as state law, may impose additional requirements." (quoting 49 U.S.C. § 44701)).

Plaintiffs' state-law claims fit easily into this framework. None of Plaintiffs' claims will affect the structure of aircraft or aircraft operations (let alone render them less safe), and so these state laws do not undermine Congress's goal of preventing plane crashes and ensuring in-flight passenger safety. There is no obstacle preemption here.

### (2)    Plaintiffs' claims do not undermine—and in fact support—Congress's goals in enacting the Clean Air Act.

The Ninth Circuit has plainly held that "[t]he central goal of the Clean Air Act is to reduce air pollution." *Oxygenated Fuels Ass'n Inc.*, 331 F.3d at 673. In achieving this goal, the CAA vests "primary responsibility" for air pollution prevention and control in "States and local governments." *Id.* (quoting 42 U.S.C. § 7401(a)(3)). By force of logic, then, state common-law claims relied upon by citizens seeking remedies for excess pollution and contamination of their properties cannot run counter to congressional purpose.

Defendant Airlines point to 42 U.S.C.A. §§ 7571(a)(2)(A) and (B)(ii) to argue that the Environmental Protection Agency ("EPA") Administrator is already charged with proposing emission standards for aircraft. *See* Airlines' MTD at 27. In so doing, Defendant Airlines imply that any state tort law action relating to aircraft-related pollution, however indirectly, must be preempted. But contaminants that flake off the fuselages of Defendant Airlines' planes are not "emissions" at all. As to those allegations in the complaint, the Airlines' argument is a non-starter. What's more, the possibility of "regulatory overlap" is not the same as "regulatory conflict." *Merrick v. Diageo Americas Supply, Inc.*, 805 F.3d 685, 695 (6th Cir. 2015). In fact, several courts have held that the CAA does not preempt state common law claims for pollution

damages so long as the state law in question is at least as strict as the federal statute. *See, e.g.*, *Int'l Paper Co. v. Ouellette*, 479 U.S. 481 (1987) (noting that similar language in the Clean Water Act does not prevent states from "requir[ing] discharge limitations more stringent than those required by the Federal Government"); *Little v. Louisville Gas & Elec. Co.*, 805 F.3d 695, 698 (6th Cir. 2015) ("[T]he Clean Air Act does not preempt plaintiffs' state common law claims"); *Patriotic Veterans, Inc. v. Indiana*, 736 F.3d 1041, 1049 (7th Cir. 2013) ("The fact that a state has more stringent regulations than a federal law does not constitute conflict preemption."); *Bell v. Cheswick Generating Station*, 734 F.3d 188, 197–98 (3d Cir. 2013) (federal standards serve "as a regulatory floor, not a ceiling," and "state tort law is a permissible way" of allowing states to impose their own higher standards); *Her Majesty the Queen in Rt. of Prov. of Ontario v. City of Detroit*, 874 F.2d 332, 342 (6th Cir. 1989) ("[T]he CAA displaces state law only to the extent that state law is not as strict as emission limitations established in the federal statute." (emphasis omitted)).

Here, allowing Plaintiffs to move forward with their claims would not undermine Congress's central goal of reducing air pollution. Just the opposite is true: preserving the state-law claims in this case would actually further Congress's stated goal of "encourag[ing] or otherwise promot[ing]" state-law actions "for pollution prevention." 42 U.S.C. § 7401(c).

### 3. The federal aviation regulatory scheme is not so expansive as to manifest Congressional intent to preempt all state law tort remedies in the field.

Field preemption similarly does not bar Plaintiffs' claims. *See* Airlines' MTD at 20–25, Port MTD at 16–18. In general, field preemption arises "where a federal regulatory scheme is so pervasive that it evinces an intent to occupy the field." *Bernstein v. Virgin Am., Inc.*, 3 F.4th 1127, 1139 (9th Cir. 2021), *cert. denied*, 142 S. Ct. 2903 (2022). There are two components to this analysis: first, identifying the legislative field that the state law at issue implicates; and second, determining whether the federal regulatory scheme is so pervasive that all state regulation of that field must be preempted. *See US Airways, Inc. v. O'Donnell*, 627 F.3d 1318, 1325 (10th Cir. 2010) (quoting *Martin ex rel. Heckman*, 555 F.3d at 809). Both components of this analysis support Plaintiffs' position that their claims are not preempted.



a.    The "legislative fields" at issue in this case are matters historically within state control.

In the wake of *Burbank*, courts have "distinguished between state or municipal action which effectively regulates the use of navigable airspace, aircraft traffic, or air flight safety, on the one hand, and state or municipal regulation of the location and environmental impacts of airports, the safety of ground maintenance facilities, and the manufacture of aircraft, on the other hand." *Bethman v. City of Ukiah*, 265 Cal. Rptr. 539, 546 (Ct. App. 1989). As to the former (local regulation of "airspace, aircraft traffic, or air flight safety"), courts have invalidated state and local regulation on the ground of field preemption. *Id.* As to the latter (including "the location and environmental impacts of airports"), courts have found no exclusive control by the FAA under the Act and thus no preemption. *Id.*; *see also Greater Westchester Homeowners Assn. v. City of Los Angeles*, 603 P.2d 1329 (Cal. 1979) (defendant was liable under a nuisance theory for personal injuries caused by noise from aircraft); *United Air Lines, Inc. v. Occupational Safety & Health Appeals Bd.*, 654 P.2d 157 (Cal. 1982) (State Division of Occupational Safety and Health had occupational safety jurisdiction over defendant airline's ground maintenance facility).

The instant case plainly falls into the latter camp, as Plaintiffs seek *no* remedy for and bring no challenge to aircraft traffic, patterns, or flight safety. Plaintiffs' Complaint, on its face, raises concerns that fit squarely within the fields of individual property rights and personal injury. *See* SAC at 42-47. There is no question that states retain power to legislate within these fields. *See* Section I.

Defendants, however, attempt to rewrite and thereby reframe for the Court Plaintiffs' Complaint as an action of the first type, arguing that the relevant fields at issue include: (1) airspace management; (2) aviation safety; (3) aircraft engine and body design; and (4) aircraft emissions. *See* Airlines MTD at 24 (listing all four fields); Port MTD at 18 (referencing the fields of "flight paths" and "flight frequency" as well as "aviation safety"). But the Complaint does no such thing. A plain reading of the Complaint establishes that Plaintiffs only challenge the Airlines' contamination of their property by virtue of emissions and toxic flaking *after this*

*pollution has left* Defendant Airlines' aircraft. *See* SAC, *e.g.*, ¶¶ 54-55. Because Plaintiffs seek only to use state law to address harm from contaminating pollutants that have *already left* the aircraft, Plaintiffs' claims do not contravene or otherwise interfere with the fields of airplane traffic or flight safety that Defendants conjure. *See Huron Portland Cement Co.*, 362 U.S. at 446 (finding no preemption where "there is no overlap between the scope" of federal and state laws). For this reason, Plaintiffs' state-law claims should proceed unencumbered by Defendants' misplaced application of legislative field preemption.

**b.    The Federal Government has not fully preempted the fields of aviation safety, airspace management, aircraft design, and aircraft emissions so as to preclude Plaintiffs' claims for damages.**

But even if this Court were to somehow hold that airspace management, the safety of air flight, aircraft engine and body design, and aircraft emissions are the relevant fields here (rather than individual property rights and personal injury), Defendants' preemption argument must also fail because none of these fields are *fully* preempted. As a general matter, the Ninth Circuit has recognized "congressional intent *not* to preempt state-law tort suits against airlines," *Gilstrap*, 709 F.3d at 1004 (emphasis in original), highlighting that the FAAct includes a savings clause and requires airlines to maintain liability insurance, including for property damage. *Id.* (citing 49 U.S.C. §§ 40120(c), 41112); *see also Depuy v. Aircraft Spruce & Specialty Co.*, 2018 WL 376701, at *1 (C.D. Cal. Jan. 10, 2018) ("[T]he FAA preserves state law tort claims and remedies."); *Brown v. Alaska Air Grp., Inc.*, 2011 WL 2746251, at *3 (E.D. Wash. July 14, 2011) ("[T]he FAA and its amendments do not preempt all state law tort actions . . . .").

Regarding aviation safety, the Ninth Circuit has explained that Congress intended to preempt only those specific aspects of aviation safety that have been pervasively regulated. *See Martin ex rel. Heckman*, 555 F.3d at 811. Thus, it is not enough for Defendants to argue that Plaintiffs' state common law claims would intrude on the field of aviation safety generally; they must specifically describe the particular aspect(s) of aviation safety that the federal government has regulated to such a degree that it must be deemed preempted. But Defendants have not done so. Nor can they: a closer reading of the case law reveals that the only aspects of aviation safety



that are preempted by federal law are those connected to "in-air safety," an area unrelated to Plaintiffs' claims. *Elassaad v. Indep. Air, Inc.*, 613 F.3d 119, 127 (3d Cir. 2010); *see also Flores*, 2022 WL 193011, at *2 ("[The FAA is] principally concerned with safety in connection with operations associated with flight." (citing *Elassaad*, 613 F.3d at 127)); *In re Mexico City Aircrash*, 708 F.2d at 406 (Congress's purpose in enacting the FAAct was "to promote safety in aviation and thereby protect the lives of *persons who travel on board aircraft.*" (emphasis added)); *Hodges*, 2010 WL 5463832, at *3 ("[T]he primary purpose of the FAA was to prevent accidents and promote passenger safety *in flight*." (emphasis in original)). The state tort law that Plaintiffs rely upon to challenge Defendants' unmitigated contamination of property and injury to persons on the ground is entirely unrelated to "in-air safety," and so federal regulations in the aviation safety field do not preempt Plaintiffs' state-law claims.

Similarly, although the FAAct grants the FAA Administrator authority to regulate the use of airspace, "this does not of necessity lead to the conclusion that localities are no longer free" to enforce local regulations, even where those regulations "may have some tangential impact on the use of airspace." *City of Cleveland v. City of Brook Park*, 893 F. Supp. 742, 751 (N.D. Ohio 1995). Defendants here conflate federal regulation of airspace with the regulation of the people and property below that airspace. Though not at issue here, Plaintiffs do not dispute that federal law may well preempt state regulations that seek to control flight paths or flight frequency. But there is no pervasive, extensive, or complete federal regulatory scheme that controls the amount of pollution that may accumulate on a family's front lawn or in the air of a child's bedroom. It is unreasonable to draw from the current body of federal regulations the radical conclusion that Congress intended to prevent state or local governments, including through state residents' application of state common law, from "regulating" in areas of property and injury traditionally within State control. *Cf. Gustafson v. City of Lake Angelus*, 76 F.3d 778, 785–86 (6th Cir. 1996) (concluding federal law does not preempt local regulation of the use of water surfaces, even when seaplanes use that water as a landing site).

Nor is the field of aircraft engine and body design exclusively regulated by the FAAct. The FAAct explicitly states that the Administrator has the authority to adopt only "*minimum*

1   *standards*" for the "design, material, construction, quality of work, and performance of aircraft."

2   49 U.S.C. § 44701(a)(1) (emphasis added); *see also GATX/Airlog Co. v. United States*, 286 F.3d

3   1168, 1171 (9th Cir. 2002) ("[T]he FAA is charged with promoting flight safety by establishing

4   minimum standards for, among other things, aircraft design."). This language establishes only

5   "broad, minimum performance and design standards, which do not evidence an intent by

6   Congress to occupy the field." *Little v. Piper Aircraft Co.*, 2009 WL 10670536, at *3 (C.D. Cal.

7   Mar. 13, 2009). As such, "[t]here is no reason to suspect that Congress intended *sub silentio* to

8   make such laws inapplicable to aircraft and their component parts." *Cavner*, 2012 WL 4467171,

9   at *2.

10          Finally, as explained in Section IV(A)(2), above, the CAA allows for and recognizes both

11  state *and* federal regulation of aircraft emissions. Section 233 fully preempts only the narrow

12  field of aircraft and aircraft engine regulation; it does not preempt state regulation of pollution

13  once that pollution has left the aircraft or engine. *See State Air Res. Bd.*, 431 F. Supp. At 1283.

###     4.    Preemption does not apply to and cannot be used as a ground for dismissal of Plaintiffs' claims by the Port in its role as the proprietor of SeaTac Airport.

16          Even if federal law preempts Plaintiffs' actions against the Defendant Airlines—which it

17  does not—their claims against the Port would nonetheless survive under the so-called Proprietor

18  Exception. The Supreme Court first recognized the existence of this exception in *City of Burbank*

19  *v. Lockheed Air Terminal Inc.*, indicating that airport proprietors may have certain powers over

20  an airport "notwithstanding federal responsibility in the area." 411 U.S. at 635 n.14. State and

21  federal courts across the country have since applied this exception to a range of cases. *See, e.g.*,

22  *Santa Monica Airport Ass'n v. City of Santa Monica*, 659 F.2d 100, 104 (9th Cir. 1981) ("[T]he

23  power of a municipal proprietor to regulate the use of its airport is not preempted by federal

24  legislation."); *Brit. Airways Bd. v. Port Auth. of N.Y.*, 558 F.2d 75 (2d Cir. 1977) ("Congress

25  provided for the promulgation by airport proprietors of reasonable regulations to establish

26  acceptable noise levels for the airfield and its environs."); *Greater Westchester Homeowners*

27  *Assn.*, 603 P.2d at 1335 (noting that an airport proprietor could "diminish LAX noise" and could

28



1    not "fairly argue that federal law has rendered [the proprietor] powerless to prevent or reduce the

2    damages of which plaintiffs complain").

3        The Proprietor Exception stems from "unmistakably clear" legislative history indicating

4    that Congress did not intend to "interfere with 'long recognized powers of the airport operators

5    to deal with noise and other environmental problems at the local level.'" *W. Air Lines, Inc. v.*

6    *Port Auth. of N.Y. & N.J.*, 658 F. Supp. 952, 957 (S.D.N.Y. 1986) (quoting 124 Cong. Rec.

7    37419 (1978) (remarks of Sen. Kennedy)), *aff'd*, 817 F.2d 222 (2d Cir. 1987); *see also, e.g.*, S.

8    Rep. No. 90-1353, at 7, *as reprinted in* 1968 U.S.C.C.A.N. 2688, 2694 ("The proposed

9    legislation is not designed to do this and will not prevent airport proprietors from excluding any

10   aircraft on the basis of noise considerations."); preamble to 14 C.F.R., Part 36, 34 Fed. Reg.

11   18,355 (Nov. 18, 1969) ("Responsibility for determining the permissible noise levels for aircraft

12   using an airport remains with the proprietor of that airport.").

13       Several courts have concluded this history establishes that Congress intended that airport

14   proprietors "may issue reasonable rules pertaining to the permissible level of noise *or other*

15   *danger* which can be caused by aircraft using the airport." *W. Air Lines, Inc.*, 658 F. Supp. at 957

16   (quotation omitted); *see also City of Houston v. FAA*, 679 F.2d 1184 (5th Cir.1982) (concluding

17   that this exception justified a proprietor's imposition of a perimeter around an airport); *Aircraft*

18   *Owners & Pilots Ass'n v. Port Auth.*, 305 F. Supp. 93 (E.D.N.Y. 1969) (upholding a proprietor's

19   authority to impose a "takeoff" fee on certain small aircraft for the purpose of reducing airport

20   congestion).

21       This precedent applies with equal force to the Port's ability to regulate aircraft-caused

22   pollution that produces substantial injury to persons and property adjacent to Sea-Tac. Congress

23   refrained from interfering with an airport proprietor's control over airport noise, and there is no

24   evidence from Defendants that Congress would have intended to exclusively regulate airplane

25   contamination of persons and property that has an equal or greater impact on local communities

26   as compared to noise. Therefore, the Port in this case has authority to impose certain restrictions

27   on aircraft-related pollution, notwithstanding federal regulation in this area. And because the Port

28

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1    retains authority to so regulate, its failure to do so subjects it to state-law claims like those

2    Plaintiffs bring in this case.

3         **5.    The anticommandeering doctrine prevents the Federal Government from
          compelling the State to enforce a federal regulatory program.**

4

5         The anticommandeering doctrine stems from the Tenth Amendment to the Constitution.

6    It is "the expression of a fundamental structural decision incorporated into the Constitution, *i.e.*,

7    the decision to withhold from Congress the power to issue orders directly to the States." *Murphy*

8    *v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1475 (2018). Under the anticommandeering

9    doctrine, the Federal Government may not "command the States' officers, or those of their

10   political subdivisions, to administer or enforce a federal regulatory program." *Id.* at 1477

11   (quoting *Printz v. United States*, 521 U.S. 898, 935 (1997)).

12        The Constitution, as Justice O'Connor noted in first recognizing the doctrine in *New York*

13   *v. United States*, 505 U.S. 144, 166 (1992), "confers upon Congress the power to regulate

14   individuals, not States." Relevant here is the Supreme Court's reminder that "a healthy balance

15   of power between the States and the Federal Government [reduces] the risk of tyranny and abuse

16   from either front." *Murphy*, 138 S. Ct. at 1477 (alteration in original) (quoting *New York*, 505

17   U.S. at 181–82).

18        The Port essentially argues that it is "command[ed]" by federal regulations to "administer

19   or enforce a federal regulatory program" that, according to the Port, of necessity (or *per force*)

20   causes whatever aircraft-related contamination of persons and property surrounding Sea-Tac

21   there may be. *Murphy*, 128 S. Ct. at 1477; Port's MTD at 8-20. This is a necessary predicate for

22   Defendants' preemption and collateral attack arguments: that the Federal Government

23   commandeers the Port to permit the challenged activity of Defendant Airlines. But to accept this

24   logic would be precisely to concede that the Federal Government has power to prohibit the

25   Port—a political subdivision of Washington State, *see* SAC at ¶¶ 40-42—from regulating the

26   Airlines' excessive contamination of Plaintiffs' persons and property. There is "simply no way to

27   understand" the FAA's regulatory provisions here "as anything other than a direct command to

28



the States. And that is exactly what the anticommandeering rule does not allow." *Murphy*, 138 S. Ct. at 1481.

To suggest that applying FAA regulations in this context would simply *prohibit* the Port from enacting any regulation of excessive contamination by aircraft, rather than force it to *adopt* positive measures, is an "empty" distinction without a difference, and one the Supreme Court explicitly rejected in *Murphy*. 138 S. Ct. at 1478. "The basic principle—that Congress cannot issue direct orders to state legislatures—applies in either event." *Id.*

Furthermore, this is not a case where Congress "evenhandedly regulates an activity in which both States and private actors engage." *Id.* All commercial services airports, including Sea-Tac, are, by statutory definition, "publicly owned." *See* 49 U.S.C. § 47102(7).[6] There are no private actors in this field, so any congressional directive prohibiting commercial airports from regulating aircraft-caused excess pollution of persons and property is necessarily directed toward States or their subdivisions.

In short, the Port cannot hide behind federal law here to disclaim liability. As a political subdivision of the State, the Federal Government cannot prevent it wholesale from all monitoring and regulation of Defendant Airlines' use of Sea-Tac to address excess contamination. And, again, because the Port retains authority to regulate pollution, its failure to do so subjects it to state-law claims of the kind Plaintiffs have brought in this case.

---

[6] The vast majority of airports are also publicly funded. One exception is Branson Airport, which is entirely privately funded. *See* Branson Airport, *Branson Airport Fact Sheet*, http://flybranson.com/docs/BransonAirportFactSheet.pdf (last visited Dec. 20, 2023). But even this airport is officially owned by a government entity. *See* Branson Airport, *About: History*, https://flybranson.com/about/history (last visited Dec. 20, 2023).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

**B.**    **The collateral attack doctrine—limited in scope—is inapplicable to this case and does not bar Plaintiffs' claims.**

    **1.**    **Plaintiffs do not seek to revisit, reverse, attack, or evade any agency order or regulation.**

The Airlines argue that "Plaintiffs seek a declaratory order and compensation for alleged pollution resulting from takeoffs and landings at Sea-Tac." Airlines' MTD at 9; *see also id*. at 12 ("Plaintiffs seek to impose liability for damage allegedly caused by aircraft emissions.").

Plaintiffs' claims are not a collateral attack on FAA and EPA rulemaking because they do not seek to revisit, reverse, attack, or evade any order or regulation. Plaintiffs do not ask this Court to overturn any agency orders or force the Airlines to change their flight paths, fuel blend, fuselage construction, or any other aspect of their day-to-day business operations. They allege only that the Airlines have a legal obligation under state law to bear the cost of the externalities created by their particular behavior, by virtue of fuel emission and flaking of contaminants from airplanes, which cause excessive contamination of Plaintiffs' property and personal exposure to excess toxicity. Defendants are asked to pay for mitigation of the pollution that they have deposited on Plaintiffs and their property and for a medical monitoring program for affected Plaintiffs. *See* SAC ¶¶ 1, 7, 8, Request for Relief ¶¶ A-E. Put simply, Plaintiffs invoke traditional common law tort principles to seek damages from non-federal defendants. The Airlines fail to cite any FAA or EPA regulations vitiating or even addressing any such obligations.

Because Plaintiffs do not challenge any aspect of any federal rule, the collateral attack doctrine—rarely employed and limited in scope—simply does not apply here. As the Ninth Circuit recently observed, "[a]t its core, the doctrine prohibits a plaintiff from using a later order that implements a prior agency action as a vehicle to undo the underlying action or order." *Ctr. for Biological Diversity v. Envtl. Prot. Agency*, 847 F.3d 1075, 1092 (9th Cir. 2017). But here, as in that case, "[t]he collateral attack doctrine is not at issue" because Plaintiffs "do[] not seek to unravel a prior agency order." *Id*. Plaintiffs do not employ "artful pleading" to evade the

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

collateral attack doctrine. *Cf.* Airlines' MTD at 10. They seek a distinct form of relief to which the doctrine does not apply.[7]

The Airlines cite a panoply of inapposite cases brought against federal agencies and officers challenging agency orders and seeking their suspension or reversal. *See* Airlines' MTD at 10-12. The gravamen of each of these cases was that a federal agency made an incorrect decision. *See California Dump Truck Owners Ass'n v. Nichols*, 784 F.3d 500 (9th Cir. 2015) (seeking invalidation of EPA approval of State Implementation Plan); *N. Carolina ex rel. Cooper v. Tenn. Valley Auth.*, 615 F.3d 291 (4th Cir. 2010) (seeking injunction against federal agency); *Gilmore v. Gonzales*, 435 F.3d 1125 (9th Cir. 2006) (suit against federal officers challenging TSA passenger ID directive); *Americopters, LLC v. F.A.A.*, 441 F.3d 726, 736 (9th Cir. 2006) (seeking relief from FAA action resulting in halt to plaintiffs' operations); *Crist v. Leippe*, 138 F.3d 801 (9th Cir. 1998) (*Bivens* claim attacking FAA's conduct resulting in license suspension); *Tur v. F.A.A.*, 104 F.3d 290 (9th Cir. 1997) (*Bivens* claim attacking agency's license revocation); *Virginia v. United States*, 74 F.3d 517 (4th Cir. 1996) (challenging constitutionality of Clean Air Act provisions); *Mace v. Skinner*, 34 F.3d 854 (9th Cir. 1994) (*Bivens* claim attacking agency's license revocation); *Green v. Brantley*, 981 F.2d 514 (11th Cir. 1993) (*Bivens* claim attacking agency's license revocation); *New England Legal Found. v. Costle*, 666 F.2d 30 (2d Cir. 1981) (seeking injunction against power plant's EPA-authorized activities); *McKay v. City & Cnty. of San Francisco*, 2016 WL 7425927 (N.D. Cal. Dec. 23, 2016) (seeking reversal of FAA's approval of new flight paths);[8] *Krauss v. FAA*, 2016 WL 1162028 (N.D. Cal. Mar. 24, 2016) (*pro se* challenge to FAA flight path approval).

---

[7] Accusations of artful pleading are a two-way street. Because "[d]efendants, as well as plaintiffs, must be presumed to be skilled in the craft of artful pleading," courts must scrutinize "clever defendants" that "learn how to characterize properly pleaded . . . claims as 'disguised collateral attacks' to circumvent liability . . . ." *Dougherty v. Carver Fed. Sav. Bank*, 112 F.3d 613, 620 (2d Cir. 1997) (reversing district court's application of collateral attack doctrine).

[8] In *McKay*, despite briefly addressing the plaintiffs' damages claims, the court focused its analysis on their requested injunctive relief of reversion to prior flight paths. *McKay*, 2016 WL 7425927 at *1 (collateral attack doctrine applies where "the complaints ask this Court to modify the FAA's approved flight paths"); *see also* Hr'g Tr. at 15:18–20, *McKay v. City & Cnty. of San*

But Plaintiffs do not contend that any agency should reconsider, amend, or revoke any regulation or order. Rather, without challenging the existing federal framework, Plaintiffs invoke fundamental state law principles to compel the Airlines to bear the costs of the externalities they generate insofar as damage has been caused to Plaintiffs and their property. Despite the Airlines' lengthy recitation of regulations relevant to commercial air travel (*see* Airlines' MTD at 2–8), the applicability of the collateral attack doctrine is not a question of how many regulations apply to the Airlines' conduct, and Plaintiffs' acknowledgment that the Airlines' flight paths are regulated is not tantamount to a challenge to them.

Moreover, a holding regarding what portion of the Airlines' conduct is authorized by federal agencies would be premature at this stage. For instance, the Airlines have not provided evidence that their emissions and heavy metal contamination are "authorized by comprehensive regulations and orders," Airlines' MTD at 10–11, and they improperly conflate emissions from fuel with metal flaking from the fuselage. *See id.* at 2–8. In resolving motions to dismiss, courts assess merely whether Plaintiffs "state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (2009) (citation omitted). The parties have not yet discovered and briefed for this Court which contaminants are present (and at what concentrations) and which contaminants are causing each Plaintiffs' compensable harm. This is an argument for another day.

The federal government heavily regulates scores of industries, but individual property rights and personal injury remain core areas of traditional state control. *See supra* Section IV(A). The Airlines fail to justify their own exclusion from these traditional federalism principles, and Plaintiffs' case is properly before this Court.

---

*Francisco*, No. 5:16-cv-3561 (N.D. Cal. Jan. 3, 2017), Doc. 79 (exclusive jurisdiction lies in Court of Appeals "for a case challenging these flight paths and asking for a reversion of the flight paths"); *id.* at 20:16–22 (interpreting prayer for relief as "asking for the court to make an order that would prohibit use of currently approved flight path and to reverse to a previously approved flight path. That's what it says.").

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1

2

### 2. Plaintiffs seek tort damages from non-federal defendants that neither the federal agencies nor the Courts of Appeals can provide; their claims are properly before *this* Court.

3

4

Courts of Appeals have exclusive jurisdiction under 49 U.S.C. § 46110(c) and 42 U.S.C.

5

§ 7607(b)(1) in only limited, defined circumstances. *See Americopters*, 441 F.3d at 735 ("Section

6

46110 does not grant the court of appeals direct and exclusive jurisdiction over every possible

7

dispute involving the FAA."). This is not such a circumstance.

8

The Supreme Court has held that the test for determining whether an exclusive

9

jurisdiction provision precludes a district court from hearing a particular claim is whether the

10

claim "could and should have been" raised in an administrative proceeding or a court of appeals.

11

*City of Tacoma v. Taxpayers of Tacoma*, 357 U.S. 320, 339 (1958). Put another way, the *Tacoma*

12

test asks "whether the administrative agency had the authority to decide the issue raised by the

13

claim." *Merritt v. Shuttle, Inc.*, 245 F.3d 182, 188 n.9 (2d Cir. 2001) (quotation marks omitted).

14

District courts retain jurisdiction over claims "outside the agency's expertise, particularly where

15

a finding of preclusion could foreclose all meaningful judicial review." *Thunder Basin Coal Co.*

16

*v. Reich*, 510 U.S. 200, 212–13 (1994). Furthermore, the Ninth Circuit has repeatedly held that,

17

because § 46110(c) grants circuit courts exclusive jurisdiction only "to affirm, amend, modify, or

18

set aside any part of" an order (and notwithstanding 49 U.S.C. § 46110), "district courts retain

19

jurisdiction over . . . claims for damages." *Magassa v. Mayorkas*, 52 F.4th 1156, 1164–65 (9th

20

Cir. 2022) (citing cases).

21

Here, Plaintiffs' claims could not and should not have been brought to the federal

22

agencies or the appellate courts in the first instance because, among other reasons, they seek

23

remedies that those institutions cannot grant. *See United States v. Al-Nouri*, 983 F.3d 1096, 1098

24

(9th Cir. 2020) ("The court of appeals is a court of limited jurisdiction, and its jurisdiction is

25

expressly provided for by statute.") (citation omitted). Neither the Courts of Appeals nor the

26

FAA nor the EPA have original jurisdiction over common-law damages claims for negligence,

27

battery, intentional trespass, or public nuisance against private defendants, and they lack the

28

authority to order private defendants to pay for periodic mitigation of contamination on



Plaintiffs' properties or a medical monitoring program. *See* 28 U.S.C. § 1291 (granting courts of appeals jurisdiction over "appeals from all final decisions of the district courts"); 5 U.S.C. § 706 (agency's scope of review under Administrative Procedures Act limited to "compel[ling] agency action" and "hold[ing] unlawful and set[ting] aside agency action"); *Beins v. United States*, 695 F.2d 591, 598 (D.C. Cir. 1982) (citing 5 U.S.C. § 706) (finding of negligence is "distinct conceptually" from administrative determinations of subjects such as statutory authority, adherence to proper procedure, and arbitrariness and capriciousness).

But, unlike the entirely distinguishable claims by plaintiffs in each of the Airlines' cited cases, these are the only claims Plaintiffs bring. *See* SAC Request for Relief. Thus, this Court retains jurisdiction over Plaintiffs' complaint. *Cf. Tacoma*, 357 U.S. at 339 (exclusive jurisdiction exists only where claim "could and should have been" presented to appellate court in first instance); *Thunder Basin Coal Co.*, 510 U.S. at 212–13 (no exclusive jurisdiction in areas "outside the agenc[ies'] expertise"); *Merritt*, 245 F.3d at 188 n.9 (exclusive jurisdiction depends on "whether the administrative agency had the authority to decide the issue").

Further, payment of Plaintiffs' requested damages under state law by Defendants operating in a federally regulated area is not "physically impossible," nor would it "frustrate any purpose of the federal . . . scheme." *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 257 (1984); *see supra* Section IV(A)(2). As the Airlines note, Congress authorized the FAA and EPA to establish regulations and standards "in the interest of safety," "to protec[t] individuals and properties on the ground," and to reduce "air pollution . . . endanger[ing] public health or welfare." *See* Airlines' MTD at 2 (citing statutes). Congress thereby has established through legislation and in no uncertain terms that, as in the context of nuclear power, the promotion of air travel "is not to be accomplished at all costs." *Silkwood*, 464 U.S. at 257 (quotation marks omitted) (quoting *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 222 (1983)). "Congress therefore disclaimed any interest" in promoting aviation "by means that fail to provide adequate remedies for those who are injured by exposure to" pollution. *Id.* at 257 (upholding state-authorized damages). Federal regulation does not preclude state law remedies that advance the congressionally authorized regulatory scheme. *Id.*

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1    **3.    The Airlines' novel, maximalist interpretation of the collateral attack**

2    **doctrine would foreclose all meaningful review of Plaintiffs' claims and**
     **constructs a wall of immunity for all manner of claims against airlines.**

3    The Airlines suggest that Plaintiffs' remedy lies exclusively in administrative reviews

4    and analyses, petitions for new rules, and ultimate review in the Courts of Appeals. Airlines'

5    MTD at 13 n.11. But this suggestion cannot be correct because, as discussed above, *see* Section

6    IV(B)(2), Plaintiffs seek remedies that administrative agencies and appellate courts cannot

7    provide. And more fundamentally, the Airlines' argument asks the Court to adopt a radical and

8    unprecedented conclusion: that Plaintiffs and those similarly situated near Sea-Tac become

9    aviation and administrative law experts obligated to monitor proposals in the Federal Register as

10   the sole means to protect themselves, their families, and their homes from the Airlines' conduct.

11   This approach would "foreclose all meaningful judicial review" for Plaintiffs. *Thunder Basin*

12   *Coal Co.*, 510 U.S. at 212–13. Defendants point to no authority supporting their sweeping

13   conclusion that this Court must apply a minimally applicable doctrine to strip citizens of their

14   rights to bring common law tort claims against an entire industry by mere virtue of the volume of

15   federal regulation to which it is subjected generally.

16   Notably, both 49 U.S.C. § 46110 and 42 U.S.C. § 7607(b)(1) contain 60-day time limits

17   to file objections in the Courts of Appeals. Sixty days is ample time for petitioners to file when,

18   as in the Airlines' cited cases, they suffer immediately apparent, direct prejudice from agency

19   orders. *See supra*, Section IV(B)(1). In those cases, the triggering events—whether a license

20   revocation or an approval of new round-the-clock flights above a person's home—were discrete

21   and identifiable.

22   But this case is different. There is no single moment when Plaintiffs could or should have

23   been aware that Defendants were exposing them to dangerous levels of pollutants (in addition to

24   the fact that no federal law has ever authorized or required it); this case involves an aggregation

25   of toxic contaminants that reached and ultimately exceeded a safe threshold over a period of

26   years. The Airlines cite an environmental review from 1997 and new air traffic routes adopted in

27   2012 as potential triggering events, *see* Airlines' MTD at 3, 5, but Plaintiffs do not allege that

28



they (or even Defendants) knew about their injuries until a 2019 University of Washington study. SAC ¶ 86. At the time of the cited environmental review and adoption of new routes, the Airlines did not know the number of flights they would be operating decades hence, and the same is true for Plaintiffs. Plaintiffs, who possess no background in aviation or environmental science, could not have anticipated their injuries, retained appropriate experts, conducted all necessary soil assays and air samples, and filed a challenge within sixty days of these decades-old orders' finalization—particularly when Plaintiffs seek no relief from those orders.

The implication of the Airlines' argument is simple and dangerous: Plaintiffs may sue any tortfeasor that trespasses, batters, or otherwise violates a duty of care to them—except where the tortfeasor is an airline. Accepting this argument means accepting that airlines are free to disregard state law. It means conceding that airlines are uniquely entitled to close the courthouse doors on communities and families who would otherwise have valid claims. And it means allowing airlines to evade any obligation to bear the cost of the externalities they generate. This unprecedented, expansive, *de facto* immunity argument is radical, flies in the face of basic tort principles, and is contrary to Congress's intent. This Court should reject the Airlines' invocation of the collateral attack doctrine as simply "not at issue here." *Ctr. for Biological Diversity*, 847 F.3d at 1093.

## C. The subsequent purchaser rule does not bar Plaintiffs' inverse condemnation claims against the Port.

The Port argues that the "subsequent purchaser rule" bars Plaintiffs' inverse condemnation claim. Port's MTD at 21–23. But this rule, which precludes suits caused by government conduct prior to a plaintiff taking ownership of affected property, *see Maslonka v. Pub. Util. Dist. No. 1 of Pend Oreille Cnty.*, 533 P.3d 400, 406 (Wash. 2023), does not apply here. In the first place, Plaintiffs allege that their damages were caused by unmitigated contamination resulting from Defendant Airlines' increased activity causing excess toxicity to fall upon their properties after purchasing them, which confers standing for their inverse condemnation claims. *See* SAC ¶¶ 14, 23, 26-27, 30, 35, 55-59. The Port disputes this, *see* Port's MTD at 22–23, but it is a factual dispute that cannot be resolved until discovery proceeds.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

Second, Plaintiffs do not allege that they knew (or should have known) of the contamination on their properties when they purchased their properties. *See* SAC ¶¶ 58, 70 (noting the University of Washington's study confirming adverse pollution caused by Defendants in the Contamination Zone was not published until 2019, and the Public Health – Seattle & King County Report was not published until 2020). The rule's logic does not apply to Plaintiffs' claims.

> **1.    Excessive and unmitigated contamination caused by recent and more frequent activity of Defendant Airlines—as permitted by the Port—after Plaintiffs purchased their homes, gives rise to new inverse condemnation causes of action.**

The subsequent purchaser rule does not apply where, as here, plaintiffs allege that additional government action, taken after plaintiffs purchased the property at issue, has given rise to a new inverse condemnation cause of action. *Wolfe v. State Dep't of Transp.*, 293 P.3d 1244, 1247 (Wash. 2013); *Buxel v. King County*, 374 P.2d 250 (Wash. 1962) (new cause of action accrued where minor drainage problem was exacerbated by a new connection).

The Supreme Court of Washington has upheld this principle in the specific context of "the gradual expansion and development of Sea-Tac Airport." *Hoover v. Pierce Cnty.*, 903 P.2d 464, 469 (Wash. Ct. App. 1995). For example, in *Petersen v. Port of Seattle*, 618 P.2d 67, 71 (Wash. 1980), the Supreme Court held that when jet-powered aircraft began to be used at the airport, a new noise environment was created, which permitted a new taking cause of action. Four years earlier, it held that a new cause of action accrued when the number of flights at Sea-Tac had more than doubled and noisier jets had replaced propeller aircraft. *Highline School Dist. v. Port of Seattle*, 548 P.2d 1085, 1091 (Wash. 1976).

Plaintiffs have connections to properties within the Contamination Zone that stretch back decades. Cindy Codoni owns a home within the Contamination Zone that she has lived in for over 50 years. SAC ¶ 14. Michelle Geer owned an apartment complex within the Contamination Zone from 2004 until August of 2023. *Id*. ¶ 23. Ace Cathcart and his wife purchased their home within the Contamination Zone in 1995. *Id*. ¶ 26. Amy France and her husband purchased their home within the Contamination Zone in 1997. *Id*. ¶ 30. And before purchasing her home within

1    the Contamination Zone in 2021, Tamara Chakos had rented an apartment in the Contamination

2    Zone since 2014. *Id*. ¶ 35.

3         Here, by failing to take action to mitigate additional pollution caused by Sea-Tac's

4    expansion and development, the Port has damaged Plaintiffs' property, thereby giving rise to

5    new causes of action. *See* SAC ¶¶ 145-147; *Petersen*, 618 P.2d at 71 (recognizing that

6    expansions in operations support a new cause of action); *Highline*, 548 P.2d at 1091 (finding

7    increase in airport use created new cause of action). Thus, Plaintiffs have alleged actions by the

8    Port that confer standing on them for their inverse condemnation claim.

9         The Port's demurral, questioning whether "the improvement of an airport terminal . . .

10   implies increased air traffic or demand," *see* Port's MTD at 22–23, improperly applies a

11   summary judgment standard to Plaintiffs' allegations. "At the pleading stage, general factual

12   allegations of injury resulting from the defendant's conduct may suffice" to show standing.

13   *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). "Where standing is raised in connection

14   with a motion to dismiss," courts must "accept as true all material allegations of the complaint,

15   and . . . construe the complaint in favor of the complaining party." *Levine v. Vilsack*, 587 F.3d

16   986, 991 (9th Cir. 2009) (alteration in original) (citation and quotation marks omitted); *see also*

17   *Gilstrap*, 709 F.3d at 1003. Courts also "presume[e] that general allegations embrace those

18   specific facts that are necessary to support the claim." *Jewel v. Nat'l Sec. Agency*, 673 F.3d 902,

19   907 (9th Cir. 2011) (alteration in original) (citation omitted).

20        Plaintiffs' complaint alleges a nexus between Defendants' ongoing contamination of their

21   properties and harms to Plaintiffs that increase over time. SAC ¶¶ 50–97. These allegations

22   suffice for surviving a motion to dismiss based on lack of standing. *Cf. Lujan*, 504 U.S. at 561.

23   Defendants' citations to challenges pursuant to the National Environmental Policy Act are

24   inapposite insofar as the plaintiffs' burden of proof in those instances is higher than Plaintiffs'

25   burden here. *See* Port's MTD at 22–23 (citing *Barnes v. U.S. Dep't of Transp.*, 655 F.3d 1124,

26   1138 (9th Cir. 2011) (applying the Administrative Procedure Act's arbitrary and capricious

27   standard to review of agency decision-making), and *City of L.A. v. FAA*, 138 F.3d 806, 807 n.2

28   (9th Cir. 1998) (declining to question FAA's airport demand projections because "predicting

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

demand for the airport in 15 years is not so much a factual finding as a prognostication and it is due more deference" in NEPA lawsuit)).[9] Plaintiffs are required only to show that their claims are "facially plausible," and they have amply satisfied that standard here. *Iqbal*, 556 U.S. at 678.

### 2. Plaintiffs have standing to bring inverse condemnation claims against the Port notwithstanding the subsequent purchaser rule.

The subsequent purchaser rule assumes that property damage attributable to government action is known at the time of purchase and therefore affects the purchase price. *See* Port's MTD at 23 (plaintiffs "are presumed to have purchased their properties at a reduced price reflecting the damage done to those properties *prior* to their purchase"). But Plaintiffs have alleged that findings regarding airport-related contamination in the area near Sea-Tac were not publicly available until 2019 or 2020 at the earliest. *See* SAC ¶¶ 58, 61-66, 70-72 (discussing materials released by the University of Washington and by Public Health – Seattle & King County concerning pollution near Sea-Tac Airport in 2019 and 2020, respectively). As such, there is no basis to apply the rule's logic that "a subsequent purchaser pays a price that presumably reflects the diminished property value in light of this earlier taking." *Wolfe*, 293 P.3d at 1247.

The facts here contrast sharply with other cases that apply the subsequent purchaser rule, including those cited by the Port, in which the parties knew, or could and should have known, about the relevant property defect at the time of sale. *See Maslonka*, 533 P.3d at 407 (purchase price reflected "known" seasonal flooding); *Wolfe*, 293 P.3d at 1248 (record reflected that subsequent purchaser was aware the property was eroding before he purchased it and had opportunity to negotiate a price reflecting diminished property value); *Crystal Lotus Enters. Ltd. v. City of Shoreline*, 274 P.3d 1054, 1056 (Wash. Ct. App. 2012) (swamp-like condition was apparent at the time of the conveyance); *Hoover*, 903 P.2d at 469 (purchaser knew or should have known of flooding problem because county records contained notice of land's propensity for flooding).

---

[9] The *City of LA* court noted that the FAA has argued in previous environmental impact statements that bigger terminals increase use. *See* 138 F.3d at 808.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

Here, neither Plaintiffs nor their counterparties had knowledge of the degree of unabated toxic contamination from the Airlines' pollution when negotiating the purchase price for their properties. *Cf. Palazzolo v. Rhode Island*, 533 U.S. 606, 627 (2001) (declining to apply subsequent purchaser rule where it "would absolve the State of its obligation to defend any action restricting land use" and "put an expiration date on the Takings Clause").

Any claims the Port might make to the contrary raise factual questions that cannot be decided on a motion to dismiss. *See Mecinas*, 30 F.4th at 905 ("[F]actual questions . . . cannot be resolved on a motion to dismiss."). Viewing the facts "in the light most favorable to the plaintiff," *Gilstrap*, 709 F.3d at 1003, it must be accepted that Plaintiffs had no knowledge of the damage to their property at the time the property was transferred. This remains a question that can be resolved only at a later stage in the litigation. Barring Plaintiffs' inverse condemnation claims based on the subsequent purchaser rule would therefore be premature under the facts alleged.

## V.    CONCLUSION

Washington State law gives Plaintiffs the means to protect themselves and their families from individual property damage and personal injury. When tortfeasors pollute the air Plaintiffs breathe in their homes and the yards where they play with their children, the laws of nuisance, trespass, negligence, battery, and (for government defendants) the Takings Clause of the Washington Constitution, offer Plaintiffs state law causes of action and remedies to these quintessentially local issues.

In their Motions to Dismiss, Defendants ask this Court to prevent Plaintiffs at the pleading stage from advancing garden-variety state common law tort claims. They do so by advocating for an unwarranted expansion of the naturally limited jurisdiction-stripping doctrines of preemption, collateral attack, and standing. But finding in favor of Defendants runs contrary to controlling authority on each ground and offends core federalist principles of joint sovereignty and local control of property rights and other tort claims that underpin the American legal order. Plaintiffs' state-law claims are not preempted because the state and federal laws at issue govern separate fields, and because both the Proprietor Exception to preemption and the

anticommandeering doctrine apply. Plaintiffs' claims cannot be dismissed as a collateral attack on agency orders because Plaintiffs do not seek to revisit, reverse, attack, or evade any agency order or regulation. And finally, Plaintiffs have standing to bring inverse condemnation claims against the Port because Plaintiffs allege additional governmental action at Sea-Tac *after* Plaintiffs purchased their homes.

Plaintiffs respectfully request that Defendants' Motions to Dismiss be denied.

DATED: December 22, 2023                    Respectfully submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP

By:   */s/ Steve W. Berman*
        Steve W. Berman, WSBA #12536
Shayne C. Stevenson, WSBA #30843
Shelby R. Smith, WSBA #31377
Martin D. McLean, WSBA #33269
Jacob P. Berman WSBA #61063
1301 Second Avenue, Suite 2000
Seattle, Washington  98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
shaynes@hbsslaw.com
shelby@hbsslaw.com
martym@hbsslaw.com
jakeb@hbsslaw.com

Abigail D. Pershing (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
301 North Lake Avenue, Suite 920
Pasadena, CA 91101
Telephone: (213) 330-7150
Facsimile: (213) 330-7152
abigailp@hbsslaw.com

Nathan Emmons (*pro hac vice* forthcoming)
HAGENS BERMAN SOBOL SHAPIRO LLP
455 North Cityfront Plaza Drive, Suite 2410
Chicago, IL 60611
Telephone: (708) 628-4949
Facsimile: (708) 628-4950
nathane@hbsslaw.com

*Attorneys for Plaintiffs and the Putative Class*

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

**CERTIFICATE OF SERVICE**

I hereby certify that on this day I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all CM/ECF recipients.

DATED this 22nd day of December, 2023.

_s/ Steve W. Berman_
Steve W. Berman

**CERTIFICATE OF COMPLIANCE WITH WORD LIMIT**

I hereby certify that this memorandum contains 13,445 words, excluding the caption, table of contents, table of authorities, signature blocks, and certificate of service, in compliance with this Court's order dated November 14, 2023, Dkt. No. 55.

DATED this 22nd day of December, 2023.

_s/ Steve W. Berman_
Steve W. Berman

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX